## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| In re: **GRCDALLAS HOMES, LLC** | § | **Case No. 19-41186** |
| | § | |
| ***Debtor*** | § | **Chapter 11** |

## UNSWORN DECLARATION OF RYAN ROUZ

My name is Ryan Rouz. My date of birth is July 31, 1989. My address is 1111 S. Akard St. #405 Dallas, Texas 75215. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 18<u>th</u> <u>day of May, 2022</u>.

1.      GRC Dallas Homes, LLC., retained me for three lawsuits referred to in this Bankruptcy as "the Causes of Action." The three Causes of action are:

a.  GRC v. Turner (20-2890-158)

b.  GRC v. Autry (21-6053-158)

c.  GRC v. Freeman (20-2993-16)

2.       In addition to the aforementioned causes of action, GRC asked me to investigate a potential cause of action against Statebridge Company, LLC., and DB RR, LLC. After investigating the facts, I decided that GRC had a legitimate claim against the Statebridge and DBRR, LLC. I drafted an original petition for GRC. **(See Exhibit 1)**. However, the original petition was never filed for two reasons. First, GRC did not have any money. Second, and the more important reason is due to the extreme pressure Kaz is already under. I know that Kaz cannot add any more lawsuits to his plate at this moment.

3.      Since September 30, 2020, GRC requested a payoff on the loans. **(See Exhibit 2)**. After GRC's initial request, a second request was sent on November 16, a third request was made on November 30, a fourth request was made on December 14, and a fifth request was made on December 21. Finally, on December 29, GRC was provided with the requested payoffs; however, the payoffs were only good through December 31, 2020. **(See Exhibit 3)**. GRC's requests were communicated to and/or directed to counsel for Statebridge, Statebridge itself, Statebridge Foreclosure, and Statebridge Bankruptcy.

4.      It took Statebridge **three (3) months** to provide GRC with payoffs on the requested loans. And when Statebridge did finally provide the payoffs, they were only good for **two (2) days**. Unfortunately for GRC, the self-serving tactics by Statebridge did not stop there. The icing on the cake was the inaccurate accounting by Statebridge on the unreasonably delayed payoff statement. Statebridge's payoff statement states "[t]he next payment is due on 11/1/2020." Counsel for Statebridge also alleges that "loans are due for 11/01/2020, which means [GRC is] 60 days behind on plan payments . . . ." This is false, as November payments cleared on October 29, 2020. **(See Exhibit 4)**.

5.      Fast forward to March 9, 2022. DBRR mailed its notice of acceleration and notice of trustee's sale to GRC. **(See Exhibit 5)**. GRC did not receive the notice until March 22, 2022. The foreclosure was scheduled for April 5, 2022. I e-mailed a payoff request to Michael Burns, attorney for DBRR, that same day. **(See Exhibits 6 and 7)**. Mr. Burns responded the same day, he acknowledged receipt of the payoff statement and forwarded the payoff request for processing. Approximately four (4) hours later, I sent Mr. Burns an e-mail with the intent to buy GRC some extra time to avoid the foreclosure.

6.      On March 23, 2022, Mr. Burns responded by saying. "Since GRC has no good faith intent to pay off the lien (as is made apparent in this message) DB RR, LLC will not be providing payoff information." On March 25, 2022 I spoke with Mr. Burns on the phone. I tried to negotiate a deal with DBRR where GRC would pay for DBRR's attorney fees and the outstanding balance in exchange for DBRR cancelling the foreclosure sale and reinstating the loan. On March 31, 2022, Mr. Burns responded, "Hi Ryan – the beneficiary denies the request to cancel the foreclosure sale. It intends to proceed with the 04/05/2022 foreclosure sale as scheduled. The requested payoff quote is attached. Thanks." **(See Exhibit 8)**.

7.      I have little to no knowledge of Bankruptcy law. For this reason, Kaz had to rely exclusively on his Bankruptcy lawyer to discuss possible ways of delaying the foreclosure. However, on March 31, 2022 Kaz and Greg seemed to butt heads. As I recall, Greg was busy throughout the day with other matters, but was trying to help Kaz. As the day progressed, Kaz became more stressed out and was desperately trying to find a solution. I recall Kaz stating he was going to have a phone call with Greg. I also recall the conversation took place after 5pm. I want to be clear that I was not privy to this particular conversation. However, Kaz informed me that he got into with Greg. Later, Kaz sent me a screen shot of a text between himself and Greg, where Greg said, "I'll call you tomorrow when I'm in a better mood and you're not being a dick to me." **(See Exhibit 9)**.

8.      Greg and Kaz did not speak for _three weeks_ after this incident. Kaz felt as though his lawyer abandoned him at a time of need. In this situation, I sympathize with both sides. As a lawyer, I sympathize with Greg because he is taking calls after-hours. In addition, Greg, much like myself, have not been paid in approximately one year. It is hard to remain a zealous advocate for your client when you feel as though you are working for free. I also sympathize

with Kaz because he too has not been paid in approximately one year. Kaz explained that he feared letting Shady Lane being foreclosed and selling at auction for less than the payoff amount – leaving GRC with one less property and deficiency. Furthermore, I sympathize with Kaz because of the numerous times he felt as though he was stonewalled by Robert Nicoud with his scorched Earth litigation. More importantly, Kaz expressed many times that he has completely lost trust in his Plan Agent, Chris Moser.

9.      Here are some notable examples of Kaz getting "stonewalled" by Robert Nicoud and/or Chris Moser, examples of Moser and Nicoud working very closely together, and examples of GRC getting hit with bad luck/bad timing:

   a.   Chris Moser stopped a $100,000 payment to Construction Consultant **(See Exhibit 10, Page 32, Line 15 – Page 33, Line 13),** which caused to contractors to stop working on the house – leaving Kaz to perform all the work himself **(See Exhibit 10, Page 78, Lines 6-14).**

   b.   Chris Moser shared confidential GRC information with Robert Nicoud without permission from GRC. **(See Exhibit 14).**

   c.   Robert Nicoud filed 3 frivolous writs of garnishment and dismissing each of them on the day of the hearing. **(See Exhibit 10, Page 60, Lines 3-25) (See also Exhibits 17 and 17).**

   d.   Chris Moser surprised Kaz during a TRO hearing in June 2021 with offers on the properties. Instead of disclosing the existence of the offers to Kaz, Chris chose to wait until the day of the hearing and

   e.   Chris Moser lets Robert Nicoud drive the bus. **(See Exhibit 10, Page 69, Line 2 – Page 70, Line 10).**

f. I will refrain from making any comments here. But I ask the Trustee to read this. **(See Exhibit 10, Page 94, Line 23 – Page 104, Line 21).**

g. In the months leading to March 22, 2022, GRC was planning on filing a motion to sell. **(See Exhibit 6, Page 7)**. GRC did not believe it needed to file a motion to sell. However, GRC wanted to avoid/minimize the objections filed by Robert Nicoud. Unfortunately, GRC's plan to file a motion to sell fell apart upon GRC receiving the *Notice of Acceleration and Notice of Trustee's Sale*.

h. On April 22, 2022, GRC finally filed its *Motion to Sell*. On April 25, the Trustee filed a *Motion to Convert or Dismiss*. On April 27, the prospective purchaser rescinded his offer after discovering a defective chain of title. The same day, Greg Mitchell filed a *Motion to Withdraw*. Despite a string of bad luck, Kaz did not stop fighting to maximize the estate's assets.

10. On the morning of April 1, 2022, I told Kaz that I would try to save the property from foreclosure to prevent GRC from being converted to Chapter 7.

11. On April 1, 2022 at 4:10 P.M., I sent Mr. Burns the following e-mail with the hopes of delaying the foreclosure: "Hi Michael, My client disputes the amount claimed by DBRR in the payoff statement. Your client is hereby put on notice of GRC's imminent DTPA claim. A formal DTPA notice is forthcoming." Mr. Burns responded, "Thank you for the notice Ryan. Dispute that your client is a consumer under the DTPA. The mortgagee will seek to recover all costs and fees incurred to defend against any baseless claims." I received Michael's email at 4:37 P.M., on Friday April 1, 2022. At this moment, there was only 1 business day separating DBRR from foreclosing on the property on April 5, 2022.

12.    After receiving Michael's email at 4:37 P.M., on Friday April 1, 2022, I drafted a lawsuit against DBRR. **(See Exhibits 11, 12, 13)**. My intent was to file a TRO to try to keep the property out of foreclosure. I wanted to argue that the payoff amount was incorrect. However, at this point there was very little time left and I could not identify with certainty that the payoff amount was incorrect. I finally realized there was nothing I could do to delay or stop the foreclosure, outside of paying off DBRR.

13.    I had the funds to prevent the foreclosure. However, I was not sure whether to purchase the property from GRC or whether I should give a loan to GRC so GRC could then pay off the mortgage. Again, I am unfamiliar with Bankruptcy law. I felt as though giving a loan to GRC would pose a higher risk for me.

14.    On April 4, 2022, at 4:14 P.M., I sent a wire transfer of $191,000 to DBRR. **(See Exhibit 6)**. I was nervous, even at this point that I would not be able to stop the foreclosure in time.

15.    On the day of the foreclosure auction - Tuesday, April 5, 2022, at 8:55 AM, Mr. Burns sent me an e-mail confirming receipt of the wire and accepted and the foreclosure sale was cancelled. **(See Exhibit 6)**. After the wire was accepted, Kaz executed a general warranty deed. I recorded the warranty deed on April 21, 2022. **(See Exhibit 15)**.

Respectfully,

**/s/ Ryan Rouz**
Ryan Rouz
1111 S. Akard St. #405
Dallas, Texas 75215
T: 469-777-1451
F: 469-666-9291
e-mail: ryan@rouzlaw.com

| | | |
|---|---|---|
| **GRCDALLASHOMES, LLC** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **STATEBRIDGE COMPANY, LLC AND** | § | |
| **DB RR, LLC** | § | |
| **Defendants.** | § | **OF DENTON COUNTY, TEXAS** |

<u>**PLAINTIFF'S ORIGINAL PETITION**</u>

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES GRCDallasHomes, LLC, hereinafter called Plaintiff, complaining of and about Statebridge Company, LLC and DB RR, LLC, hereinafter called Defendants, and for cause of action shows unto the Court the following:

**DISCOVERY CONTROL PLAN LEVEL**

1.      Plaintiff intends that discovery be conducted under Discovery Level 2.

**PARTIES AND SERVICE**

2.      Plaintiff, GRCDallasHomes, LLC, is a Limited Liability Company whose address is 13220 Beach Club Road, The Colony, Texas 75056.

3.      Defendant Statebridge Company, LLC, a Nonresident Limited Liability Company, may be served with process by serving the registered agent of said company, InCorp Services, Inc., at 36 South 18th Avenure, Suite D, Brighton, CO, 80601, its registered office. Service of said Defendant as described above can be effected by certified mail, return receipt requested.

4.      Defendant DB RR, LLC, a Nonresident Limited Liability Company, may be served with process by serving the registered agent of said company, THE CORPORATION TRUST COMPANY, at 1209 ORANGE ST, WILMINGTON, New Castle, DE, 19801, its

registered office. Service of said Defendant as described above can be effected by certified mail, return receipt requested.

## JURISDICTION AND VENUE

5. The subject matter in controversy is within the jurisdictional limits of this court.

6. Plaintiff seeks:

a. only monetary relief of $250,000 or less, excluding interest, statutory or punitive damages and penalties, and attorney fees and costs.

7. This court has jurisdiction over Defendant Statebridge Company, LLC, because said Defendant purposefully availed itself of the privilege of conducting activities in the state of Texas and established minimum contacts sufficient to confer jurisdiction over said Defendant, and the assumption of jurisdiction over Statebridge Company, LLC will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

8. Furthermore, Plaintiff would show that Defendant Statebridge Company, LLC engaged in activities constituting business in the state of Texas as provided by Section 17.042 of the Texas Civil Practice and Remedies Code, in that said Defendant contracted with a Texas resident and performance of the agreement in whole or in part thereof was to occur in Texas.

9. This court has jurisdiction over Defendant DB RR, LLC, because said Defendant purposefully availed itself of the privilege of conducting activities in the state of Texas and established minimum contacts sufficient to confer jurisdiction over said Defendant, and the assumption of jurisdiction over DB RR, LLC will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

10. Venue in Denton County is proper in this cause under Section 15.011 of the Texas

Civil Practice and Remedies Code because this action involves real property as provided by said Section, and this county is where all or part of the real property is located.

## FACTS

11.     Statebridge issued loans to GRC for a property located at 6012 Mayes Place, The Colony, Texas 75056. DB RR, LLC purchased the loans from Statebridge. Statebridge remained the servicer of the loans. GRC filed for Bankruptcy on May 3, 2019.

12.     Since **September 30, 2020**, GRC requested a payoff on the loans.  After GRC's initial request, a <u>second</u> request was sent on **November 16**, a <u>third</u> request was made on **November 30**, a <u>fourth</u> request was made on **December 14**, and a <u>fifth</u> request was made on **December 21**.  Finally, on December 29, GRC was provided with the requested payoffs; however, the payoffs were only good through **<u>December 31, 2020</u>**.  GRC's requests were communicated to and/or directed to counsel for Statebridge, Statebridge itself, Statebridge Foreclosure, and Statebridge Bankruptcy.  Despite that, Statebridge still failed to respond within a reasonable amount of time to GRC's request.  It goes without saying that a delayed response to the benefit of Statebridge at GRC's detriment.

13.     It has taken Statebridge **three (3) months** to provide GRC with payoffs on the requested loans.  And when Statebridge did finally provide the payoffs, they were only good for **<u>two (2) days</u>**.  The delay by Statebridge in providing the payoff statement is a far cry from being provided within a reasonable amount of time of the initial request.  To add insult to injury, the payoff statement finally provided by Statebridge three (3) months after the initial request was unreasonable in and of itself, as it was only good for a period of two (2) days.  Unfortunately for GRC, the self-serving tactics by Statebridge did not stop there.  The icing on the cake was the <u>inaccurate</u> accounting by Statebridge on the unreasonably delayed payoff statement.  The

Statebridge payoff statement states "[t]he next payment is due on 11/1/2020."[2] Counsel for Statebridge also alleges that "loans are due for 11/01/2020, which means [GRC is] 60 days behind on plan payments . . . ."[3] This is false, as November payments cleared on October 29, 2020.[4]

14.     The repeated incidents of improper accounting by Statebridge, coupled with its inability to provide payoff statements within a reasonable amount of time from the time of the request has damaged GRC.  Specifically, GRC has 1) incurred monthly payments and insurance on the subject properties; 2) incurred carrying costs on the subject properties; 3) incurred additional fees and expenses, including interest, default interest, and miscellaneous fees assessed by Statebridge; and 4) has been named a party to a lawsuit as a result of its inability to close on a pending transaction.

## BREACH OF CONTRACT

15.     Plaintiff incorporates by reference paragraphs 11-14 herein,

16.     A valid contract existed between the Parties.

17.     Defendants had a duty to provide an accurate payoff statement by the eighth business day after the date the request is received, pursuant to Title 7, Section 155.3 of the Texas Administrative Code.

18.     Plaintiff performed or tendered performance under the contract.

19.     Defendant breached the contract.

20.     Plaintiff was damaged because of the breach.

## FRAUD

19.     Plaintiff incorporates by reference paragraphs 11-14 herein,

20.     Defendant made a representation to the Plaintiff.

21. The representation was material.

22. The representation was false.

23. Defendant made the representation knowingly or recklessly

24. Defendant made the representation with the intent that the Plaintiff act on it.

25. Plaintiff relied on the representation.

26. The representation caused the Plaintiff injury.

### DAMAGES FOR PLAINTIFF, GRCDALLASHOMES, LLC

27. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff, GRCDallasHomes, LLC, was caused to suffer economic losses of $8,336.51 and attorney fees.

### PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, GRCDallasHomes, LLC, respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants, jointly and severally, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

By: /s/ Ryan Rouz
    Ryan Rouz
    Texas Bar No. 24093079
    Email: ryan@rouzlaw.com
    1111 S. Akard St. #405
    Dallas, TX 75215
    Tel. (469) 777-1451
    Fax. (469) 666-9291

Attorney for Plaintiff

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

**To:** kaz danesh <cancunkaz@hotmail.com>
**Cc:** Christopher Moser <cmoser@qslwm.com>; Rod Khavari <rodk@dfwlawgroup.com>; Ashley Hill <Ashley.Hill@padgettlawgroup.com>
**Subject:** RE: Subject: RE: GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady lane north keller

I will advise them of your message below. If you do not intend to make any additional plan payments, please let me know, so that we may proceed accordingly. Thanks.



**Kim Moses Linden**
5501 LBJ Freeway, Suite 925
Dallas, Texas 75240
(850) 422-2520 Office
(850) 422-2567 Fax
Kim.Linden@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Louisiana*

Escalation Contact: Keena Newmark, Managing Attorney Bankruptcy, Keena.Newmark@Padgettlawgroup.com

---

**From:** kaz danesh <cancunkaz@hotmail.com>
**Sent:** Tuesday, December 29, 2020 4:57 PM
**To:** Kim Linden <Kim.Linden@padgettlawgroup.com>
**Cc:** Christopher Moser <cmoser@qslwm.com>; Ashley Hill <Ashley.Hill@padgettlawgroup.com>; Rod Khavari <rodk@dfwlawgroup.com>
**Subject:** Re: Subject: RE: GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady lane north keller

Thanks Kim, but ive been waiting over 3 months for these from your office and over 2/3 weeks from requesting them from statebridge, statebridge foreclosure and statebridge bancruptcy
Ive already incurred damages and expenses and I have previously authorized my state litigation attorney to send out a notice for DTPA which statebridge should be receiving shortly and to file suit

> On Dec 29, 2020, at 4:50 PM, Kim Linden <Kim.Linden@padgettlawgroup.com> wrote:
>
> Mr. Danesh, please find attached the requested payoffs. Please also note that the loans are due for 11/01/2020, which means you are 60 days behind on plan payments, and January payments will be due next week. Please advise when these payments will be made. Thanks.
>
> <image001.png>
>
> **Kim Moses Linden**
> 5501 LBJ Freeway, Suite 925
> Dallas, Texas 75240
> (850) 422-2520 Office
> (850) 422-2567 Fax
> Kim.Linden@Padgettlawgroup.com
> www.padgettlawgroup.com
> *Licensed in Texas & Louisiana*
>
> Escalation Contact: Keena Newmark, Managing Attorney Bankruptcy, Keena.Newmark@Padgettlawgroup.com
>
> ---
>
> **From:** kaz danesh <cancunkaz@hotmail.com>
> **Sent:** Monday, December 21, 2020 6:02 PM

**To:** Kim Linden <Kim.Linden@padgettlawgroup.com>
**Subject:** Re: Subject: RE: GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady lane north keller

Kim,
Checking in to see if you have received payoff from statebridge

> On Dec 14, 2020, at 9:48 AM, kaz danesh <cancunkaz@hotmail.com> wrote:
>
> Kim just doing a weekly checkin. I didnt hear from you below. Im hoping you have the payoff.
>
> Hi Kim just checking in with you again on this, coming up on 6 weeks though no fault of your own I understand but I'd really like to see if we can get these payoffs and try to start moving into some settlement talks
>
> As you can see by the motion that was filed by one of the unsecured creditors they're trying to get a disbursement but Im trying to get your client settled before dealing with unsecured creditors just in case my company goes into chapter 7 before the 5 years (we are at year one)
>
> I just sold a house and Had 313,000 as per the motion in the Plan Agents account
> I'm down to around 250k now after paying expenses for GRC which We can confirm that thru the PA when settlement talks start so your client knows exactly
>
> Please see if you can get the payoffs asap, make sure they are at the 5.5% and see if we can move on to trying to get these settled so your client can be done with this BK and the wait at such a low interest rate when they are used to getting double that via their hard money.
>
> Please let me know
>
>
>> On Nov 30, 2020, at 11:40 AM, Kim Linden <Kim.Linden@padgettlawgroup.com> wrote:
>>
>> Thanks, I haven't gotten the reapplication yet, but will continue to work to obtain those current payoff numbers.
>>
>> _____
>> **From:** kaz danesh <cancunkaz@hotmail.com>
>> **Sent:** Monday, November 30, 2020 8:02 AM
>> **To:** Kim Linden <Kim.Linden@padgettlawgroup.com>
>> **Cc:** Christopher Moser <cmoser@qslwm.com>; Ashley Hill <Ashley.Hill@padgettlawgroup.com>; joyce@joycelindauer.com
>> **Subject:** Re: Subject: RE: GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady lane north keller
>>
>> Hi Kim,
>> Hope you had a good holiday week Just checking in on the above payoffs and accounting to make sure accurate in hopes of coming to a mutual agreement
>> Please let me know
>>
>>
>>> On Nov 16, 2020, at 1:54 PM, Kim Linden <Kim.Linden@padgettlawgroup.com> wrote:
>>>
>>> Mr. Daneshmandi,
>>>
>>> Thank you for your inquiry. I am working on the payoffs - every time they are prepared another payment is made. I am hoping to get those updated numbers to you this week.
>>>
>>> With respect to settlement, if you would like to propose an offer I will certainly forward it to Statebridge, otherwise, continued payment under the plan is preferred.
>>>
>>> Also, below you stated that "[p]er my plan I am paying 5% interest on these notes". Please note that the plan provides for interest on both properties to be paid at 5.5%. See Docket No. 140, Sections 3.08(b) and 3.09(b).
>>>
>>> Please let me know if you have any additional questions or concerns.

&lt;image001.png&gt;

**Kim Moses Linden**
5501 LBJ Freeway, Suite 925
Dallas, Texas 75240
(850) 422-2520 Office
(850) 422-2567 Fax
Kim.Linden@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Louisiana*

Escalation Contact: Keena Newmark, Managing Attorney Bankruptcy,
Keena.Newmark@Padgettlawgroup.com

---

**From:** kaz danesh <cancunkaz@hotmail.com>
**Sent:** Monday, November 16, 2020 1:30 PM
**To:** Kim Linden <Kim.Linden@padgettlawgroup.com>
**Cc:** Christopher Moser <cmoser@qslwm.com>; Ashley Hill <Ashley.Hill@padgettlawgroup.com>
**Subject:** Re: Subject: RE: GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady lane north keller

Hi Kim,
I was writing to see if your client has any interest in settling this matter as my previous email asked.
As well I would like to get a payoff for the 2 outstanding loans good for 30 days so that I can make sure the terms of the plan are outlined in the interest rate.
Can you let me know on the above

Thanks

> On Sep 30, 2020, at 4:35 PM, Kim Linden <Kim.Linden@padgettlawgroup.com> wrote:
>
> Mr. Daneshmandi,
>
> I am in receipt of your communication below and have forwarded your request to Statebridge.
>
> I understand the terms of the confirmed plan and GRC's obligations with respect to same. The reference to a six month period to sell the properties, I believe, arose in between prior counsel's communication on curing the first post-confirmation plan payment delinquencies, but I was unable to confirm the offer was ever accepted by both sides.
>
> I will let you know as soon as I hear anything, if Statebridge is interested in discussing your below proposal any further. Thank you.
>
> &lt;image001.png&gt;
>
> **Kim Moses Linden**
> 5501 LBJ Freeway, Suite 925
> Dallas, Texas 75240
> (850) 422-2520 Office
> (850) 422-2567 Fax
> Kim.Linden@Padgettlawgroup.com
> www.padgettlawgroup.com
> *Licensed in Texas & Louisiana*
>
> Escalation Contact: Keena Newmark, Managing Attorney Bankruptcy,
> Keena.Newmark@Padgettlawgroup.com

---

**From:** kaz danesh <cancunkaz@hotmail.com>
**Sent:** Wednesday, September 30, 2020 11:15 AM
**To:** Kim Linden <Kim.Linden@padgettlawgroup.com>

Hi Kim,
My name is Kazem Daneshmandi and am owner of GRC which is in BK protection under my plan

As per your email below you state that there is a 6 month plan or argreement that the properties would be marketed or sold. There is no such language in my plan and was not part of my plan. Please coordinate with statebridge that I am planning on taking the entire 5 years of restructuring to get these properties rehabbed and sold. Per my plan I am paying 5% interest on these notes. I know statebridge services or sells these notes off for significatinaly higher rate so these have and will become and stay losses for their investors and statebridge

Im reaching out today to see if your client would like to settle the claims for a reduced settlement fee of the payoffs so that their money doesnt have to be paid in 5 years and can be made as close to whole as possible. I will need a significant settlement proposal for me to work with my PA to settle these properties with GRC funds in my DIP acct

Statebridge for years overcharged me on interest and points as well as junk fees and has withheld considerable amounts that are due back to me that they make clients jump thru hoops to regain   I would like to put the statebridge chapter behind me but in no means am I willing to just settle for anywhere near what a current payoff would be at 5%
Please generate a payoff good for 60 days out which should give both of us time to settle this debt if your client chooses. Please forward the payoff so that we can make sure the accounting is correct on it per the plan and judges orders. Please ensure that the % being charged is the lower amount and has been for the last year and that the additional money in the payment is being credited to principal   Please send a detailed accounting report Then please coordinate with your client on an offer they would like to present to GRC at that point I will talk to the PA Chris Moser and see what funds are avail to settle one or both if the terms are acceptabke. Please be advised that my DIP acct has approx 200k in it and am hoping for a non state bridge house to sell in the next 60 days which will give me more money to settle. As noted above I am not planning on selling the statebridge houses for up to 5 years

Thanks. Any questions please email

---

**From:** Kim Linden <Kim.Linden@padgettlawgroup.com>
**Sent:** Monday, July 13, 2020 1:55 PM
**To:** cmoser@qslwm.com; Joyce Lindauer <joyce@joycelindauer.com>
**Subject:** RE: GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady Lane North

Good afternoon, I'm just following up on the below. Statebridge has informed me that Chris has submitted payment for July, but should we be expecting payment from the Debtor for the other plan payments?  Also is the Debtor going to provide proof of insurance.

Thanks, and hope all is well.

<image001.png>

**Kim Moses Linden**
5501 LBJ Freeway, Suite 925
Dallas, Texas 75240
(850) 422-2520 Office
(850) 422-2567 Fax
Kim.Linden@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Louisiana*

Escalation Contact: Keena Newmark, Managing Attorney Bankruptcy, Keena.Newmark@Padgettlawgroup.com

**From:** Kim Linden
**Sent:** Wednesday, June 24, 2020 4:35 PM
**To:** cmoser@qslwm.com; joyce@joycelindauer.com
**Subject:** GRC Dallas 19-41186 / 6012 Mayes Place & 1005 Shady Lane North

Chris / Joyce,

Hope all is well.  I am following up on the prior communications with Bruce Akerly regarding the debtors plan payments in this post-confirmation case.

The Plan states that Debtor will be making these payments, but it seems like Chris might also be disbursing, so I am including both of you.  The Debtor has not made any additional payments under the plan, and has yet to provide Statebridge with proof of insurance on these properties.  In addition, Statebridge is requesting an update on the Debtor's marketing efforts or listing of the properties pursuant to the agreement that this would be done within six months.

See attached Notices of Default.  You will also receive the appropriate copy by mail.  Please let me know if you think this matter can be resolved.

Thanks so much.

**<image001.png>**

**Kim Moses Linden**
5501 LBJ Freeway, Suite 925
Dallas, Texas 75240
(850) 422-2520 Office
(850) 422-2567 Fax
(972) 989-7925 Cell
Kim.Linden@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Louisiana*

Escalation Contact: Keena Newmark, Managing Attorney Bankruptcy, Keena.Newmark@Padgettlawgroup.com

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Tuesday, February 11, 2020 10:47 AM
**To:** Bruce Akerly <bakerly@akerlylaw.com>
**Cc:** joyce@joycelindauer.com; Kimberly Hill <kimhill@qslwm.com>
**Subject:** GRCDallas

Bruce,

On Thursday of last week I received the funds from the DIP account and deposited the funds into my account. I can now start making plan payments. Please verify that your client is owed 2 months of payments. Do you want the payments made to your client or to you.

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**

**Texas Board of Legal Specialization**
**Quilling, Selander, Lownds, Winslett & Moser, P.C. | 2001 Bryan**
**Street, Suite 1800, Dallas TX 75201**
**Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email:**
**cmoser@qslwm.com**

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. Thank you for your time and attention to this matter.

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this

email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.
&lt;39786_GRC Dallas Homes LLC_1005 Shady Lane North_payoff gtd 12.31.2020.pdf&gt;
&lt;39726_GRC Dallas Homes LLC_6012 Mayes Place_payoff gtd 12.31.2020.pdf&gt;

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.



STATEBRIDGE.

December 29, 2020

GRC DALLAS HOMES LLC
13220 BEACH CLUB ROAD
THE COLONY TX  75056

Payoff figures have been requested on the loan for the borrower and property described below.

Loan ID:  0000039726
Loan Type: Commercial
GRC HOMES LLC
KAZEM DANESHMANDI
6012 MAYES PLACE
THE COLONY, TX  75056

When remitting funds, please use our loan number to ensure proper posting and provide us with the borrower's forwarding address. Funds received in this office after 12:00 noon will be processed on the next business day, with interest charged to that date. All funds must be certified:  money order, wire, Western Union, or cashier's check.

All payoff figures are subject to clearance of funds in transit. The payoff is subject to final audit when presented. Any overpayment or refunds will be mailed directly to the borrower. We will prepare the release of our interest in the property after all funds have cleared.

| **Projected Payoff Date** | **12/31/2020** |
|---|---|
| Principal Balance | $156,036.31 |
| Interest Thru 12/31/2020 (92 days $23.51/day) | $2,159.22 |
| Default Interest thru 12/31/2020 (31 days @ $13.00/day) | $403.00 |
| Fees | $69.50 |
| Prepayment Penalty | $0.00 |
| Release Fees | $69.00 |
| Funds owed by borrower (escrow advance) | $133.10 |
| Funds owed to borrower | ($775.00) |
| **Total Payoff** | **$158,095.13** |
| Per diem | $36.51 |

The next payment due is 11/1/2020. Payments are made by ACH on a Monthly basis. The current interest rate is 5.50000%.  The default rate is 3%.

**PLEASE CONTACT US TO UPDATE FIGURES PRIOR TO REMITTING FUNDS AS THEY ARE SUBJECT TO CHANGE WITHOUT NOTICE.**

Statebridge Company, LLC
6061 S. Willow Drive
Suite 300
Greenwood Village, CO  80111
(866) 466-3360
(720) 600-7894  Fax
payoff@statebridgecompany.com

Statebridge Company, LLC is a debt collector and is attempting to collect a debt.  Any information obtained may be used for that purpose.  If you are in active bankruptcy or have previously received a discharge in bankruptcy, this correspondence is not and should not be construed to be an attempt to collect a debt, but a possible enforcement of a lien against property.



**GRC HOMES LLC  -  Loan ID #0000039726**

## <u>FEE DETAILS</u>

| <u>Description</u> | <u>Amount</u> |
|---|---|
| BPO | $70.00 |
| Inspections | ($0.50) |
| | **$69.50** |

Statebridge Company, LLC is a debt collector and is attempting to collect a debt.  Any information obtained may be used for that purpose.  If you are in active bankruptcy or have previously received a discharge in bankruptcy, this correspondence is not and should not be construed to be an attempt to collect a debt, but a possible enforcement of a lien against property.



# BANK WIRE/ACH INSTRUCTIONS

## Statebridge Company C Collections

Community Banks of Colorado,
a division of NBH
1111 Main Street, Suite 2800
Kansas City, MO 64105

ROUTING 102102013
ACCOUNT 2080151

BENEFICIARY: Statebridge Company

Please reference the loan # or account number in all ACH/Wires.  Please be sure to include beneficiary name to ensure your wire is credited to your account.

Statebridge Company, LLC is a debt collector and is attempting to collect a debt.  Any information obtained may be used for that purpose.  If you are in active bankruptcy or have previously received a discharge in bankruptcy, this correspondence is not and should not be construed to be an attempt to collect a debt, but a possible enforcement of a lien against property.



Check 3182 Amount 142.28 Date 10/29/2020

Check 3182 Amount 142.28 Date 10/29/2020

Check 3183 Amount 162.11 Date 10/29/2020

Check 3183 Amount 162.11 Date 10/29/2020

Check 3184 Amount 897.01 Date 10/29/2020

Check 3184 Amount 897.01 Date 10/29/2020

Check 3185 Amount 1021.67 Date 10/29/2020

Check 3185 Amount 1021.67 Date 10/29/2020

P.O. Box 23159
San Diego, CA 92193-3159

.

IMPORTANT INFORMATION
ENCLOSED



(11) 969 0024 8258 9453 1

**Mailed On:** 3/9/2022      **Order Number:** 0170190-01
**ClientID:** Padgett_000461 FC **Reference Number:**   19-005174

GRC D Home LLC
13220 Beach Club Road
The Colony, TX 75056



The Padgett Law Group has been retained to enforce a security interest through foreclosure of your property. Although this firm may not be a "debt collector" as defined by section 1692a (6), and although this firm is merely enforcing a security interest, please be advised that to the extent that this is an attempt to collect a debt, any information obtained will be used for that purpose. If you are in bankruptcy or have been discharged in bankruptcy, this letter is for informational purposes only and is no intended as an attempt to collect a debt or as an act to collect or recovery all or any portion of the debt from you personally.

Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active-duty military service to the sender of this notice immediately.

March 9, 2022

Kazem Daneshmandi
13220 Beach Club Road
The Colony, TX 75056

Via certified mail return receipt requested and first-class mail.

RE:   Property Address: 1005 Shady Lane North, Keller, TX 76248
Loan No.: 0000039786
Our File No.: 19-005174-5
Holder of Account: Statebridge Company, LLC

The Padgett Law Group has been retained to represent Statebridge Company, LLC, whose address is 6061 S Willow Drive, Suite 300, Greenwood Village, CO 80111 which, if it is not the current mortgagee, is acting as the mortgage servicer and representing the current mortgage pursuant to a mortgage servicing agreement concerning the note and Deed of Trust associated with the above referenced loan number.

We have been requested to pursue non-judicial foreclosure in accordance with the terms



of the Note and Deed of Trust and applicable law.  Consequently, the following notices are provided to you:

1. The maturity date of the Note is hereby accelerated, all sums secured by the Deed of Trust are declared to be immediately due and payable, and our firm will cause to be enforced the Power of Sale clause in the Deed of Trust, which provides for the sale of the above-referenced property, at a public foreclosure sale in the time and manner permitted by law.
2. The property has been scheduled for foreclosure sale on Tuesday, April 5, 2022, between the hours of 10:00 am - 1:00 pm at THE BASE OF THE COURTHOUSE STEPS ON THE EAST SIDE OF THE BUILDING, Tarrant County, Texas. If the preceding area is no longer the designated area, the place of sale will be at the area most recently designated by the County Commissioner's Court. This sale shall commence between 10:00 am - 1:00 pm or within three hours after. The property will be sold to the highest bidder for cash.

Attached for your review is a copy of the notice of acceleration and notice of trustee's sale which has been or will be filed with the Tarrant County clerk and posted at the courthouse door or other location designated by the County Commissioner's Court.

Written requests should be addressed to this law firm as follows: Timothy D. Padgett, P.A., 6267 Old Water Oak Road, Suite 203, Tallahassee, FL 32312.

Sincerely,

Padgett Law Group
6267 Old Water Oak Road, Suite 203
Tallahassee, FL 32312
Telephone: (850) 422-2520

# NOTICE OF ACCELERATION AND NOTICE OF TRUSTEE'S SALE

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

## DEED OF TRUST INFORMATION:

| | |
|---|---|
| Date: | **January 25, 2017** |
| Grantor(s): | **GRCDALLASHOMES LLC** |
| Original Mortgagee: | **BLACK SQUARE REAL ESTATE, INC.** |
| Original Principal: | **160,000.00** |
| Recording Information: | **D217028144** |
| Property County: | **Tarrant** |
| Property: | **LOT 13, BLOCK 2, BUCHANAN SUBDIVISION, AN ADDITION TO THE CITY OF KELLER, TARRANT COUNTY, TEXAS, ACCORDING TO THE MAP OR PLAT THEREOF RECORDED IN VOLUME 388-10, PAGE 14, PLAT RECORDS OF TARRANT COUNTY, TEXAS.** |
| Property Address: | **1005 Shady Lane North Keller, TX 76248** |

## MORTGAGE SERVICING INFORMATION:
**The Mortgage Servicer, if not the Current Mortgagee, is representing the Current Mortgagee pursuant to a Mortgage Servicing Agreement.**

| | |
|---|---|
| Current Mortgagee: | **DB RR, LLC** |
| Mortgage Servicer: | **Statebridge Company, LLC** |
| Mortgage Servicer Address: | **5680 Greenwood Plaza Blvd. Suite 100S Greenwood Village, CO 80111** |

## SALE INFORMATION:

| | |
|---|---|
| Date of Sale: | **April 5, 2022** |
| Time of Sale: | **10:00 am or within three hours thereafter.** |
| Place of Sale: | **At the base of the Courthouse steps on the east side of the building or, if the preceding area is no longer the designated area, at the area most recently designated by the County Commissioner's Court.** |
| Substitute Trustee: | **David Stockman, Donna Stockman, Guy Wiggs, Brenda Wiggs, Janet Pinder, Kathy Arrington or Michelle Schwart, any to act** |
| Substitute Trustee Address: | **5501 East LBJ Frwy, Ste. 925 Dallas, TX 75240** |

WHEREAS, the above-named Grantor previously conveyed the above described property in trust to secure payment of the Note set forth in the above-described Deed of Trust; and



WHEREAS, a default under the Note and Deed of Trust was declared, such default was reported to not have been cured, and all sums secured by such Deed of Trust are declared immediately due and payable.

WHEREAS, the original Trustee and any previously appointed Substitute Trustee has been removed and David Stockman, Donna Stockman, Guy Wiggs, Brenda Wiggs, Janet Pinder, Kathy Arrington or Michelle Schwart, any to act, have been appointed as Substitute Trustees and authorized by the Mortgage Servicer to enforce the power of sale granted in the Deed of Trust; and

WHEREAS, the undersigned law firm has been requested to provide these notices on behalf of the Current Mortgagee, Mortgage Servicer and Substitute Trustees;

NOW, THEREFORE, NOTICE IS HEREBY GIVEN of the foregoing matters and that:

1. The maturity of the Note is hereby accelerated, and all sums secured by the Deed of Trust are declared to be immediately due and payable.
2. David Stockman, Donna Stockman, Guy Wiggs, Brenda Wiggs, Janet Pinder, Kathy Arrington or Michelle Schwart, any to act, as Substitute Trustee will sell the Property to the highest bidder for cash on the date, at the place, and no earlier than the time set forth above in the Sale Information section of this notice. The sale will begin within three hours after that time.
3. This sale shall be subject to any legal impediments to the sale of the Property to any exceptions referenced in the Deed of Trust or appearing of record to the extent the same are still in effect and shall not cover any property that has been released from the lien imposed by the Deed of Trust.
4. No warranties, express or implied, including but not limited to the implied warranties of merchantability and fitness for the particular purpose shall be conveyed at the sale, save and except the Grantor's warranties specifically authorized by the Grantor in the Deed of Trust. The property shall be sold "AS-IS", purchaser's will buy the property "at the purchaser's own risk" and "at his peril" and no representation is made concerning the quality or nature of title to be acquired. Purchasers will receive whatever interest Grantor and Grantor's assigns have in the property, subject to any liens or interest of any kind that may survive the sale. Interested persons are encouraged to consult counsel of their choice prior to participating in the sale of the property.
5. If the sale is set aside for any reason, the Purchaser at the sale shall be entitled only to a return of the funds paid. The Purchaser shall have no further recourse against the Mortgagor, the Mortgagee, the Mortgagee's Attorney, or the duly appointed Substitute Trustee.

Padgett Law Group
6267 Old Water Oak Road
Suite 203
Tallahassee, FL 33213
(850) 422-2520

Re: 1005 Shady Lane payoff request

ryan rouz <ryan@rouzlaw.com>
Tue 4/5/2022 9:08 AM
To: Michael Burns <Michael.Burns@padgettlawgroup.com>

Thank you.

Get Outlook for iOS

---

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Tuesday, April 5, 2022 8:55:01 AM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Hi Ryan – confirmed that the wire has been received and accepted and the foreclosure sale has been cancelled.



**Michael John Burns, Esq.\***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

---

**From:** Michael Burns
**Sent:** Monday, April 4, 2022 4:18 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Received, confirming.



**Michael John Burns, Esq.\***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

---

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Monday, April 4, 2022 4:14 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Subject:** Re: 1005 Shady Lane payoff request

Michael,

I sent out a $191,000 pay-off wire with excess funds per the instructions you had sent. I just confirmed with Chase the wire has hit. See proof of wire below.

Please confirm receipt of funds and confirm the trustee will pull the property from the auction. Also, let me know when I should expect the release of lien.

Thanks.

---

# DOMESTIC WIRE TRANSFER VIA: NBH BANK/ 102102013 A/C: STATEBRIDGE COMPANY, LLC -…

## Pending

--                                    -$191,000.00



## Wire Transfer Agreement - continued

**(b)** Prior to sending a Consumer International Wire Transfer, we will provide you with certain important disclosures regarding your transaction including, to the extent applicable: the amount and that will be transferred to the beneficiary, the amount and description of any fees and taxes imposed by us, the total amount of the transaction, the exchange rate to be used if applicable, the amount of currency to be transferred, the amount and description of any fees imposed by intermediaries or our agents, and the amount that will be received by the beneficiary. In addition to the items above you will also be provided the date the funds are to be made available to the beneficiary, error resolution and cancellation right information and other disclosures. This will be provided either at the time you authorize the wire transfer or on a receipt provided after you've authorized your transaction.

**(c)** Except as otherwise agreed in writing, we are liable only for damages required to be paid as provided under Regulation E, subpart B or, to the extent applicable, UCC 4A. Except as required by Regulation E, subpart B, we will not be responsible for the acts or omissions of any other person or entity, including but not limited to any processor, any country's central bank, or any other financial institution, and no such person or entity will be deemed our agent. We will not be liable for the failure or delay of any wire transfer or for failing to meet other obligations in the Agreement because of circumstances or causes beyond our control, including governmental, legal or regulatory restrictions or prohibitions, third party actions, natural disasters, equipment or system failures, labor disputes, wars or riots. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**(d)** You have the right to cancel Consumer International Wire Transfers at no cost to you within 30 minutes after you have authorized us to send it. Please refer to the disclosure we provided to you at the time you authorized the Consumer International Wire Transfer on how to cancel.

**(e)** If you think there has been an error or problem with your Consumer International Wire Transfer, call us at 1-888-434-3030, visit a Chase branch, or send an account inquiry via Secure Message Center on chase.com.

You must contact us within 180 days of the date we disclosed to you that funds would be made available to the recipient. When you do, please tell us:

· Your name and address;
· The error or problem with the transfer, and why you believe it is an error or problem;
· The name of the recipient, and if you know it, their telephone number or address;
· The dollar amount of the transfer; or
· The confirmation code or number of the transaction

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation and will advise you of any remedies that may be available to you. If no response is received, we will refund your account for the applicable remedies. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

---

By providing your signature as authorization, you agree to these terms and conditions, that the wire transfer information in this document is accurate and you authorize us to process this wire transfer.

Recipient Bank's Identifier (ABA/SWIFT): 102102013

Recipient's Account Number: 2578665290

Sender's Signature:

Date: 4/4/22

Email Address: ryan@rouzlaw.com

Transaction Number (Contact ID): 844747026050001

The Email Address and Transaction Number provided will be used for communication purposes.

## Wire Transfer Outgoing Request

# CHASE ○

### Wire Transfer Sender Information

| Sender Name: | | | | |
|---|---|---|---|---|
| RYAN ROUZ | | Street Address: | | |
| Account Name: | | 1111 S AKARD ST UNIT 405 | | |
| ROUZ & ASSOCIATES, PLLC | | | | |

| City: | State: | Zip: | Country: | Daytime Phone: |
|---|---|---|---|---|
| DALLAS | TX | 75215-1020 | USA | 469-773-1491 |

| Primary ID Type: | ID Issuer: | ID Number: | ID Issue Date: | ID Exp: |
|---|---|---|---|---|
| Driver's License | TX | 22296861 | 10/29/2019 | 07/31/2025 |

| Secondary ID Type: | ID Issuer: | ID Number: | ID Issue Date: | ID Exp: |
|---|---|---|---|---|
| Chase or Bank Issued Credit/Debit Card | Chase | XXXXXXXXXXXXX3404 | | 08/31/2024 |

Comments:

### Wire Transfer Information

| Request Date: | Request time: | Effective date: | Wire Type: |
|---|---|---|---|
| 04/04/2022 | 04:10:47PM Eastern time | 04/04/2022 | Domestic |

| Debit Account #: | Debit Account Type: | Wire Amount (US dollars): | |
|---|---|---|---|
| XXXXX0796 | BUS COMPLETE CHK | $191,000.00 | |

| Qualifying Account #: | Qualifying Account Type: | Source of funds: | Wire Fee: |
|---|---|---|---|
| | | Checking | $35.00 |

| Currency type to be sent: | Exchange rate: | Foreign currency amount: | Amount to Collect (USD): |
|---|---|---|---|
| US Dollars | N/A | N/A | $191,035.00 |

| FX Contract Number: | | | |

### Recipient Account Information

| Account Name: | | |
|---|---|---|
| Statebridge Company, LLC - Payoffs | | |
| Street Address: | Account Number: | |
| | 2578665290 | |
| | City: | State: | Zip: | Country: |

Text to Recipient:
0000039786, Kazem Daneshmandi and GRC D Home LLC, 1005 Shady Lane North, Keller, TX 76248

### Receiving Bank Information

| Bank Name: | | |
|---|---|---|
| Community Banks of Colorado, A Division of NBH Bank | | |
| Street Address: | Bank ABA/SWIFT Code: | |
| 3780 W 10th St | 102102013 | |
| | City: | State: | Zip: | Country: |
| | Greeley | CO | 80634-1819 | USA |

| Intermediary Bank Name: | | |
|---|---|---|
| Street Address: | Intermediary Bank ABA: | |
| | City: | State: | Zip: | Country: |

Text to Receiving Bank:

N15220-CS WTA (03/2022)

Page 1 of 5

Get Outlook for iOS

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Friday, April 1, 2022 4:37:33 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Thank you for the notice Ryan. Dispute that your client is a consumer under the DTPA. The mortgagee will seek to recover all costs and fees incurred to defend against any baseless claims.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Friday, April 1, 2022 4:10 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Subject:** Re: 1005 Shady Lane payoff request

Hi Michael,

My client disputes the amount claimed by DBRR in the payoff statement. Your client is hereby put on notice of GRC's imminent DTPA claim. A formal DTPA notice is forthcoming.

Thank you.

| | |
|---|---|
| Rouz Law P.C.<br>Attorney Ryan Rouz<br>1111 S. Akard St. Ste. 405<br>Dallas, TX 75215<br>Phone: 469-777-1451<br>Fax: 469-666-9291<br>www.sandersrouz.com |  |

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Thursday, March 31, 2022 7:41 AM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Hi Ryan – the beneficiary denies the request to cancel the foreclosure sale. It intends to proceed with the 04/05/2022 foreclosure sale as scheduled.

The requested payoff quote is attached. Thanks.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** Michael Burns
**Sent:** Monday, March 28, 2022 5:47 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Not yet Ryan. Following up now.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Monday, March 28, 2022 1:25 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Subject:** Re: 1005 Shady Lane payoff request

Hi Michael,

Any word from your client on this?

Thank you

Get Outlook for iOS

---

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Friday, March 25, 2022 2:57:17 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Just tried. Let me know when you're back. I'm at 713.446.1707.



**Michael John Burns, Esq.\***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Friday, March 25, 2022 2:50 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Subject:** Re: 1005 Shady Lane payoff request

Hi Michael,

Let me know if you're free for a call today so we can try to get this matter settled.

Thank you

Get Outlook for iOS

---

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Wednesday, March 23, 2022 6:22 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Just tried to ring. Let me know when you're around.



**Michael John Burns, Esq.\***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** Michael Burns
**Sent:** Wednesday, March 23, 2022 3:31 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

A call makes sense to make sure we're petting the same dog here. My read of the message below is that your client will move to convert to Chapter 7 for the sole purpose of attempting to invoke the automatic stay/enjoin the sale, I read that to mean there is no intent to pay the lien.

I've got time after 5 today, and can clear time tomorrow if needed.



**Michael John Burns, Esq.\***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Wednesday, March 23, 2022 3:28 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Subject:** Re: 1005 Shady Lane payoff request

When did your client make it clear that it intends to delay the foreclosure? I sent this to you yesterday, "Please let me know if you'd like to schedule a conference call sometime this week to discuss a potential resolution to this matter." My client is working on multiple ways to resolve this matter - including a payoff, which is why I submitted a payoff request.

I am expecting the payoff amount by April 1, 2022.

Rouz Law P.C.
Attorney Ryan Rouz
1111 S. Akard St. Ste. 405
Dallas, TX 75215
Phone: 469-777-1451
Fax: 469-666-9291
www.sandersrouz.com



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Wednesday, March 23, 2022 3:18 PM
**To:** ryan rouz <ryan@rouzlaw.com>; Gregory Mitchell <gmitchell@freemanlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Thanks for the detail. I disagree. Your client has made clear that it intends to delay foreclosure, not make payment.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Wednesday, March 23, 2022 3:16 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>; Gregory Mitchell <gmitchell@freemanlaw.com>
**Subject:** Re: 1005 Shady Lane payoff request

At this point my client is weighing its options. GRC needs the payoff amount so it's counsel can properly advise it. Regardless, you do not have discretion to ignore a payoff request. Try it - your client will be sued if we do not get a payoff statement.

Get Outlook for iOS

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Wednesday, March 23, 2022 3:09 PM
**To:** ryan rouz <ryan@rouzlaw.com>; Gregory Mitchell <gmitchell@freemanlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

For what purpose does it need a payoff? Does it intend to payoff or attempt to convert to Chapter 7?



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Wednesday, March 23, 2022 3:08 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>; Gregory Mitchell <gmitchell@freemanlaw.com>
**Subject:** Re: 1005 Shady Lane payoff request

What are you talking about? How are you going to give us a payoff amount? My client needs the payoff amount. The deadline remains.

Get Outlook for iOS

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Wednesday, March 23, 2022 3:05:10 PM
**To:** ryan rouz <ryan@rouzlaw.com>; Gregory Mitchell <gmitchell@freemanlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Hi Ryan, received. GRC has no ability or basis to convert to Chapter 7. Any attempt to do so is pretextual. Regardless, and with the facts before us, a conversion to Chapter 7 (even if allowed) would not reimpose the 362 stay. DB RR, LLC intends to proceed with foreclosure as scheduled. Since GRC has no good faith intent to pay off the lien (as is made apparent in this message) DB RR, LLC will not be providing payoff information. For conference purposes, DB RR, LLC opposes any motion to convert on the grounds that such action is dilatory and there is no fact or law to support it.

Thanks.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com

www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Tuesday, March 22, 2022 6:28 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>; Gregory Mitchell <gmitchell@freemanlaw.com>
**Subject:** Re: 1005 Shady Lane payoff request

Hi Michael,

I've just had a meeting with GRC's rep and Mr. Mitchell, GRC's BK attorney.

GRC was about to file a motion to sell - but this move by your client to foreclose on the property made GRC change its plan of action. For this reason, my client has to convert to Chapter 7 to keep this property out of foreclosure for the best interest of GRC's Creditors.

This move will put the automatic stay back into effect - thereby keeping the property out of foreclosure for close to 6 months. Then the trustee will take control over GRC's estate.

My client can then motion the Court to convert back to Chapter 11 and file the motion to sell. This will put your client right back into the position it was a month ago.

Unless we are able to enter into some kind of agreement before March 25, 2022, GRC is going to convert to Ch. 7. Please let me know if you'd like to schedule a conference call sometime this week to discuss a potential resolution to this matter.

Thank you.

| | |
|---|---|
| Rouz Law P.C.<br>Attorney Ryan Rouz<br>1111 S. Akard St. Ste. 405<br>Dallas, TX 75215<br>Phone: 469-777-1451<br>Fax: 469-666-9291<br>www.sandersrouz.com |  |

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

**From:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Sent:** Tuesday, March 22, 2022 3:27 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Additional material attached Ryan.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** Michael Burns
**Sent:** Tuesday, March 22, 2022 2:50 PM
**To:** ryan rouz <ryan@rouzlaw.com>
**Subject:** RE: 1005 Shady Lane payoff request

Hi Ryan – received and forwarded payoff request for processing. DOT attached. Thanks.



**Michael John Burns, Esq.***
*Managing Attorney - Litigation*
5501 LBJ Freeway
Suite 925
Dallas, TX 75240
(850) 422-2520 Office, Ext. [7140]
(713) 446-1707 Cell
(850) 422-2567 Fax
Michael.Burns@padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas

Escalation Contact: Evan Singer, Managing Attorney – Default at Evan.Singer@Padgettlawgroup.com

**From:** ryan rouz <ryan@rouzlaw.com>
**Sent:** Tuesday, March 22, 2022 2:08 PM
**To:** Michael Burns <Michael.Burns@padgettlawgroup.com>
**Subject:** 1005 Shady Lane payoff request
**Importance:** High

Hi Michael,

Please see the attached payoff request. I've also sent a copy of the payoff request through via first class mail.

Are you also able to provide me with a copy of the Loan Agreement for this property?

Thank you.

Rouz Law P.C.
Attorney Ryan Rouz
1111 S. Akard St. Ste. 405
Dallas, TX 75215
Phone: 469-777-1451
Fax: 469-666-9291
www.sandersrouz.com



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you

# *ROUZ LAW. P.C.*



**Ryan Rouz**
**1111 S. Akard St. #405**
**Dallas, TX 75215**
**T: 469.777.1451**
**F: 469.666.9291**
**ryan@rouzlaw.com**

March 22, 2022

To:     Timothy D. Padgett, P.A.,
        6267 Old Water Oak Road, Ste. 203
        Tallahassee, Florida 32312

CC:     michael.burns@padgettlawgroup.com

Customer Name: GRC Dallas Homes, LLC
Loan Number: 0000039786
Address: 1005 Shady Lane North, Keller, Texas 76248

Hi Mr. Padgett,

I represent GRC Dallas Homes, LLC. I am requesting the payoff amount through April 4, 2022.

Please email the payoff to the following email address: ryan@rouzlaw.com
Please fax the payoff to the following fax number: 469-666-9291.
Please mail a hard copy to the following address: 1111 S. Akard St. #405 Dallas, TX 75215.

Thank you.

Ryan Rouz

With Permission:

Kazem Daneshmandi



March 31, 2022

Kazem Daneshmandi
GRC D Home LLC
c/o Rouz Law, P.C.
Attn: Ryan Rouz
1111 S. Akard St. #405
Dallas, TX 75215
*via email ryan@rouzlaw.com*

RE: Our File No.: 19-005174
Property Address: 1005 Shady Lane North, Keller, TX 76248

Dear Mr. Daneshmandi:

This is being provided to you at your request and is for informational purposes only and has been based on information provided by your servicer. The amount to pay off the above referenced mortgage loan, which includes, but may not be limited to, payments, late fees, principal and interest and any other applicable advances, good through April 5th, 2022, is $190,720.52. Funds received after that date or funds that cannot be posted due to missing or incorrect information and funds that cannot be clearly identified will be returned, and additional fees, costs, and disbursements will continue to accrue. This amount consists of the following:

| | |
|---|---|
| Principal Balance | $175,607.27 |
| Interest calculated from August 1, 2021 | $6,626.74 |
| Escrow | $1,925.36 |
| Attorneys Fees | $2,902.50 |
| Attorneys Cost | $427.46 |
| Default Interest calculated from October 1, 2021 | $2,721.91 |
| Fees | $658.50 |
| Release Fees | $58.00 |
| Suspense Funds | $-207.22 |

**Total Payoff Amount**: $190,720.52

Please be advised that the amount listed above does not include additional fees and/or costs that may be incurred between the date of this letter and April 5th, 2022.

This information is provided at the request of the borrower for borrower's benefit and for informational purposes only, and there are no intended third-party beneficiaries

If your personal liability for this debt has been modified or extinguished by a discharge in bankruptcy, this is NOT a demand for payment and is being provided by our office for informational purposes only. We do not suspend the account or foreclosure action pending funds and any funds received must be certified funds, sufficient to cover all items quoted above. **ALL FUNDS AND PAYOFF ARE SUBJECT TO FINAL APPROVAL BY THE LENDER.**

Please submit your payoff **via wire transfer or via certified funds made payable to STATEBRIDGE**

**COMPANY, LLC AS ATTORNEY IN FACT FOR DB RR, LLC. Personal checks will not be accepted. CERTIFIED FUNDS OR WIRE TRANSFERS MUST BE RECEIVED BY 12:00 P.M. (EST) ON A NORMAL BUSINESS DAY (MONDAY THROUGH FRIDAY) TO BE PROCESSED THAT DAY.**

Funds must be remitted via wire transfer or cashier's check only. Any proceeds received that are not in the form of a cashier's check or wire will be returned to the sender, and additional fees, costs, disbursements, and interest may continue to accrue on the loan until adequate funds are received, verified, and accepted by Statebridge Company, LLC.

Mail Certified Funds to:
Statebridge Company, LLC
ATTN: Cashiering Department
6061S. Willow Drive, Suite 300
Greenwood Village, CO 80111

Wire instructions are as follows:
Bank: Community Banks of Colorado,a division of NBH, 1111Main Street, Suite 2800, Kansas City, MO 64105
Beneficiary: Statebridge Company, LLC - Payoffs
ABA: 102102013
Account Number: 2578665290

Reference Information: 0000039786, Kazem Daneshmandi and GRC D Home LLC, 1005 Shady Lane North, Keller, TX 76248

*Note: an additional $26 fee is required to handle each wire transfer and must be added to the amount submitted.*

Failure to include the above information on the wire advice may cause a delay in posting the funds. Padgett Law Group will not be responsible for any additional interest or fees that may be assessed as a result of incomplete or incorrect wire information. Wire transactions that are received and cannot be identified will be returned to the ABA and account number from which they were received.

If you have any questions or require additional information regarding the loan, please contact Statebridge Company, LLC at 866-466-3360. Thank you for your courtesies in this regard.

**WE RESERVE THE RIGHT TO CORRECT ANY PORTION OF THIS STATEMENT AT ANY TIME. THE FIGURES PROVIDED HEREIN ARE BASED UPON INFORMATION AVAILABLE AT THE TIME OF ISSUANCE. ALL BALANCES ARE SUBJECT TO CHANGE AS A RESULT OF ANY TRANSACTIONS THAT OCCUR AFTER THE ABOVE-WRITTEN STATEMENT DATE AND PRIOR TO THE APPLICATION OF PAYOFF FUNDS.**

**PURSUANT TO THE FAIR DEBT COLLECTION PRACTICES ACT, YOU ARE HEREBY ADVISED THAT THIS OFFICE MAY BE DEEMED TO BE A DEBT COLLECTOR. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.**

**IF YOUR PERSONAL LIABILITY FOR THIS DEBT HAS BEEN MODIFIED OR EXTINGUISHED BY A DISCHARGE IN BANKRUPTCY, THIS IS NOT A DEMAND FOR PAYMENT AND IS BEING PROVIDED BY OUR OFFICE FOR INFORMATIONAL PURPOSES ONLY.**

Sincerely,

Padgett Law Group
6267 Old Water Oak Road, Suite 203
Tallahassee, FL 32312
attorney@padgettlawgroup.com

we talked to their atty please do your research on the case law and statue and email to me and Ryan only. Until we see if this Asshole aggressive. But please do so today

He said he will get us a payoff and he will talk to his client and see if he can sell the note that way we don't have to go in front of judge Rhodes

Thu, Mar 31, 6:38 PM

I forwarded you the payoff when your free ring me please

I'll call you tomorrow when I'm in a better mood and you're not being a dick to me.

I'm not being a dick to you I'm calling my attorney asking for advice and your advice back to me as I don't remember I don't recall I don't have anything in front of me how is that being a dick to you you work for me not the other way around

Read





1               IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE EASTERN DISTRICT OF TEXAS
2                        SHERMAN DIVISION

3

4    IN RE:                    )   BK. NO:  19-41186-BTR

5                              )

6    GRCDALLASHOMES, LLC       )

7        D E B T O R.          )

8

9

10                *   *   *   *   *   *   *   *   *   *

11                    TRANSCRIPT OF PROCEEDINGS

12                *   *   *   *   *   *   *   *   *   *

13

14

15

16

17

18

19

20         BE IT REMEMBERED, that on the 3rd day of June, 2021,

21    before the HONORABLE BRENDA T. RHOADES, United States

22    Bankruptcy Judge at Plano, Texas, the above styled and

23    numbered cause came on for hearing, and the following

24    constitutes the transcript of such proceedings as hereinafter

25    set forth:

1                I N D E X

2                                              PAGE

3    CHRIS MOSER

4         DIRECT EXAMINATION
              BY:  Mr. Moser in Narrative       17
5    CROSS-EXAMINATION
              BY:  Mr. Mitchell                 19
6             BY:  Mr. Nicoud                   20
         RECROSS-EXAMINATION
7             BY:  Mr. Mitchell                 30
              BY:  Mr. Nicoud                   35
8
     KAZEM DANESHMANDI
9
         DIRECT EXAMINATION
10            BY:  Mr. Mitchell                 37
         VOIR DIRE EXAMINATION
11            BY:  Mr. Nicoud                   64
         DIRECT EXAMINATION CONTINUED
12            BY:  Mr. Mitchell                 65
         CROSS-EXAMINATION
13            BY:  Mr. Nicoud                   73

14   ROBERT NICOUD

15       DIRECT EXAMINATION
              BY:  Mr. Nicoud in Narrative      82
16
     JOHN CALDWELL
17
         DIRECT EXAMINATION
18            BY:  Mr. Nicoud                   86
         CROSS-EXAMINATION
19            BY:  Mr. Mitchell                 87

20

21

22

23

24

25

```
 1              E X H I B I T   I N D E X

 2                                      PAGE FIRST REFERENCED

 3  Plan Agent Exhibit 4                     20

 4  Debtor Exhibit 1                         31

 5  Debtor Exhibit 2                         50

 6  Debtor Exhibit 3                         60

 7  Debtor Exhibit 4                         60

 8  Debtor Exhibit 5                         61

 9  Debtor Exhibit 6                         65

10  Debtor Exhibit 8                         67

11  Debtor Exhibit 9                         68

12  Debtor Exhibit 10                        69

13  Caldwell Exhibit A                       32

14  Caldwell Exhibit H                       21

15  Caldwell Exhibit I                       22

16  Caldwell Exhibit J                       24

17  Caldwell Exhibit K                       25

18  Caldwell Exhibit L                       26

19  Caldwell Exhibit M                       26

20  Caldwell Exhibit N                       27

21  Caldwell Exhibit O                       28

22

23

24

25
```

CINDY SUMNER, CSR (214) 802-7196

1                   P R O C E E D I N G S

2              COURTROOM DEPUTY:  GRCDallasHomes, LLC.  Case

3   number 19-41186.  Plan Agent motion for authority, motion for

4   sanctions, and motion to compel debtor and creditor.

5              THE COURT:  Appearances.

6              MR. MITCHELL:  Good morning, Your Honor.  This

7   is Greg Mitchell on behalf of the debtor.

8              MR. NICOUD:  Robert Nicoud on behalf of

9   creditor, John Caldwell.

10             MR. MOSER:  Chris Moser, Plan Agent.

11             MR. CAVARI:  Rod Cavari, I'm observing for

12  GRC.

13             THE COURT:  Okay.  All right.  Where are we?

14             MR. MOSER:  This is Chris Moser.  This is my

15  motion for interim distribution.  But perhaps we probably

16  need to deal with the sanction motion beforehand, would be my

17  suggestion.

18             MR. NICOUD:  This is Robert Nicoud, and I

19  would concur.

20             THE COURT:  Okay.  All right.  You may

21  proceed.

22             MR. NICOUD:  Your Honor, Robert Nicoud on

23  behalf of John Caldwell.

24        We have filed a motion for sanctions seeking a unique

25  form of relief.  We had submitted as part of this hearing a

1   request for production to the debtor requesting documents

2   relevant to the monies that had been spent by the estate

3   since confirmation.  We received -- at the time the motion

4   was filed, we had received absolutely no response, although

5   counsel for the debtor had asked for an extension of time

6   earlier.  Last night at 7:35 p.m. I did receive a form of

7   response.  We think the Court should disregard the response

8   and just treat this matter as if it had not been responded

9   to.

10      Now, we don't want the hearing rescheduled because of

11  lack of discovery.  That just rewards the debtor for not

12  complying.  So what I'm asking the Court to do is to

13  basically have a conclusion that the debtor has failed to

14  maintain appropriate records to account for the funds and the

15  property that the debtor was holding for the benefit of

16  creditors.  And that the Court should consider that failure

17  to maintain records as an additional ground for possible

18  conversion of this case to Chapter 7.

19      And we cite the Court's inherent authority to fashion a

20  unique response to failure to comply with discovery citing

21  the U.S. Supreme Court case of Goodyear Tire & Rubber versus

22  Hager where a Court had to deal with a discovery breach that

23  was not found out or not discovered until long after the case

24  had settled.  And in that case, the U.S. Supreme Court

25  recognized that the Trial Court still had the inherent

1   authority to in that case issue a sanctions order and force

2   Goodyear to pay attorney's fees to the other party.  In the

3   same vein, our position is that the Court now has authority

4   here to make this determination as a law of the case that the

5   debtor has failed to maintain proper records for the property

6   that has been in the debtor's position.  And so we would ask

7   the Court to issue such a ruling as a sanction prior to the

8   start of the hearing on the merits.

9        And that concludes my argument.

10            THE COURT:  Okay.  Prior to the start of the

11  hearing on the merits of what?

12            MR. NICOUD:  Of the -- what brought us here,

13  which is the Plan Agent's motion for authority.

14            THE COURT:  Okay.  Just so we're clear.

15  You're asking for -- is that the Court convert the case; is

16  that correct?

17            MR. NICOUD:  Ultimately, yes.  That issue is

18  before the Court today.

19            THE COURT:  Okay.  All right.  Did you wish --

20  did anyone else wish to make an opening statement?

21            MR. MITCHELL:  Your Honor, this is Greg

22  Mitchell.  I do have a couple of comments regarding the

23  sanctions motion, if I may.

24            THE COURT:  You may.

25            MR. MITCHELL:  First of all, the parties have

1   been and were doing so up until the last minute engaged in

2   active efforts to resolve this issue.  The -- the -- I want

3   to point out that, as the Court is probably aware, in the --

4   in the last several months, the debtor has not really had

5   anybody that is being paid to do any work for it.

6   Mr. Daneshmandi, the debtor's representative, is doing his

7   best to keep the debtor on track.  And, you know, as we'll

8   discuss in more detail, he hasn't been paid for this entire

9   year.  And so to expect the debtor to spend hours and hours

10  responding to discovery requests is a little unrealistic.

11       But with that being said, the reality, as we focused on

12  the productions that we did respond to, albeit late, the

13  questions that were being asked was not asking for

14  information that is -- it is not all completely within the

15  realm of this creditor's ability to obtain.  And, in fact, we

16  believe they already have all of the information that they're

17  asking for.  There's only three requests there.  The first

18  one asks for information related to payment requests

19  submitted to the Plan Agent.  Mr. Nicoud has been in repeated

20  communications with Mr. Moser, the Plan Agent, requesting

21  documents.  And we believe he has everything that he's asking

22  for.  And he certainly has the -- all of the Plan Agent's

23  reports.  And so that's not -- that's not going to provide

24  any new information that he doesn't already have.

25       The second request asks for information related to any

1   revenue of the debtor, which is all represented in the Plan

2   Agent's report.  And then finally, the third one asks for

3   1099s issued by GRCDallasHomes.  The debtor's representative

4   has looked and has not been able to locate -- there was an

5   issue with a server.  But, again, that information is not

6   something that is not readily accessible via the Plan Agent's

7   report.  So we would reject the notion that any sanction is

8   appropriate.  We certainly don't believe that it has any

9   bearing on the motion that's before the Court today, which is

10  simply to determine whether or not the Plan Agent's motion is

11  appropriate.

12        And we would also submit to the Court that the issue of

13  a conversion to Chapter 7 is not before the Court today.

14  Mr. Cardwell did not file a motion asking for that relief.

15  As the Court may recall, the Court's order that ultimately

16  culminated in the Plan Agent's motion said that based on its

17  findings that the debtor either needed to come into

18  compliance, or file a motion to amend or modify its plan.

19  And only then would the Court consider conversion.  It did

20  not say that it would automatically be converted if a motion

21  was filed and was found not to be appropriate.

22        So I guess just to lay the groundwork for the

23  procedural posture that we believe the case is in, we don't

24  believe that the result of the motion today, even if it's not

25  granted, should automatically lead to a conversion to Chapter

1   7.  We believe that there are multiple options for that,

2   including the motion that we filed which -- I don't know

3   exactly where the Court wants to take that up in the sequence

4   of events, but as the Court is aware, we filed a motion for

5   mediation that is included as part of what's to be considered

6   today.  It was really -- it was really in the alternative to

7   the Plan Agent's motion.  So I guess our suggestion would be

8   to take up the Plan Agent's motion.  And if for some reason

9   the Court does not believe that the Plan Agent's motion is

10  appropriate, then we would urge the Court to consider our

11  mediation motion.  We sincerely believe that it's not in the

12  best interest of all the parties involved, including all of

13  the creditors except for Mr. Caldwell, for this case to be

14  converted to Chapter 7.

15      And that concludes my remarks on the -- on the motion

16  for sanctions.  I do have some additional remarks regarding

17  the Plan Agent's motion, when we get to that point.

18          THE COURT:  All right.  Mr. Nicoud, this is

19  essentially a discovery sanction motion, correct.

20          MR. NICOUD:  Correct.

21          THE COURT:  Okay.  So what has been requested

22  and not produced?

23          MR. NICOUD:  Well, what was requested was --

24  well, Mr. Mitchell when through that.  We -- this comes

25  before the Court based on the Court's finding that the way

1    the debtor has been operating was a breach of the plan.  We

2    wanted to find out, yes, the debtor has made payment requests

3    to the Plan Agent.  But they are just -- as I think the

4    evidence will ultimately show, they're just one or two page

5    requests.  We want $10,000 to do X, Y, Z on these properties.

6    And what we're wanting to find out is, what was that $10,000,

7    what was it spent on?  Who got the money?  You must have

8    hired subcontractors.  Where did the money go?  What did we

9    get out of it, other than a report that we wanted $10,000 to

10   spend on this property?

11       I don't think it's an extraordinarily difficult matter

12   to comply with.  These are records that should be kept in the

13   normal course of any business.  And that they would be

14   relatively easy to produce.  With regard to the issue on

15   revenue, again, this may come up, but this came before the

16   Court because we discovered that the debtor had entered into

17   a lease of one of the properties post-confirmation with no

18   accounting for that lease income.  Nothing was turned over to

19   the Plan Agent.  It's not in the Plan Agent's reports.  We

20   want to know, are there any other leases?  Are there any

21   other sources of income, other than from sales of property

22   that we as creditors don't know about?  So those are the

23   matters that we are -- we were trying to explore with our

24   requests for production.  And, again, all of the grounds

25   raised by the debtor could have been included in a formal

1   response or even an informal response.  But we received

2   nothing other than a request for a 7 day delay in responding,

3   which we granted.  And only with that time period expired,

4   did we file the motion.

5           MR. MITCHELL:  Your Honor, if I may respond

6   briefly to the last points.

7           THE COURT:  Hold on just one moment, please.

8       Okay.  Where is -- this is a discovery dispute, in the

9   first instance.  So which requests for production has not

10  been complied with?

11          MR. NICOUD:  Well, it was attached to the

12  motion served on April 16, 2021.  And it would be document

13  287.

14          THE COURT:  I see it.  Okay, I see it.  I see

15  three line items, document requests.  All documents

16  reflecting or relating to all documents which reflect or

17  relate to any revenue of GRC.  And then the third is the all

18  IRS Form 1099s issued by the debtor.

19      So my question is, which one of these has not been

20  complied with, in your judgment?

21          MR. NICOUD:  None.  At the time the motion was

22  filed, we had received no response at all.

23          THE COURT:  Okay.  And now?

24          MR. NICOUD:  At 7:35 p.m. last night, I

25  received an email with 25 pages of documents attached, which

1    I've briefly reviewed.  All of which are -- consist of emails

2    between Mr. Daneshmandi and Mr. Moser.  There's one invoice

3    for a third party.  And then there was a formal response that

4    said that the debtor had had computer problems and,

5    therefore, couldn't generate the 1099s.  Again, that came at

6    7:35 p.m. last night.

7              THE COURT:  All right.  I'll hear response

8    from Mr. Mitchell.

9              MR. MITCHELL:  Thank you, Your Honor.

10         So as I pointed out initially, as far as the requests,

11   we would submit that every document that we could produce in

12   response to numbers 1 and 2, Mr. Caldwell and Mr. Nicoud

13   already had.  And if they didn't have it, the Plan Agent has

14   it, because the request itself specifically says, related to

15   payment requests submitted to the Plan Agent.  And then the

16   Plan Agent has all of the information related to the revenue.

17   So we believe the request was really just an attempt to

18   harass.  And we tried to respond in good faith.  But as I

19   pointed out, the debtor has nobody being compensated to do

20   anything.  And so while Mr. Daneshmandi is attempting to do

21   as much as he can, he's also left without an income to make a

22   living.  And so he has to figure out how to do that, in

23   addition to all of this other stuff.

24         We admit to the late response.  The only -- I'm not

25   going to try to make excuses for the late response.  We admit

1  to the late response.  We were trying to pull anything

2  together that we thought was -- might be in addition to what

3  the -- Mr. Caldwell and his attorney should already have.

4      The other thing that I wanted to point out, Your Honor,

5  though, is all of the issues raised by Mr. Nicoud and that

6  are being raised by the requests that are being made we

7  submit are completely irrelevant to the issue before the

8  Court today.  It appears as if Mr. Caldwell is simply trying

9  to mitigate the issue of whether the debtor was in default of

10 its plan. And the Court has already ruled on that.  The Court

11 ruled that the debtor was in default on its plan.  So we're

12 kind of past that.  And the motion before the Court today is

13 whether or not the Plan Agent's motion can do what the Court

14 said that the debtor had to do.  And the Court said in its

15 ruling that the debtor either needs to, one, come into

16 compliance with the confirmed plan.  Or, number, two, modify

17 its plan so that whatever it does or has done can be -- can

18 be ratified going forward.

19     And so when -- our decision was to work with the Plan

20 Agent to file the motion that has now been filed, which we

21 submit brings the debtor into compliance.  And so a lot of

22 these issues that focus on whether or not the debtor, you

23 know, was in default of its plan are kind of irrelevant,

24 since the Court has already made that ruling.  So we would

25 submit that notwithstanding any issues regarding, you know,

1  the timing of our response, that none of these requests have

2  anything to do with any issue that's going to be presented to

3  the Court today.

4          THE COURT:  Okay.  Mr. Nicoud, what do the

5  three requests have to do with the matter before the Court

6  today?

7          MR. NICOUD:  Okay.  All right.  Procedurally

8  we are before the Court because on March 12th, this Court

9  issued an order that required that the debtor had to either

10 within 14 days of that order file a proposed plan

11 modification, or come into compliance with the plan as

12 previously confirmed.  So the issue is does their proposal to

13 the -- what we want to show is that they have not -- they

14 have not submitted a modification.  And the debtor has not

15 come into compliance with the defaults under the plan.  They

16 have -- the debtor has mis-spent money that should have gone

17 to the unsecured creditor's pool.  These issues are relevant

18 to see how the debtor has, in fact, spent the money that

19 could have gone into the unsecured creditor's pool.  So that

20 is why it is relevant to the hearing today.

21     Next matter is, if the debtor thinks that it is

22 irrelevant or burdensome, there's a procedure for addressing

23 that, which is that you file a timely formal response stating

24 your grounds.  You don't just don't do anything.

25         That's my response.

CINDY SUMNER, CSR (214) 802-7196

1          THE COURT:  All right.  Does anyone wish to

2    present any evidence in support of their position?

3          MR. NICOUD:  Robert Nicoud.  I would just ask

4    the Court to -- to the extent necessary, I'm representing

5    that, in fact, the request for production was forwarded to

6    counsel for the debtor, as represented in the motion for

7    sanctions.  And that until 7:35 last night, I had not

8    received any formal response.

9          THE COURT:  All right.  Is there any dispute

10   about that, Mr. Mitchell?

11         MR. MITCHELL:  Your Honor, no.  The time --

12   the timing of the response is not in dispute.

13         THE COURT:  All right.  So no evidence from

14   anybody about anything, right?  Is that what I'm

15   understanding?

16         MR. NICOUD:  Well, my -- I guess I just

17   testified.

18         THE COURT:  Right.  Other than the failure to

19   respond prior to 7 -- is it 7:25 yesterday evening?

20         MR NICOUD:  7:35.

21         THE COURT:  7:35 yesterday evening.

22     Okay.  So -- all right.  Given the debtor's failure to

23   respond timely without any excuse, and I'm talking about

24   legal excuse, the Court finds cause to award sanctions.  The

25   Court will award a sanction, the cost associated with the

1  filing of the motion for sanctions, as well as -- as well as

2  the hearing on the motion.

3       Mr. Nicoud, you're to file with the Court what your

4  fees and expenses were associated with the filing of this

5  motion and prosecuting it.  That needs to be filed within 7

6  calendar days.  Okay?  And then we'll determine the amount of

7  attorney's fees and expenses to be awarded upon the filing of

8  that motion -- I'm sorry, from the filing your expenses and

9  fees.  Okay?

10            MR. NICOUD:  I believe I understand.

11  Otherwise, the balance of the request is not granted?

12            THE COURT:  The balance is denied.  It seems

13  to me that the debtor is -- it's a discovery dispute.  And

14  that's what it's asked for right now.

15       Now let's turn to the balance of the matter on the

16  Court's docket.  Mr. Moser, it's your motion.

17            MR. MOSER:  Yes, ma'am.  I -- the opening I

18  have is also going to be my direct testimony.  I'd ask the

19  Court's guidance of whether I could be just sworn in to avoid

20  doing duplicatives, saying the same thing twice and then have

21  people cross-examine me.

22            THE COURT:  Okay.  We can certainly swear you

23  in.

24       Let's swear in Mr. Moser.

25            (The witness was sworn by the courtroom deputy.)

1                    CHRIS MOSER

2    The witness, having been duly sworn to tell the truth,

3    testified on his oath as follows:

4                    DIRECT EXAMINATION

5    BY MR. MOSER (in narrative).

6                    THE WITNESS:  Your Honor, I'm Chris Moser.

7    I'm the Plan Agent under the debtor's second amended plan of

8    reorganization, which was confirmed a little over two years

9    ago.  My duties as Plan Agent include accounting for the

10   monies that I receive from the sales of the properties, to

11   make plan payments as directed by the debtor, and to consult

12   with the debtor's principals regarding maximizing recovery to

13   unsecured creditors.

14       When I first got this job just as two years ago, there

15   were ten houses that the debtor owned, plus a one-third

16   interest in another house.  Since the time I've been Plan

17   Agent, five of the ten houses have sold.  Those five houses

18   have generated gross sale proceeds that have hit my bank

19   account of approximately $1.55 million.  That's what's been

20   collected.  From the $1.55 million, I've written checks or

21   disbursed in round numbers $800,000 of that amount for

22   improvements to the ongoing houses, to pay salaries, and to

23   pay legal fees.  So today that leaves me with holding the

24   amount of $353,000 from the $1.55 million that I have.

25       The plan was confirmed over two years ago.  I have made

1  zero, no distributions to unsecured creditors.  And speaking

2  of unsecured creditors, if you take out the subordinated

3  creditors, which are Mr. Daneshmandi's mother, there's $1.4

4  million of general unsecured creditors in the estate.  Of

5  this amount, Mr. Caldwell is the largest.  He's owed about

6  $607,000.  So that would put him at 43, 44 percent of the

7  entire unsecured creditor pool.

8       Like Mr. Nicoud said, three months ago this Court did

9  find that the debtor was in default of its plan for failing

10  to make distributions to creditors for the time period that's

11  been post-confirmation.  And gave the debtor 14 days to

12  either cure the default or to modify the plan.  Once this

13  ruling came down, I spoke with the debtor's principal and the

14  decision was made to file this motion for interim

15  distribution.  And the concept of the motion is that of the

16  $353,000 I have, I was asking to distribute right at $275,000

17  to general unsecured creditors and to also pay some

18  administrative costs, like for legal fees and salaries.

19      Mr. Caldwell has opposed the motion for the reasons

20  Mr. Nicoud stated.  He doesn't think that the past defaults

21  are cured by money, that money cures it.  He would like the

22  case converted to Chapter 7 and have a fiduciary in charge to

23  sell the houses and to pay creditors.  But as Plan Agent, my

24  thought was it was better to get money out to creditors as

25  soon as possible, to make a distribution.  It's been quite

1   some time.  And then we'll see where we go from there.

2       There are five houses that are still left.  And as was

3   alluded to, Mr. Daneshmandi has been fixing up the houses and

4   improving them.  But during the course of the case, he had

5   gotten garnished by Mr. Caldwell and as a result, was not

6   getting a paycheck.  And with all of the other issues about

7   the default, there have been no payments to Mr. Daneshmandi

8   since December of last year.

9       And that would conclude my testimony.

10          THE COURT:  Thank you.

11   Does anyone wish to cross?

12          MR. MITCHELL:  Your Honor, this is Greg

13   Mitchell for the debtor.  I do have a few questions.  I also

14   wanted to make an opening statement.  But I can -- I can do

15   either of those in any order.  If the Court would rather me

16   ask Mr. Moser my questions first, I can -- I would like to do

17   that.

18          THE COURT:  All right.  I'll let you cross

19   right now and I'll take any statements from you in closing.

20   Okay?

21          MR. MITCHELL:  That will be fine.

22          THE COURT:  Thank you.

23          <u>CROSS-EXAMINATION</u>

24   BY MR. MITCHELL:

25       Q.  Mr. Moser, regarding the amounts that were paid out

1  you referenced throughout the course of the plan, was it your

2  belief when you made distributions that those distributions

3  were either approved or authorized under the confirmed plan?

4      A.   Yes.   That was my belief.

5      Q.   Okay.

6           MR. MITCHELL:  I think that's the only

7  question I wanted to ask at this time.

8           THE COURT:  Thank you.

9      Does anyone else wish to cross-examine this witness?

10          MR. NICOUD:  Yes.  This is Robert Nicoud.

11          <u>CROSS-EXAMINATION</u>

12  BY MR. NICOUD:

13     Q.   Mr. Moser, your exhibit -- or Plan Agent Exhibit

14  Number 4, found at document number 282-4, would you explain

15  what that document is?

16     A.    That is my cash -- Exhibit Number 4 is my cash

17  receipts and disbursement record through, I believe, for the

18  one that I had filed was through May 5th.  It shows all the

19  money in and all the money out.

20     Q.   Okay.  So it's a true and accurate representation

21  of all of the money in and all of the money out?

22     A.   Yes, it is.

23     Q.   Okay.

24          MR. NICOUD:  Unusual, but we move for

25  admission of Plan Agent Exhibit 4.

1           THE COURT:  Okay.  Where is that at?

2           THE WITNESS:  It is at docket number 282,

3  Exhibit Number 5.

4           MR. NICOUD:  4.

5           THE WITNESS:  Number 4, excuse me.

6           THE COURT:  All right.  Any objection?

7           MR. MITCHELL: No objection.

8           THE COURT:  Exhibit 5 is an attachment to the

9  exhibit and witness list which has been docketed as docket

10  number 282, Exhibit 4 is admitted.

11      Q.   All right.  Next I'm going to go through a series

12  of exhibits on the Caldwell exhibit list.  And that is found

13  at document 291.

14      So tell me when you're --

15      A.   I found it.  I have it.

16      Q.   Okay.  If you'll look at Caldwell Exhibit H found

17  at document number 291-8

18      A.   I see it.

19      Q.   Okay.  Just what is this document?

20      A.   It was an invoice I received from Construction

21  Consultants regarding $150,000 draw that they wanted.  And

22  that was paid.

23      Q.   Well, was it -- was every bit of it paid?

24      A.   Part -- part of it was paid.  Part of it was not.

25      Q.   Okay.  And how did you receive this?

1      A.   It was an email from Mr. Daneshmandi.

2      Q.   Okay.  Other than this page, did you receive any

3  other information concerning this payment request?

4      A.   No.  This is the extent of the payment request.

5      Q.   Okay.  But you maintained this in your normal

6  records?

7      A.   I did.

8           MR. NICOUD:  Okay.  Move for admission of

9  Caldwell Exhibit H.

10          THE COURT:  Where is that for the record?

11          MR. NICOUD:  I'm sorry?

12          THE COURT:  Where is that for the record?

13          MR. NICOUD:  Oh, document number 291-8.

14          THE COURT:  Okay.  H, as in --

15          MR. NICOUD:  Harold.

16          THE COURT:  Okay.  All right.  I just wanted

17  to make sure.

18      All right.  Any objection?

19          MR. MITCHELL:  None, Your Honor.

20          THE COURT:  Thank you.

21      Exhibit H, which was attached to the exhibit and

22  witness list docketed as docket number 291 is admitted.

23      Q.   Okay.  Turning to Caldwell Exhibit I, found at

24  document 291-9.

25      A.   I see it.

1       Q.    And what is this?

2       A.    It's an email exchange between myself and

3    Mr. Daneshmandi and my paralegal.

4       Q.    Okay.  And -- and is Mr. Daneshmandi requesting

5    payments?

6       A.    Yes.

7       Q.    Okay.  Is this a typical exchange when

8    Mr. Daneshmandi is requesting a payment?

9       A.    It would usually sometimes start with a phone call.

10   But it would always follow up with an email of some sort,

11   yes.  So it's typical.

12      Q.    Okay.  And was this maintained in the normal course

13   of your business?

14      A.    Yes, it was.

15      Q.    Okay.  Was any additional documentation regarding

16   the payment request submitted with this request?

17      A.    Not with this request, no.  And I don't recall

18   receiving any.

19      Q.    Okay.

20            MR. NICOUD:  Move for admission of Caldwell

21   Exhibit I, found at docket number 291-9.

22            THE COURT:  Any objection?

23            MR. MITCHELL:  No objection.

24            THE COURT:  Okay.  Exhibit I attached to the

25   witness and exhibit list which has been docketed at docket

1   number 291 is admitted.

2       Q.   Next turning to Caldwell Exhibit J, found at

3   document number 291-10.

4       A.   Yes, I have it.

5       Q.   Okay.  And what is this?

6       A.   That's an invoice from Mr. Daneshmandi for a

7   $24,000 payment.

8       Q.   And on the last page it refers to requesting three

9   separate checks of $8,000?

10      A.   Yes.

11      Q.   And was this received from Mr. Daneshmandi?

12      A.   Yes, it was.

13      Q.   Okay.

14           THE COURT:  I don't see where it says that

15  he's requesting three checks of $8,000.  Is that --

16           MR. NICOUD:  That would be -- that's on page 2

17  of document number 291-10 at the very top.

18           THE COURT:  We're talking about Exhibit J,

19  right?

20           MR. NICOUD:  Yes.

21           THE COURT:  Okay.  I'm looking at Exhibit J

22  and I don't see -- oh,  I see, please remit three checks --

23  second page.  Thank you.

24           MR. NICOUD:  Okay.  And we move for admission

25  of Caldwell Exhibit J.

1             THE COURT:  Any objection?

2             MR. MITCHELL:  No objection.

3             THE COURT:  Exhibit J is admitted.

4     Q.   Next moving on to Caldwell Exhibit K, found at

5  docket number 291-11.

6     A.   I have it.

7     Q.   What is this?

8     A.   It's another invoice for $50,000 from

9  Mr. Daneshmandi for another property.

10    Q.   Okay.  And was this amount paid by you?

11    A.   It was, yes.

12    Q.   Are -- okay.  Are you sure about that?

13    A.   I'm not.  I'd have to look at my dates on it.

14    Q.   Okay.

15    A.   It doesn't look like it was.  It was -- no.

16    Q.   Okay.  Okay.  And, again, was there any backup

17  submitted for this amount?

18    A.   That is the total itemization of what the request

19  was for.

20    Q.   And was this maintained by you in the normal course

21  of business?

22    A.   Yes.

23             MR. NICOUD:  Move for admission of Caldwell

24  Exhibit K, like Karen, found at docket number 291-11.

25             THE COURT:  Any objection?

1          MR. MITCHELL:  None.

2          THE COURT:  Exhibit K is admitted.

3     Q.   Next to Exhibit L, found at docket number 291-12.

4      What is this?

5     A.   It's an email exchange between me and

6  Mr. Daneshmandi and my paralegal regarding payments.

7     Q.   Okay.  Maintained by you in the normal course of

8  business?

9     A.   Yes.

10         MR. NICOUD:  Move for admission of Caldwell

11  Exhibit L.

12         THE COURT:  Any objection?

13         MR. MITCHELL:  No.

14         THE COURT:  All right.  Exhibit L is admitted.

15    Q.   Next to Caldwell Exhibit M, found at docket number

16  291-13.

17    A.   I have it.

18    Q.   What is this?

19    A.   Another email exchange.  But this is between --

20  starts out on the top between you and me and then the other

21  email exchange is between me and my paralegal about payments

22  to Mr. Daneshmandi.

23    Q.   Okay.  Can we scroll down?  So the email exchange,

24  when does it start with between you and your paralegal?

25    A.   We started emailing each other, it looks like

1  September of 2020.

2       Q.   Okay.  All right.  And was this the original email

3  from Mr. Daneshmandi on September 28th, 2020, was this

4  document maintained by you in the normal course of business?

5       A.   Yes, it was.

6       Q.   Okay.  Do you know if all of the amounts were paid?

7       A.   Well, there's a check attached to it.  One of the

8  checks was voided, I know that.  I'd have to go back and

9  verify.  But most likely.  Most likely.

10       Q.   Okay.  This is maintained by you in the normal

11  course of business?

12       A.   Yes.

13            MR. NICOUD:  Okay.  Move for admission of

14  Caldwell Exhibit M, like Michael.

15            THE COURT:  Any objection?

16            MR. MITCHELL:  No objection.

17            THE COURT:  Exhibit M is admitted.

18       Q.   Moving on to Caldwell Exhibit N, like Nancy, found

19  at docket number 291-14.

20       A.   I see it.

21       Q.   What is that?

22       A.   It's an invoice from Mr. Daneshmandi for work at

23  a -- at Shady Lane.

24       Q.   Okay.  Maintained by you in the normal course of

25  business?

1    A.   Yes.

2              MR. NICOUD:  Move for admission of Caldwell

3  Exhibit N found at docket number 291-14.

4              THE COURT:  Any objection?

5              MR. MITCHELL:  No objection.

6              THE COURT:  Exhibit N is admitted.

7    Q.   And moving to Caldwell Exhibit O, found at docket

8  number 291-15.

9    A.   That's another invoice from Mr. Daneshmandi for

10  Lakeview.

11   Q.   Okay.  And maintained by you in the normal course

12  of business?

13   A.   Yes.

14             MR. NICOUD:  Move for admission of Caldwell

15  Exhibit O.  This is found at docket number 291-15.

16             COURTROOM DEPUTY:  Stop talking at this time,

17  please.  Our judge just got disconnected.  She'll be back on.

18  Thank you.

19             THE COURT:  All right.  I'm sorry, folks.

20  Apparently I got disconnected somehow.  And so I'm back on

21  now.

22     I think I got disconnected right after the Exhibit N

23  was to be admitted; is that right?

24             MR. NICOUD:  I had moved for Exhibit N.  I had

25  moved on to Exhibit O.  But if it wasn't on the record, I

1   move for the admission of Exhibit N found at docket number

2   291-14.

3                 THE COURT:  Okay.  I think Exhibit N has been

4   admitted.  And that's where we -- right after that is when I

5   got disconnected.

6                 MR. NICOUD:  All right.

7      Q.   Turning to Caldwell Exhibit O, found at docket

8   number 291-15.

9       Mr. Moser, what is that?

10     A.   It's an invoice from Mr. Daneshmandi for the

11  Lakeview project for $25,000.

12     Q.   Okay.  Maintained by you in the normal course of

13  business?

14     A.   Yes.

15                MR. NICOUD:  Move for admission of Caldwell

16  Exhibit O.

17                THE COURT:  Any objections?

18                MR. MITCHELL:  No objection.

19                THE COURT:  All right.  Exhibit O is admitted.

20     Q.   Mr. Moser, have you become aware that the debtor is

21  pursuing several state court lawsuits?

22     A.   That's correct.  There's two of them for specific

23  performance where the debtor wants the contract, wants to

24  perform under the contract and purchase two houses.

25     Q.   And have you received any -- when were you informed

1   of those, that those had been filed?

2        A.   I've kind of known about them for a while.  About

3   the time they were filed, I'd talked to Mr. Daneshmandi quite

4   often.  So I'm sure we've talked about it.  But I wasn't

5   involved in the loop as far as whether to file them.

6        Q.   Okay.  And have you been getting any progress

7   reports on them?

8        A.   Just recently.  Yesterday I got some reports.

9        Q.   Okay.

10            MR. NICOUD:  I'll pass the witness.

11            THE COURT:  Does anyone else wish to examine

12   this witness?

13            MR. MITCHELL:  Your Honor, I would like to

14   recross, based on some of the questions that Mr. Nicoud had

15   asked.

16            THE COURT:  You may proceed.

17            MR. MITCHELL:  Thank you.

18                 <u>RECROSS-EXAMINATION</u>

19   BY MR. MITCHELL:

20        Q.   Mr. Moser, I'm going to start back at the

21   beginning.  I'll jump around a little bit.

22        Did -- first of all, regarding the motion that's before

23   the Court today, did you receive the debtor's request to make

24   the distribution that's now the subject of the motion?  Did

25   you receive that within the 14 days from the Court's order?

1    A.   Yes.  It was a cooperative effort.  We worked

2   together for it.  But I did receive it, yes.

3    Q.   Okay.  And do you have the debtor's exhibits in

4   front of you?

5    A.   Yes.

6            MR. MITCHELL:  And I will reference for the

7   Court that the debtor's exhibits, our witness and exhibit

8   list is at docket number 294.

9    Q.   And so the Debtor's Exhibit 1?

10    A.   Yeah.  That's a letter that I received from

11   Mr. Cavari regarding the interim distribution.

12    Q.   Okay.  And that was within 14 days of the Court's

13   order; is that your testimony?

14    A.   That is correct.

15    Q.   Okay.

16            MR. MITCHELL:  Your Honor, I would ask that

17   the Court admit Debtor's Exhibit Number 1 into evidence.

18            THE COURT:  Any objection?

19            MR. NICOUD:  No objection.  This is Robert

20   Nicoud.

21            THE COURT:  All right.  Exhibit 1 which was

22   filed as an attachment to the exhibit and witness list, which

23   has been docketed as docket number 294 is admitted.

24            MR. MITCHELL:  Thank you, Your Honor.

25    Q.   Mr. Moser, as part of the expenses that were paid

1   out, did they include, for example, payments to secured

2   creditors that had liens on the property?

3       A.   Yes, they did.

4       Q.   Okay.  And did those payments include property

5   taxes on the properties of the debtor?

6       A.   Yes.  I believe.  There were a couple of

7   properties.  Yes, they did.  But there were also some claims

8   that they had in the bankruptcy case that got paid.  So I'm

9   not -- I don't know the answer to that for certain.  I'd have

10  to look.

11      Q.   Okay.  That's fine.

12       And the payments you made also included some attorney's

13  fees, as well?

14      A.   Definitely included attorney's fees, yes.

15      Q.   Okay.  I want to refer back to Mr. Caldwell's

16  Exhibit H.  Let me get to it.

17       And this was an Construction Consultant invoice that

18  you testified about earlier.  And I believe you said that

19  this amount was paid; is that right?

20      A.   Parts of it were paid.  I believe 100 was paid and

21  50 wasn't, is my recollection.

22      Q.   Okay.  I'm going to refer back to Mr. Caldwell's

23  Exhibit A -- excuse me -- yeah, that's right, Exhibit A,

24  which is your report, the Plan Agent report.

25       And if you look down at the bottom of page 4 leading to

1   the top of page 5 --

2       A.   Right.

3       Q.   -- do you see there there are four, I guess,

4   negative disbursements, if you will, of $25,000 each?

5       A.   Yes.

6       Q.   Does that help refresh your recollection as to what

7   amounts were put back from that amount that was paid in

8   Exhibit A?

9       A.   Yes.  I had it backwards.  50 was paid.  100 I

10  stopped payments on.

11      Q.   Okay.  So 100 out of the 150 as part of Exhibit A

12  ended up back in the Plan Agent account?

13      A.   Yes.

14      Q.   Okay.  Turning back to Mr. Caldwell's Exhibit I.

15      A.   Okay.

16      Q.   This is a communication between you and

17  Mr. Daneshmandi.  It looks like you requested that some

18  support be provided before you make a payment?

19      A.   Correct.

20      Q.   First a general question.  Was that -- was that a

21  common procedure?  I mean, you didn't just make payments just

22  because you received an invoice, right?  I mean, you would

23  verify that a requested payment was appropriate, at least at

24  some level?

25      A.   That's correct.  There was always some -- more than

1  discussion.  There was either an email or something in

2  writing.

3      Q.   Okay.  And pursuant to this Exhibit I, you

4  requested information.  Do you recall if you subsequently

5  received the support in order to make those payments?

6      A.   I'm sure I did, or I wouldn't make the payments.  I

7  have a paralegal who's very strict on that.

8      Q.   Understood.

9       All right.  Give me a second.

10              MR. MITCHELL:  So, Your Honor, I don't recall

11  if it was admitted, but I just want to make sure that it is

12  admitted.  If Mr. Caldwell did not request that his Exhibit A

13  be admitted, we want to ask that Mr. Caldwell's Exhibit A be

14  admitted into evidence.

15              MR. NICOUD:  Caldwell has no objection.

16              THE COURT:  All right.  Exhibit A is admitted.

17              MR. MITCHELL:  Okay.  Thank you.

18      Q.   Mr. Moser, I'll ask a question that I asked earlier

19  and I think I recall the answer.  But just to clarify, all of

20  the payments that you made that were requested by

21  Mr. Daneshmandi, you only paid them if you believed they were

22  either approved by the Court or consistent with the confirmed

23  plan; is that right?

24      A.   That's correct.

25      Q.   Would you even on occasion visit some of these

1   properties to verify that, you know, activity was going on,

2   that things you were paying for were being done?

3       A.   Yes, I did, with Mr. Daneshmandi.

4       Q.   Okay.  Did you -- did you have any opinion about

5   the conditions of the property when you went to see them?

6   Again, based on -- just given your level of expertise and

7   understanding, did it look like the properties were making

8   progress, were proceeding as you might expect?

9       A.   Yeah.  They were all construction sites at various

10  stages.  But I will say the finished products, the ones I saw

11  were pretty impressive.

12      Q.   Okay.

13           MR. MITCHELL:  I will pass the witness.

14           THE COURT:  Okay.  Any other questions for

15  this witness?

16           MR. NICOUD:  This is Robert Nicoud.

17                RECROSS-EXAMINATION

18  BY MR. NICOUD:

19      Q.   Let's turn to Caldwell Exhibit J.

20      A.   All right.  Okay.

21      Q.   Now, with regard to the description of the items to

22  be paid, did you independently verify that each of those

23  things had been done?

24      A.   I did not.  But I will say Shady Lane is one of the

25  properties I went to and that was being done.  But I did not

1   independently verify the other ones.

2       Q.   Okay.  And when you did visit properties, were you

3   taking along the payment requests and checking off items to

4   see if they'd been done, or were you just verifying that they

5   were -- that work was being done?

6       A.   The bigger picture.  Just verifying work was being

7   done, who was working there, what was left to be done, how

8   close we are to selling it.

9       Q.   Okay.

10              MR. NICOUD:  Pass the witness.

11              THE COURT:  All right.  Mr. Moser, did you

12  wish to testify any further, in light of all of the

13  examination?

14              MR. MOSER:  No, ma'am, I rest.

15              THE COURT:  Thank you.  All right.  I'll

16  excuse you as a witness.

17      Is there any other evidence you wish to submit,

18  Mr. Moser?

19              MR. MOSER:  No, ma'am.

20              THE COURT:  Thank you.

21      All right.  Any other evidence any other party wishes

22  to submit?

23              MR. MITCHELL:  Your Honor, this is Greg

24  Mitchell.

25      I think both I and Mr. Caldwell probably have some

1  evidence.  We can go in any order you like.

2                THE COURT:  All right.  Well, since you're

3  speaking, let's hear from the debtor first and then senior

4  creditors.

5                MR. MITCHELL:  Okay.  I would like to call

6  Mr. Daneshmandi.

7                THE COURT:  All right.  Mr. Daneshmandi, are

8  you present?

9                MR. DANESHMANDI:  Yes, I am.

10               THE COURT:  All right.  Let's swear you in.

11               (The witness was sworn by the courtroom deputy.)

12                      <u>KAZEM DANESHMANDI</u>

13   The witness, having been duly sworn to tell the truth,

14  testified on his oath as follows:

15                   <u>DIRECT EXAMINATION</u>

16  BY MR. MITCHELL:

17      Q.   Mr. Daneshmandi, can you state your name for the

18  record, please.

19      A.   Kazem Daneshmandi.

20      Q.   I'll jump right in and I'll start with kind of

21  picking up with some of the questions that I asked Mr. Moser.

22  Were you -- were you in regular communication with Mr. Moser

23  regarding the houses, the properties of the debtor?

24      A.   Yes.

25      Q.   And did you provide information regarding the

1    requests that you were making for disbursements for the

2    property?

3        A.    Yes.

4        Q.    And kind of like Mr. Moser said in response to my

5    question, you apparently provided him enough information

6    to -- that he paid those requests, correct?

7        A.    Yes.   I provided the information and he also met me

8    at numerous properties.

9        Q.    Okay.   Let's talk in general about the expenses

10   that were incurred.

11         Let's talk generally first.   There were -- there were

12   large payments made to secured creditors of the properties;

13   is that true?

14       A.    That's correct.

15       Q.    And was there a general strategy going into the

16   confirmed plan as far as, you know, secured creditors and

17   then potentially eliminating the secured creditors as you go?

18       A.    Yeah.   But the plan was to work on the houses.   To

19   get the ones that were as close to finished finished,

20   especially if they had secured creditors, since my plan was

21   that secured creditors get paid off first.   So I would go

22   into -- the plan got confirmed October 31st of 2019.   So

23   that's -- that was about a year and a half ago.   And when it

24   was confirmed, the game plan when me and Joyce Lindauer, who

25   drew up the plan and Chris and Kim, his assistant, sat down

1   was to go ahead and -- I believe there was $77,000 left in my

2   debtor-in-possession account.  To take that money.  Make the

3   payments as Chris saw fit for lawyers, taxes, mortgage

4   payments, insurance, things like that.  And then to use money

5   to finish the next property to get sold and that was closest

6   to being ready, which would have been 2046 Greenstone in

7   Carrollton, which the secured creditor was Wells Fargo.  So

8   we went ahead and did -- did that.  Got it all fixed, fixed

9   up.  And sold it.

10      At that point, money would come back into the account.

11  And Chris, myself, Joyce would come up with the plan, like

12  the plan of attacked based on the plan that was drawn up.

13  And they would, again, distribute money to the ad valorem

14  taxes, which I think are like -- I don't have it on me, the

15  exhibit.  I think it was like almost 67,000.  The lawyers

16  that were dealing with the cases that were accrued by the

17  plan.  And then the money that was left over, which at that

18  point only came down to -- I'll have to look at the Plan

19  Agent report.  But I believe that it came down to, I want to

20  say maybe $2,000.  And that money was then supposed to go

21  towards fixing up that property, the next property that was

22  getting ready to be sold, which was 2029 Chatsworth in

23  Carrollton.  And at that point --

24      Q.  Let me jump in and try and steer a couple of

25  questions.  And I'm not trying to cut you off.  But I think

1   what it sounds like and what I think you're trying to get at

2   is, is it fair to say that the strategy that you took as far

3   as fixing up property, selling property, fixing up property,

4   selling property, did you believe that was consistent with

5   the plan that was confirmed, as far as the expenses that were

6   incurred and the timing of expenses, and that sort of thing?

7   Did you believe, as you were going, that everything was

8   consistent with the plan that was in place, that was

9   confirmed?

10       A.   Yes, 100 percent.  I -- I believed it was

11   consistent.  So did Joyce.  So did Chris.  So did Rod.  So

12   did Robert Nicoud.  Everyone was thinking it was consistent.

13   Even based on the email communications, everybody was on the

14   same plan.  Get the money.  Fix up the houses.  Pay off

15   secured creditors.  Pay off all these bills.  Onto the next

16   one.  Until finally -- like right now, we're down to the last

17   secured creditor house.  As soon as that one's done, then

18   from there on out, it was just all cash to be able to pay

19   everybody.  That was the plan that was drawn up from the get

20   go.  And that's the plan we went with.  If it was

21   inconsistent at any means, then we wouldn't even be able to

22   finish the first property, because there was no money from

23   the money that was transferred to even finish it.  So it

24   wouldn't make sense just to -- I guess, before the plan even

25   got confirmed, for it not to get confirmed or to go to

 1  Chapter 7 at that point.  Because the plan was to fix up the

 2  houses.  Sell them.  Pay off secured creditors, taxes,

 3  lawyers, again, et cetera, et cetera, salaries, wages.  And

 4  continue that train, keep going forward so that train keeps

 5  moving.

 6      Q.   Right.  And even -- and even though this was

 7  contemplated to be a liquidating plan, you believed that

 8  this, this process, this train you're talking  about, was

 9  consistent with that, even though it was --

10           MR. NICOUD:  Objection, Your Honor, leading.

11  This is Robert Nicoud.

12           MR. MITCHELL:  I can rephrase the question,

13  Your Honor.

14           THE COURT:  The objection is sustained.  You

15  can rephrase the question.  Thank you.

16           MR. MITCHELL:  I apologize.

17      Q.   Mr. Daneshmandi, did you believe that the -- that

18  the efforts that you were making was the -- the best way to

19  implement the plan and maximize the estate assets?

20      A.   Yes.  Yes, per my plan.  It said to maximize the

21  profits of each house, which means to maximize would have

22  been to fix up the houses and keep going into it.  Fix up the

23  houses and sell them.  I completely thought it was

24  consistent.  Chris completely thought it was consistent.

25  Joyce -- everyone thought it was consistent to continue

1  having this train run.  So, yes, I do believe we were

2  operating under the plan correctly.  Otherwise -- I mean, I'm

3  sure Chris would have notified me or told me from the get go,

4  hey, he said no -- he said no to payment plenty of times to

5  me.  From the get go he would have said, no.  Just me

6  reviewing email things, I can see it in the language.  Chris

7  was completely thinking the same thing that I was thinking,

8  thinking exactly what the plan was thinking.  Fix the

9  properties up.  Pay the secured creditors.

10      Go ahead.

11      Q.  Sir, no.  If you hadn't incurred the expenses that

12  you incurred and engaged in the -- in the actions that you

13  engaged in, do you believe --

14          MR. NICOUD:  Objection; leading, Your Honor.

15          THE COURT:  Objection sustained.

16      Q.  Would we be sitting here today, Mr. Daneshmandi,

17  with $360,000 in the Plan Agent's bank account had it not

18  been for your efforts?

19      A.  No.  100 percent no.  We would be sitting here

20  right now -- we actually wouldn't be sitting here.  The plan

21  would have got -- not got confirmed.  And we would have gone

22  into Chapter 7 a year and a half ago on October 31st.  No one

23  has ever objected to the consistency of the plan.  Not even

24  Mr. Nicoud and Mr. Caldwell objected to the consistency of

25  the plan, because everybody was on board that the plan was

1   operating correctly, especially with the people that were

2   running the plan which at that time would be me with the

3   guidance of Chris.  If Chris thought it wasn't supposed to be

4   correct, he would have told me.  He wouldn't have paid me.

5   Nothing would have happened.  We'd be having this

6   discussion -- to answer your question, we would not be here

7   with any money.  That's the truth.

8        Q.    So real quick, just to kind of summarize the

9   numbers.  You prepared a demonstrative exhibit.  Do you

10  recall that?

11       A.    Yes.

12       Q.    And you provided that to me.

13             MR. MITCHELL:  Your Honor, I filed that as

14  a -- this morning.  I've labeled it, I think, on the exhibit

15  and witness list.  But it's the only document that's attached

16  to docket number 298.  And I also sent a copy to Mr. Nicoud

17  and Mr. Moser.  If you want to pull that up.  I was just

18  going to -- if there's no objection to the use of the

19  demonstrative, I was going to ask Mr. Daneshmandi to kind of

20  summarize the numbers that we believe reflect the money that

21  exists and the money that's been paid out.

22       And before I proceed, Your Honor, I just want to make

23  sure that you got there.

24             THE COURT:  I'm pulling it up right now.  It

25  will just take a minute.

1          MR. MITCHELL:  Okay.  That's fine.  I just

2    didn't want to start, if you weren't --

3          THE COURT:  Okay.  I've pulled it up.  It's

4    docket 298 you said, right?

5          MR. MITCHELL:  Yes.

6          THE COURT:  All right.  You may proceed.

7          MR. MITCHELL:  Okay.  Thank you.

8    Q.   Mr. Daneshmandi, you have this in front of you.

9    Can you kind of walk us through, again, kind of the summary

10   of what you believe to be the numbers as we sit here today as

11   far as what we have left, what number -- what amounts were

12   spent, and what they were spent on?

13   A.   Sure.  So my lawyer bills that were confirmed with

14   the plan and/or Judge Rhoades, her individual orders to get

15   them approved total $141,472.45.  And that included Trustee

16   fees, the Plan Agent, all of the lawyers involved.  The Plan

17   Agent hired a consultant and used an independent bank to do

18   the reports.  So that also includes, you know, the $300

19   charge here and there they would get for that.  So the lawyer

20   bills were authorized.

21   Q.   Okay.  And just so we're on the same page, what

22   other -- what other lawyers were paid as part of this?

23   A.   That was Joyce Lindauer, who first drew the plan

24   up.  That includes Rod Cavari.  It includes Chad Rubeck for

25   the appeal on the claim which is still on appeal right now.

1   Caldwell's claim is still on appeal.  It includes you, Greg

2   Mitchell.  It includes Ryan Luce, who is dealing with the

3   Caldwell actions, as well as Rod Cavari.  That includes

4   (indecipherable few words) who is dealing with one of the

5   properties that's owned by GRC, a third interest,

6   (indecipherable two words) bankruptcy.  He's dealing with

7   that.  I believe that's all the lawyers.  Lawyers, Trustees,

8   Plan Agent, Chris Moser, obviously.  That's where the

9   141,472.45 came from.  All confirmed and approved by either

10  the plan or separate orders that Judge Rhoades had signed.

11       Q.   Okay.  Then we have the mortgage payments.  I'm

12  assuming that's self-explanatory.  These were -- were those

13  mortgage payments on properties that are part of the

14  bankruptcy estate?

15       A.   Correct.  There was two secured creditors when the

16  plan got confirmed; Wells Fargo, which became the first

17  property paid off.  So there were some mortgage payments to

18  them.  And then Statebridge, which had, I think at that time,

19  two -- I think they had two -- I think they had two loans at

20  that time.  They might have had three.  I don't necessarily

21  off the top of my head recall.  I know 1005 Shady Lane,

22  Keller was a loan with them.  I know that 6012 Mays was a

23  loan to them.  I believe that's it.  So the mortgage payments

24  per the Plan Agent's report, that was an exhibit, those were

25  authorized mortgage payments from the plan that were paid,

1   32,166.33.

2        Q.    Okay.  Tell me about the wages and salaries number.

3        A.    The wages and salaries, I was getting paid $7,500 a

4   month to run this estate.  That was up until December of

5   2020.  So the total of the wages, including having an

6   assistant for three months, three months maybe four, to help

7   me try to get everything on track totaled 107,500, which were

8   all also approved in my plan.  But then I was -- Mr. Caldwell

9   got three writ of garnishments, so they stopped paying me.

10  The last payment, I think, was December 2020.  He did three

11  separate writ of garnishments and he would just dismiss them

12  the day of the hearing.  And Chris would email me

13  (indecipherable word), dismissed the writ of garnishment.  So

14  I haven't been paid since, since January.  December was my

15  last payment since January.  Nothing this year.  So that's

16  all the wages in the confirmed plan, which was October 31st,

17  2019, a year and a half ago to now.  That was --

18       Q.    Okay.  So just to be clear, was your efforts in

19  working on behalf of the debtor, was that your only job?

20       A.    Yes.

21       Q.    And you spent all of your productive time trying to

22  re-commence the confirmed plan?

23       A.    All plus some.  Time and a half, double time.  I

24  spent all of my time trying to get everything worked out with

25  this company.

1    Q.   Okay.  Tell me about the taxes number.  Are those

2  property taxes related to the property?

3    A.   Correct.  So those were all of the taxes that had

4  been paid over the year and a half, which included ad valorem

5  taxes, the County taxes, Tarrant County, things like that.

6  So when I tallied all of those up, based on the Plan Agent's

7  report, I came to $62,320.36.  And those were all authorized

8  by the plan.

9    Q.   Okay.  Tell me where the -- moving to the net

10 generated from sales.  Where does that number come from?

11   A.   The net generated from sales, per my plan, all

12 sales proceeds were to be deposited with Mr. Moser.  So the

13 net generated from sales for every -- effectively every wire

14 that came through from the title companies, the total paid to

15 secured creditors, the closing costs, things like that, the

16 number came to 812,000 -- I'm sorry, $802,912.  And then of

17 that, Chris is holding right now $360,000.  So with all of

18 the approved expenses from lawyer bills, mortgages, wages,

19 taxes minus the 802,912, minus the 360, will leave $442,912

20 which was supposed to be for construction expenses.  And per

21 my disclosure statement, I estimated I was going to spend

22 $430,000.  And this is obviously before COVID-19 hit and all

23 of the prices have 10 times grown in (indecipherable word),

24 and lumber, and all of that kind of stuff.  So now I'm only

25 $12,000 under my complete budget.  And I only have --

1      Q.    Okay.   Okay.   And your last comment kind of

2   transitioned to the next couple of questions I was going to

3   ask.

4         One of the complaints from Mr. Caldwell has been the

5   timing that there were, you know, estimates earlier on that

6   were believed to -- that we would be a lot further along than

7   we are.   Tell me about that and tell me the affect that COVID

8   had on your business and the building -- working on the

9   properties.

10      A.    I mean, COVID-19 effectively started end of

11   February and really hit, I think it was March when they

12   started doing the stay-at-home and dealing with that.   So --

13   and it definitely hindered not only me being on the

14   properties actually doing physical labor, doing things like

15   that.   But the people working on the properties, the labor

16   force kind of disappeared.   Cost of labor skyrocketed.   Cost

17   of materials skyrocketed.   Home Depot wasn't open.   And when

18   it did become open, it was only open from like 9 to 4.

19   Things like that.   It just became a -- COVID-19 -- and I did

20   get COVID two times -- was just crazy.   So it effectively

21   slowed everything down big time.   Like I saw in, you know,

22   some of the exhibits that I communicated to Joyce in February

23   that some of these properties were going to get done in a

24   month, or two months, or six weeks, and obviously with

25   COVID-19, that was just impossible to do.   No one could work.

1   The costs were going up.  It was just impossible to complete

2   those.  And that's why it took a little longer to complete

3   those.

4        So I've been in my confirmed plan right now for a year

5   and a half.  I know Mr. Moser said it's been two years.  It

6   hasn't been two years.  It's been a year and a half that I've

7   been in my confirmed plan.  In that year and a half, almost a

8   year and two months of it have been COVID.  And the last six

9   months of it, Robert Nicoud and John Caldwell have stopped

10  any payments to be made to anybody.  So it's just been

11  sitting and looking (inaudible word), even though I'm still

12  working and (indecipherable two words), it's just -- it's not

13  feasible.  So out of a year and a half, a year was COVID and

14  a half a year was me, you know, the way I like to put it,

15  being stonewalled.  And at this point I still have sold five

16  of the ten properties, I think -- I think it was ten

17  properties total -- five of the ten properties.  And out of

18  those remaining five, one of the properties has been for sale

19  since confirmation, almost a year and a half now, or longer.

20  It was even when I declared bankruptcy back in May.  So

21  there's only four properties at that point that are left.

22  And two are, you know, partially completed.  And then one is,

23  the mobile home has -- the other one is a mobile home that's

24  in dilapidated condition and one is a rehab.  So I've been

25  doing my best to run the company and with COVID, lack of

1    employees -- they're not even employees, they're

2    subcontractors.  Lack of subcontractors, lack of money from

3    the Plan Agent.  And also, just to point out, if you look at

4    the Plan Agent report list, there are times like 2029

5    Chatsworth -- is there any way -- can you pull up the Plan

6    Agent report listed in the exhibits so I can see it?

7        Q.   Let me -- I don't -- let me ask some specific

8    questions.  That kind of got off track a little bit.

9        A.   All right.

10       Q.   No, you're fine.  We'll come back to some questions

11   that hopefully will touch on that.

12        Let's look at some specific exhibits that we have.

13            MR. MITCHELL:  Again, Your Honor, I'm

14   referring to exhibits attached to our witness and exhibit

15   list that appears at docket number 294.  And now I'm turning

16   to Exhibit Number 2.

17       Q.   Mr. Daneshmandi, Exhibit Number 2 is a number of

18   pictures that were taken, or that you took showing some of

19   the properties.  And if you would, tell us what we're seeing

20   here and how that affects why we're here today.

21       A.   Give me a second.  I'm trying to --

22       Q.   No problem.

23       A.   Okay.  So the pictures that you're seeing -- I

24   can't see -- I can't see your screen.  So I don't know what

25   you're sharing.  I only know what I provided.  I don't know

1  if you can email me the exhibit, then I can see it.  I can't

2  see the screen.  So I can take a picture, but I don't want to

3  start talking about a picture when you guys are looking at

4  something else.

5      Q.   Okay.  So, I guess, tell me in general, while I'm

6  trying to do that, tell me in general, the pictures that you

7  provided, they were pictures of the properties.  Were they

8  designed to be a before and after?  Were they designed to

9  kind of show us what the state of the property?  What was the

10 point of the pictures?  And then hopefully I can get you to

11 the pictures here.

12     A.   Sure.  If you look at the pictures, there's one

13 picture that says Google on it.  And it's going to have the

14 address 6012 Mays Place.  And that's going to be the before

15 picture.  It's going to have --

16          MR. NICOUD:  Your Honor, I'm going to object

17 about talking about the pictures.  We don't have it before

18 the Court.

19          THE COURT:  Well, I thought he was talking

20 about Exhibit 2?  Is he not talking about Exhibit 2?

21          MR. NICOUD:  Well, we don't know -- he -- the

22 witness has said he doesn't have it in front of him.  So I'm

23 not sure which picture we're talking about.

24          THE COURT:  Mr. Mitchell?

25          MR. MITCHELL:  Your Honor, I'm trying to

CINDY SUMNER, CSR (214) 802-7196

1  direct Mr. Daneshmandi.  I've sent over the pictures.  We're

2  not in the same place, so I apologize.  We're trying to

3  coordinate this as best we can.

4           THE COURT:  Why don't we take a 10 minute

5  recess right now so you can get off-line and coordinate and

6  make sure that he has a copy of the full set of the exhibits.

7           MR. MITCHELL:  That's fine.

8        Your Honor, before we take a break, can we address the

9  timing issue?  This was requested to be a two hour setting.

10  And so I didn't try to make accommodations when I got a

11  hearing set on me for 1:30 this afternoon in the District

12  Court in the Eastern District of Texas.  I have a hearing at

13  1:30.  If we're going to go that long, or even close to that

14  long, can we at least address that?  Because I actually have

15  to go there.  It's an in-person hearing.  And I was only

16  anticipating a two hour hearing, because that's what I

17  thought we got, as far as the setting.

18           THE COURT:  Well, who set this hearing?

19           MR. MITCHELL:  Well, I think we had initially

20  set at a particular day and Mr. Nicoud said that he thought

21  it was going to take a couple of hours and so he --

22           THE COURT:  My question is where in the

23  hearing in the Eastern District of Texas that you just

24  mentioned?

25           MR. MITCHELL:  It's actually at the Plano

1  District Court.

2            THE COURT:  Okay.  So you're going to be in

3  Plano?

4            MR. MITCHELL:  Correct.

5            THE COURT:  All right.  And that's fairly

6  close to your office, right?  How long do you expect that

7  hearing to last?

8            MR. MITCHELL:  I don't think it will take more

9  than 30 minutes.

10            THE COURT:  All right.  We'll recess -- we'll

11  recess then to give you time to go handle that matter.  Or

12  we'll just see where we are when it's time to recess for a

13  lunch break.  Okay?

14            MR. MITCHELL:  Okay.  Fair enough.  Thank you,

15  Your Honor.

16            THE COURT:  We're going to take a 10 minute

17  recess right now.  Why don't you all organize that in terms

18  of discussing off-line what remains, what evidence remains,

19  how long it's going to take, et cetera.  And, also, if anyone

20  wishes to examine any witness about an exhibit, you all need

21  to make sure the witness has a copy of the exhibits in front

22  of them when you start.  So you all do what you need to do to

23  make sure that happens.  Okay?  So we'll take a 10 minute

24  recess to give you all time to get organized.

25       We stand in recess.

1              (Brief recess ensued.)

2              COURTROOM DEPUTY:  GRCDallasHomes, LLC.  Case

3    number 19-41186.  Plan Agent motion for authority to make

4    certain payments, motion for sanction, and motion to compel

5    debtor and creditor.

6              THE COURT:  All right.  When we -- when we

7    recessed, we recessed so that the parties can make sure all

8    of the witnesses have a copy of the exhibits in front of them

9    and to make arrangements about scheduling issues related to

10   scheduling conflicts for this afternoon.

11        So where are we now?

12             MR. MITCHELL:  Your Honor, I think we're

13   prepared to proceed.  I think Mr. Daneshmandi has the

14   exhibits in front of him.  As far as timing, as I mentioned,

15   my -- the hearing is at 1:00 -- is at 1:30.  I just Google

16   mapped it.  I'm exactly 30 minutes away.  So any cushion

17   would be appreciated.  But that's where I'm at.

18             THE COURT:  Okay.  Let's see if we can finish

19   with this witness first.  And maybe that might be where we

20   need to recess for the morning, any way.

21        So you may proceed.

22             MR. MITCHELL:  Thank you, Your Honor.

23        Q.   Mr. Daneshmandi, when we left off, we were starting

24   to look at exhibits.  Do you have those exhibits in front of

25   you now?

1      A.   Yes.

2      Q.   Okay.  So starting with Exhibit 2.  Exhibit 2 is a

3 lot of pictures.  Tell us what we're seeing in these pictures

4 as it relates to what's before the Court.

5      A.   Correct.  Exhibit 2 is just a bunch of trash and

6 stuff that's been taken out of the property and bundled up.

7 The trash container has all of the trash in it, as well.  If

8 you go down to the following picture with the trees that are

9 growing into the electrical meter.  It just shows that the

10 electricity for that house needs to get done.  That's a fire

11 hazard.

12           MR. NICOUD:  Excuse me, Your Honor, Robert

13 Nicoud.  Can we find out what property we're talking about

14 and when the photo was taken?

15           THE COURT:  All right.  Let's be a little more

16 specific in your questioning so that we can get the

17 information.  And then further information ou guys can get

18 on -- in terms of by cross-examination.

19      Q.   Okay.  I guess, Mr. Daneshmandi, tell me, I guess,

20 were these pictures all taken at the same time?  Were they

21 taken at various times?

22      A.   The pictures were taken at various times.  I don't

23 recall the exact date that the pictures were taken, but I can

24 tell you which property the pictures are from.

25           The first picture with the trash outside --

1      Q.    Okay.

2      A.    -- is 2029 Chatsworth in Carrollton.  And the next

3  picture is the trash container that was -- that's either at

4  the property of 2029 Chatsworth or 6012 Mays.  The next

5  photo, which is the electrical meter with the trees growing

6  in, that is 6012 Mays.  It shows that it needed electricity.

7  The next picture you see is a finished out version of 6012

8  Mays with (indecipherable two words), the baseboard, the

9  stone, floors, the texture tape bed, electrical, faucets,

10  things like that.  The next picture you're seeing like a

11  custom gate that I've done, the landscaping, the paint, the

12  roof, deck work.  That's at 6012 Mays, as well.  The next

13  picture is going to be 6012 Mays that shows, again, the new

14  windows, the new door, painting, brick work, the landscaping,

15  the gate, next to a security system (inaudible word).  The

16  next picture is an internal picture -- interior picture,

17  excuse me, of 6012 Mays, again, which is the finish out

18  flooring, tape and bed, texture, followed by the next

19  picture, again, custom doors, custom windows, custom

20  cabinets, back splash, fans, lights.  You name it, it's in

21  the property.  All of these photos are 6012 Mays.

22      The next one is the new appliances, refrigerator,

23  double oven, the vent-a-hood, the dishwasher, the faucets,

24  double faucets, LED lights, the chandelier, the mirror,

25  doors, the handles on the doors, on the kitchen doors.  The

1  next one is a custom fireplace with stone inserts, security

2  system, inlays on top of the fireplace, the 6 inch baseboard,

3  the floors, the windows, the fans.  The next one is a close

4  up of the back splash, again, the cabinet, the glass inserts

5  into the custom cabinets, the appliances, the handles.  Then

6  you're going to go into the next picture, which would be the

7  bedroom which you'll see the two (indecipherable word) on the

8  doors, electrical, the baseboards, the new mirrors, LED

9  lights, HVC, which is air-conditioning ventilation, fire

10  alarm, things like that.  Next one you're going to see a

11  custom bathroom, custom glasswork, custom door, custom full

12  tile through the whole bathroom, including a custom floor

13  shower pan, tile, new toilet, new fixtures, new lights.

14  There's an LED speaker on top cuing up the light.

15       The next one you're going to look at the guest bathroom

16  new bathtub, new tile, new faucets, new cabinets with

17  handles, granite, toilet.  Next one you see a custom closet,

18  which is glass insert, custom cabinet work, handles,

19  flooring, trim work.  Next one is, again, another photo of

20  the bathroom that shows the glasswork that was done, the

21  flooring, the custom (inaudible word).  The next one you'll

22  see an outside photo which shows all of the stamped color

23  concrete that was done to the house.  I believe we had almost

24  three truckloads of concrete, the custom cedar pergola, the

25  fan, the lights, the brickwork, the doors, the landscaping.

1   Your next one is going to have a new garage door, the 8X8

2   cedar fence with top cap and rails at the top pieces,

3   stained.  You've got the stained concrete in multi -- three

4   different colors.  You've got new windows, new doors, new

5   trims.

6        You see the new 15 year roof on there with a bridge

7   (indecipherable word).  That's a little fence on top of the

8   roof.  The landscaping.  And then you're going to go to the

9   next picture which has Google on it.  That's the before

10  picture of that exact same house.  You can tell the

11  landscaping is not done.  The concrete is not done.  The

12  brick's not done.  The painting is not done.  The roof's not

13  done.  The trees aren't cut.  No new windows.  Anything like

14  that on it.  The final foundation has been done, obviously.

15  If you look at the next picture it says Google from the back.

16  It shows there's no foundation done, because those big cracks

17  in the driveway.  There's cracks in the driveway.  There's

18  cracks in the house, multiple cracks, which are also leaked

19  plumbing repairs.  (Indecipherable word) pipes, things like

20  that.  And that's just the -- that's the before picture of

21  the lot.  No fence.  No new grass.  No roof.  No bricks.  No

22  stamped concrete.  None of that stuff in there.  So that's

23  that exhibit.

24        Q.   Okay.  So did you take all of these pictures and

25  you're familiar with all of the contents in them?

1      A.   Yes.  The last photo, the Google ones, that's done

2   by the Google car that takes pictures.  I'm not sure.

3      Q.   Okay.  But you're familiar with the contents and

4   everything that we see here that's represented is true and

5   correct, to the best of your knowledge?

6      A.   Yes.

7      Q.   And -- so basically is this -- does this represent

8   kind of the quality of work that's being done to the

9   properties owned by the debtor?

10      A.   Correct.  It represents pretty much the before

11   pictures of how all the properties were.  If you would have

12   asked Chris what he thought of the properties he saw, they

13   were dilapidated conditions, not habitable, just messed up

14   and junk, with all due respect.  And then after I get done

15   finishing them, they're, you know, top of the tier.  Best of

16   the best.  That's why they sell so quick.  That's why they

17   get over my disclosure amounts.  I'm getting more for them,

18   because I put in all of that work and repair and money.

19      Q.   Okay.

20           MR. MITCHELL:  Your Honor, I'd ask that

21   Exhibit 2 be admitted into evidence.

22           MR. NICOUD:  Objection; relevance.

23           THE COURT:  Objection is overruled.  Exhibit 2

24   will be admitted.  You can connect as to relevance at

25   closing.

1            MR. NICOUD:  Okay.

2            MR. MITCHELL:  Thank you, Your Honor.

3       Q.   Mr. Daneshmandi, let's just go through them in

4  sequence.  Exhibit Number 3 is a State Court motion to

5  dismiss without prejudice in a -- in case number 20-10384 in

6  the 462nd District of Denton County.

7        What does this relate to and how is it relevant to

8  what's before the Court today?

9       A.   That's pretty much John Caldwell just stonewalling

10 GRC and wanting it to burn.  That's one of three writ of

11 garnishments they did.  And they would just dismiss them on

12 the day of the hearing just so that Chris wouldn't pay me and

13 the process wouldn't keep going.  And I tried my best to keep

14 the process going, but it's hard when you can't have access

15 to funds.  So the way that I would refer to it in my mind,

16 and I would tell my lawyers I was like, hey, COVID-19 hit and

17 Caldwell-19 hit.  Either one is going to make me not be able

18 to finish what I have to do per the plan.

19      Q.   And while we're at that, along the same lines,

20 looking at Exhibit 4.  Exhibit 4 is styled a notice of

21 non-suit in a different case filed by John Caldwell, cause

22 number 21-3543-431 in the 431st District of Denton County.

23 Is this a different case that shows us more of the same?

24      A.   Yes.  Filed for writ of garnishment and then

25 non-suited the day before the hearing.

1      Q.    Okay.

2             MR. MITCHELL:  Your Honor, I would ask that

3      Exhibits 3 and 4 be admitted.

4             MR. NICOUD:  No objection.

5             THE COURT:  Exhibits 3 and 4 will be admitted.

6             MR. MITCHELL:  Thank you.

7      Q.    Mr. Daneshmandi, turn to Exhibit 5.  Tell me what

8      we're looking at and how it relates to what's before the

9      Court today.

10     A.    Exhibit Number 5 was 2029 Chatsworth Drive in

11     Carrollton.  I believe it was the second property that I

12     sold.  So after I fixed up the property, obviously you get it

13     approved by the City per the permits, things like that, as

14     well as the people that are buying it get a residential

15     inspector to come out and inspect everything.  At the time

16     that they got the inspection, the Plan Agent only had maybe 2

17     to $5,000 in his account maximum.  In this addendum, this is

18     what the buyer was asking for.  They're asking for all this

19     stuff to get fixed.  So then I just cross it off and say,

20     fine, I'll give you a new roof.  You go to the next page,

21     mechanical exhaust vent.  Everything that I say yes and

22     there's a CG, that's their signature, is me going these are

23     all -- me agreeing that these are all of the issues with the

24     house that they want to address so that it would sell and

25     bring money into the plan for Chris.  So each one, yes, yes,

1   yes.  So if you go down I'm doing grating and drain through

2   all the supply system.  The water -- (indecipherable word)

3   one is not necessary, but everything else.  All of the water

4   supply lines in the attic should be fixed.  Grating and

5   drainage, roof, mechanical exhaust vents.

6        We'll go to the next page now.  The faucets appear

7   sub-below water pressure.  I go fix all new pipes and

8   faucets.  Next, the (indecipherable two words) is not

9   functioning.  It's probably from the (indecipherable word).

10  Fix or replace faucet.  Then it goes (indecipherable word),

11  which are electrical things you plug into the electricity.  I

12  go, yes, I'll switch them to make it Code compliant.

13  (Indecipherable few words) outlets work.  Fine, I'll switch

14  them and make them Code compliant.  Next page, same thing.

15  All of the electrical stuff that needs to be done, I'm

16  saying, yes, yes, yes, yes, I'll do it all.  That's all

17  electrical stuff.

18       If you go down to electrical system.  The condition

19  should be further investigated and corrected.  Next, fix --

20  locate (indecipherable word).  I go, yes, install

21  (indecipherable word).  Fashion details.  There's no

22  (indecipherable word) on there, yes, yes.  So you see me

23  agree to everything -- this is agreeing to everything,

24  essentially, that they want so that I could get the house

25  sold for maximum value per my plan.  And I'm going ahead and

1    agreeing to fix all of these things on it.  We both signed

2    it.  But at that time, Chris didn't have money in the

3    account.  So I emailed him and I said, hey, we don't have any

4    money.  I'm going to use some of my cash that I've been using

5    from getting from my wages and salary to go ahead and pay

6    out-of-pocket to get all of this stuff done.  To put a whole

7    new roof on a house, 30 squares, and all of this concrete

8    work, and exhaust, and electrical.  All of this kind of

9    stuff.  I'm going to go ahead and pay for it out-of-pocket

10   because if I don't, this house is not going to sell.  We're

11   not going to have any money in the account.  I'll pay for it

12   out-of-pocket.  I'm going to bill you later.  He agreed to

13   it.  What I submitted was the email communication where I'm

14   telling Chris that and he's responding back to me and we

15   continue to do that.  And I'm asking for that money back.

16   Chris asked me, can I have support?  Like he'd ask for all of

17   the repairs, to have support for this repair.  I sent him

18   saying, yes.  I've done all this, as a contractor would.  I

19   want to get paid for it.  And I'm using my own money to fund

20   the job, because there's no money left because he had paid

21   all of the taxes and the lawyers.  You see, I think, $142,000

22   to lawyers.  The majority -- a lot of these are because they

23   just keep stonewalling motion, motion, objection, objection.

24   They just won't let me (indecipherable word).  It's like

25   getting a divorce.  It's crazy.

1    Q.   Okay.  So --

2                MR. MITCHELL:  Yeah, that's all of the

3  questions I have for Exhibit 5, Your Honor.  I would ask that

4  Exhibit 5 be admitted into evidence.

5                THE COURT:  Any objection?

6                MR. NICOUD:  Voir dire, Your Honor.

7                THE COURT:  You may.

8                MR. NICOUD:  I just want to --

9                     VOIR DIRE EXAMINATION

10  BY MR. NICOUD:

11    Q.   What is the date of this document?

12    A.   I believe there's dates in the -- it looks like

13  there are signatures from -- like automated signatures.

14                MR. MITCHELL:  Yeah.  There's a DocuSign date

15  right next to the signatures that says 4/24 -- 4/25.

16    A.   Yeah.

17                MR. MITCHELL:  April 25th of 2020.

18    A.   First page of the exhibit.

19    Q.   So 4/25/2020?

20    A.   Actually, it's on multiple pages of the exhibit,

21  but, yes, 4/25/2020.

22                MR. NICOUD:  With that, no objection.

23                THE COURT:  All right.  Exhibit's admitted.

24                MR. MITCHELL:  Thank you, Your Honor.

25                     (no omission)

1                   <u>DIRECT EXAMINATION CONTINUED</u>

2    BY MR. MITCHELL:

3        Q.   Mr. Daneshmandi, turn to Exhibit 6.  Exhibit 6 is

4    an email from your former counsel regarding -- this is back

5    in March of 2020.  What is the reason for including this

6    exhibit and what does this tell us, as it relates to what's

7    before the Court?

8         Mr. Daneshmandi, are you there?  Can you hear me?

9        A.   I can now.

10       Q.   Okay.

11       A.   I can now.

12       Q.   Okay.

13       A.   It's an email from Joyce to Mr. Robert Nicoud dated

14   March 5th, which potentially was the peak of COVID-19.  So

15   Mr. Nicoud had emailed Joyce and put her on notice saying

16   that the properties weren't finished as per -- as he wanted.

17   And we were in default.  Ms. Lindauer, however, responded

18   back, we're not in default.  The houses are getting done.

19   It's a process.  As we know with construction, it usually

20   takes longer than necessary.  She pointed that stuff out to

21   him.  So the email just goes, Greenstone he said was one of

22   the houses that weren't done and not sold.  And that's one of

23   the houses -- hey, that house was closed.  Next was

24   Chatsworth at that time.  And I was saying, hey, I'm going to

25   get it finished because of permit inspections like Jewel and

1    Harlington.  It's due for -- and these are all, you know,

2    like rough times.  That's the whole point that I was trying

3    to say with this was, these are all rough times.  This was

4    like when Corona hit.  So all of these things -- like the

5    houses will get put for sale way later.  I will finish them

6    way later.  There's -- I couldn't be bound by this, because

7    this was right at the beginning of the start of Corona and

8    everything in my life completely changed.  So that was the

9    whole point of -- you know.

10        Q.   So does this email kind of show that despite some

11   of the delays, there was regular communication between your

12   counsel and Mr. Caldwell's counsel regarding status?

13        A.   Yes.  And if Mr. Nicoud thought we were in

14   violation or inconsistent or anything like that, he

15   definitely would have notified my lawyer, as he did on this

16   occasion, as proof.  If he thought there was something wrong,

17   he would have notified her.  If Chris thought there was

18   something wrong, they would have notified her.  No one ever

19   thought anything was wrong.  We were following through with

20   what we were supposed to do.

21        Q.   Okay.

22             MR. MITCHELL:  And for the record, Your Honor,

23   this is also Caldwell -- Mr. Caldwell's Exhibit G.  I don't

24   recall if that was admitted.  But we would ask that it be

25   admitted as our Exhibit Number 7.  No, Number 6, I'm sorry,

1  our Exhibit --

2                THE COURT:  All right.  Any objection?

3                MR. NICOUD:  No objection.

4                THE COURT:  All right.  Exhibit 6 is admitted.

5     Q.   Mr. Daneshmandi, I want to turn to Exhibit Number

6  8.  Exhibit Number 8 is a text message string between you and

7  Mr. Caldwell.  Tell me what's going on here and when this

8  happened and why it happened.

9     A.   Okay.  So the basis of the lawsuit that's now in

10 the appeal process of Mr. Caldwell's, finally thought we had

11 a contract between us to -- he invested money into a

12 particular property.  I signed the promissory notes, which is

13 the basis of the appeal that's going that says, hey, if

14 anything goes in default, I will give you --

15                MR. NICOUD:  Your Honor, this is Robert

16 Nicoud.  The witness has testified it pertains to a state

17 court matter that's on appeal.  It's not relevant to this

18 proceeding.

19                MR. MITCHELL:  Your Honor, we would submit

20 that this -- that this exhibit is relevant to show the kind

21 of mentality of the objecting creditor.  That, you know, as

22 we've tried to argue all along, Chapter 7 is not in the best

23 interest of anyone.  And we believe that Mr. Caldwell's

24 recommendations to the Court, decisions, are made based on

25 emotion.  That he sincerely does not like Mr. Daneshmandi,

1  which is certainly his right.  But we believe that it's

2  clouding his views.  And we believe that this text message

3  kind of demonstrates that clouding of kind of clear thinking.

4          THE COURT:  All right.  I don't think

5  Mr. Caldwell's thinking is at issue.  Objection is sustained.

6          MR. MITCHELL:  Okay.  Thank you, Your Honor.

7      Q.   Mr. Daneshmandi, if you would turn to Exhibit 9.

8  And I would point out that Exhibit 9 is also Mr. Caldwell's

9  Exhibit H.  I think Mr. Moser addressed this in some

10  follow-up questioning.  But I just wanted to go ahead and ask

11  you, there's void written by several entries.  Does the void

12  reflect the numbers that were backed out that we looked at in

13  Exhibit A when I was questioning Mr. Moser?

14      A.   Correct.  They were voided checks.  So out of those

15  six checks, four of them were voided.

16      Q.   Got it.  So out of $150,000 that was initially

17  paid, $100,000 was eventually put back?

18      A.   Correct.

19      Q.   Okay.

20          MR. MITCHELL:  And I guess even though I

21  believe Exhibit H was admitted, we would ask that our Exhibit

22  9 be admitted, to the extent that it reflects the

23  (indecipherable word) of the particular transactions.

24          THE COURT:  Any objection?

25          MR. NICOUD:  No objection.

1           THE COURT:  Exhibit 9 is admitted.

2      Q.   Okay.  Mr. Daneshmandi, we're almost there.  Look

3  at Exhibit 10.  Exhibit 10 is an email from Mr. Moser to your

4  counsel, Mr. Cavari, and you were included.  Tell me what we

5  see here and how this is relevant to what's before the Court.

6      A.   What you're seeing is an email from Chris back to

7  Rod.  And it was -- when the Court found us in default we

8  contacted Joyce and I said, Joyce, can you re-do the plan?

9  She said, no.  At that point, me and Rod called up Chris and

10  said, hey, we want you to distribute all of the money, except

11  for the 50, 60 grand that's for lawyers, for the allowed

12  administrative expenses to all of the creditors.  And then --

13  so we initiated that discussion with Chris saying, hey, we

14  want to do this.  Chris came back and said that -- exactly

15  what it says in the email.  Nicoud won't let it -- Nicoud

16  would be amenable to keeping the case in Chapter 11 and

17  making a proposed distribution, if we can all reach an

18  agreement on selling the remaining houses.  From that brought

19  Rod had replied back to him saying the Court's order did not

20  ask for us to come into an agreement with Mr. Nicoud.  It

21  just asked us to come into compliance.  And by coming into

22  compliance, the 300 -- over 300,000 we have distributed to

23  all of the creditors.  That's what we want to do.  And that's

24  Chris' response back saying, good.  I think it's a step in

25  the right direction to make a large distribution, which is

1  all of the money in their estate to the people.  And when I

2  went back and went through the accounting of the Plan Agent's

3  report, I only spent 156,000 on construction of other

4  properties that haven't been sold as of right now, but are in

5  the process getting work.  So 156,000 was to remain

6  non-compliant.  Us putting double that, 300,000 to pay

7  everybody, should put us back into compliance.  And out of

8  good faith, we're trying, A, (indecipherable word) the plan;

9  B, just give all of the money back to the people and come

10  into compliance like the Court had asked.

11      Q.   Okay.

12           MR. MITCHELL:  Based on that, I would ask that

13  Exhibit 10 be admitted into evidence.

14           MR. NICOUD:  No objection.

15           THE COURT:  Exhibit 10 is admitted.

16      Q.   Mr. Daneshmandi, I just have one other -- well,

17  probably just one question, but one line of questioning, if I

18  have a follow-up.

19       Have you made a side-by-side comparison of the results

20  if this case were to be converted to Chapter 7 versus other

21  options?  And, if so, what did you conclude?

22      A.   Yes, I did.  So if they were to convert this to

23  Chapter 7, the first thing would be the secured creditor

24  Statebridge would take back 1005 Shady Lane.  Then there's

25  only remaining four properties.  The four properties, as I've

1  mentioned, one has been for sale for, you know, 6, 700 days,

2  a long time.  It's a mobile home, unhabitable.  Another is a

3  mobile home, unhabitable.  So both of those, per my

4  disclosure statement and per the Cad results are both

5  $25,000.  So I've submitted both of those at 25.  The house

6  on Keller, like I said, would go back to the creditor.  Then

7  there's only two properties house.  There's a house on

8  Lakeview that on my disclosure I put at 90.  Cad is 120, but

9  the house is still down to the studs on the inside.  The

10  inside needs to be finished.  And then the other house, which

11  is 4430 Chapman, that house still needs -- it's on my

12  disclosure for 130.  The Cad value is 130.  That house would

13  end up selling for that.  Or if it went to Chapter 7, it

14  would both just go away.

15      So if you just look at the numbers, $130,000 for

16  Chapman plus the two mobile homes at $25,000 a piece would be

17  50,000, that would be 180 plus Lakeview, which would end up

18  getting 90,000, so 180 would make 270,000.  And Chris is

19  holding $300,000 right now.  So that would be $500,070.  If

20  this went to Chapter 7 after all of the fees and the -- and,

21  you know, the lawyers putting in the notice to get fee

22  agreements and stuff like that, after it was all done, and

23  salary fee agreements, all that, it might net the creditors

24  25 cents on the dollar.  If we continue with the plan as

25  confirmed, as we've been doing for the last year and a half,

CINDY SUMNER, CSR (214) 802-7196

1    I'm still projected to pay people 45 cents to 50 cents on the

2    dollar completely.  So I'm still on track to do exactly that.

3    Even if I was -- let's say even right now if I was to take

4    1005 Shady Lane and say, hey, let me go ahead and finish this

5    property, that property alone would then generate over

6    100,000 plus thousand dollars into the estate.  And then I

7    could fire sale the other properties without excess fees and

8    stuff like that.  And at that point, it would still net the

9    creditors probably around 40 to 45 cents right there.  If we

10   continue, it's exactly what the plan was drawn up and meant

11   to be, to pay people a maximum of 50 cents on the dollar of

12   their allowed claims.

13       Q.   Fair enough.  I think you answered any follow-up

14   that I would have.

15                 MR. MITCHELL:  I'll pass the witness.

16                 THE COURT:  All right.  Does anyone wish to

17   examine this witness?

18                 MR. NICOUD:  This is Robert Nicoud.

19                 THE COURT:  Okay.  You may proceed.

20                 CROSS-EXAMINATION

21   BY MR. NICOUD:

22       Q.   Turn, please, to Debtor's Exhibit Number 5.

23        Tell me when you're ready.

24       A.   I see it.

25       Q.   Okay.  And I want to understand, these are all

1    issues that were raised by the purchasers, proposed

2    purchasers after the house was complete and offered for sale?

3         A.   Correct.

4         Q.   Now I don't see that -- there were no issues with

5    the air-conditioning unit; am I correct?

6         A.   Correct.

7         Q.   Okay.  It had a brand new air-conditioning unit in

8    it, didn't it?

9         A.   Correct.

10        Q.   And do you know when that was installed?

11        A.   I don't recall.

12        Q.   Okay.  Was it installed after October 18th of 2019?

13        A.   After -- when?  October?

14        Q.   October 18th, 2019.

15        A.   Honestly, I don't recall.  I've been working on

16   that house for years.

17        Q.   Okay.  Do you recall that it needed a new

18   air-conditioning unit in October of 2019?

19        A.   I don't recall the month that it needed a new

20   air-conditioner unit.  But I do remember it needing a new

21   air-conditioner unit.

22        Q.   Okay.  Did you, on behalf of GRC, ever reach an

23   agreement with John Caldwell regarding the amounts of funds

24   to be spent for a new air-conditioning until on the

25   Chatsworth property?

1      A.   I don't -- I don't really recall, but, perhaps.

2      Q.   Okay.  Are you familiar with the pending lawsuits

3  in state court that GRC is pursuing?

4      A.   Yes.

5      Q.   Okay.  There's a suit against Julie Turner.  What

6  was that -- what is that one about?

7      A.   This suit against Julie Turner, I believe it's a

8  breach of contract suit (indecipherable word) from other

9  causes of action.  But I have -- I had the house under

10  contract.  The people didn't perform and didn't want to sell

11  it for the price after it went under contract.  So we're

12  suing for specific performance.

13      Q.   Okay.  So it's to compel her to sell the property

14  to GRC?

15      A.   Correct.

16      Q.   And how much would GRC have to pay, if it won the

17  lawsuit?

18      A.   That's a number that's undetermined.  I don't know

19  what the Court would make us pay.  Would it make us pay the

20  purchase price less the attorney's fees?  Would it make us

21  pay the purchase price less damages and attorney's fees?

22  Would it make us pay over the purchase price?  I'm not sure.

23      Q.   Okay.  Next item.  There's a lawsuit pending

24  against Pamela Freeman.  What's that one about?

25      A.   Exact same reason.  House was under contract.

1   People decided they didn't want to sell it.   Breach of

2   contract, amongst other things.

3       Q.   Did you consult with Mr. Moser before these

4   lawsuits were filed?

5       A.   Yes.   Chris knew about the lawsuits from -- to be

6   honest with you, you actually brought up the lawsuits during

7   pre-confirmation.   Joyce had not included the causes of

8   action.   And then you made a big deal about it so Joyce was

9   like, okay, we'll include the causes of action.   And she went

10  through and listed the causes of action for you.

11      Q.   You don't even know when these lawsuits were filed.

12      A.   I don't have the dates in front of them.   But

13  they've been filed.   I've consulted with Joyce.   I've

14  consulted with Chris on them.   Chris has consulted with the

15  attorneys on them.   So it's been in the process.

16      Q.   Do you recall GRC entering into a lease for the

17  property on Mays?

18      A.   Yes.

19      Q.   And that lease was entered into after the plan was

20  confirmed, correct?

21      A.   Yes.

22      Q.   And payments were $2,500 a month?

23      A.   Correct.

24      Q.   And were those monies turned over to Mr. Moser?

25      A.   No.   They weren't supposed to be.   Per my plan,

1  sales proceeds were supposed to be turned over to Chris

2  Moser.

3      Q.   Okay.  Does GRC have any other income, other than

4  from sales proceeds, since the confirmation of this plan?

5      A.   No.

6      Q.   Okay.  No other leases?

7      A.   No.

8      Q.   Does GRC keep records of the payments that it makes

9  to its subcontractors?

10     A.   It depends on the subcontractors and the work being

11 done.  So not always.

12     Q.  So some yes, some no?

13     A.   If it calls for it then, yes.  If it doesn't call

14 for it, there's no need.

15     Q.   So it depends on whether it's called for or not?

16     A.   Let's just say I go pick up four subs at $250 a day

17 and say, hey, do they know how to do roofing?  Yes.  Okay.

18 Come on out, let's knock out this roofing.  I work.  I could

19 pay them in cash and there's no receipts or records.

20     Q.   Your mother has a real estate company similar to

21 GRC; is that correct?

22     A.   I wouldn't say similar to GRC.  I would just say

23 she has a real estate company.

24     Q.   Okay.  Generally, what kind of business does it do?

25     A.   Real estate.

```
 1                    MR. MITCHELL:  Your Honor, I'm going to object
 2   generally to the relevance of this line of questioning as to
 3   what it has to do with what's before the Court today.
 4                    THE COURT:  All right.  What's it's relevance?
 5                    MR. NICOUD:  I want to -- the testimony given
 6   was that he does 110 percent of his effort toward GRC.  And I
 7   want to find out, does he do any work for his mother's
 8   company.
 9                    THE COURT:  All right.  You may proceed on
10   that question.
11        Q.   Do you do any work for your mother's company?
12        A.   I help my mom out.
13        Q.   Okay.  How many properties does it own?
14        A.   I don't know.
15        Q.   More than ten?
16        A.   No.
17        Q.   Okay.  Does she have any other employees or
18   helpers?
19        A.   Yes.  I wouldn't say employees.  She has
20   subcontractors, as well.
21        Q.   Okay.  Do you help her coordinate with the subs and
22   so forth?
23        A.   I help my mom out whenever she needs anything in
24   life.
25        Q.   Okay.  Do you charge her anything for that?
```

1        A.    I don't charge her anything to do it.

2        Q.    Okay.

3        A.    I don't get paid.  I've never gotten paid.

4        Q.    Okay.

5        A.    I'm just being a son.

6        Q.    Okay.  Now, what is the current status of the

7   property at 1005 Shady Lane?

8        A.    The current status is the foundation was fixed.

9   The roof has been done.  The concrete holes have been filled

10  in.  I haven't been there really recent.  Coming up I have to

11  do the concrete work.  I have to put the rebar in.

12  Effectively right now, the problem is you guys have stopped

13  me from working on the house.  But my goal was after the roof

14  was to go on --

15       Q.    I just want to know what the status of it is.

16       A.    Okay.  The status is in construction.

17       Q.    Okay.  If you'll look at GRC Exhibit 9.

18       A.    I see it.

19       Q.    And the -- there's an entry for Shady Lane.  And

20  that $25,000 was actually paid to Construction Consultants?

21       A.    There's -- yeah, $50,000 got billed.

22       Q.    But only 25 is allocated to Shady Lane; is that

23  correct?

24       A.    That's what it appears.  But, again --

25       Q.    Do you know that to be a fact?

```
 1      A.   Well, there's a lot of properties on there.  And
 2  there was agreed upon work to be done.  Checks got cancelled.
 3  You guys had objected to them getting paid and the amounts.
 4  So it was a cluster situation of all of these houses and
 5  checks getting cancelled.  What work's getting done here.
 6  What work's been finished.  Who's been paid.  There's no
 7  money in the account.  Paying cash.  All of this kind of
 8  stuff is going on at this time.  So I can't honestly sit here
 9  and look at this bill and take it piece by piece.
10      Q.   Okay.  So when it says $25,000 per task here,
11  that's not necessarily, if I'm understanding it correct, a
12  correct allocation?  Some are different, some are in
13  progress?
14      A.   I don't know, because I didn't prepare that.
15      Q.   Well, did you request that it be paid?
16      A.   Yes, I did.  I requested through the Plan Agent to
17  get paid.  And Chris -- Chris actually came to those
18  properties.  Chris --
19      Q.   Did you -- did you make sure that the work was
20  done?
21      A.   Yes, for the work completed.  Sure.
22      Q.   Okay.  Can you turn to Caldwell Exhibit J?
23      A.   Yes, I see it.
24      Q.   Okay.  And that includes some work done on Shady
25  Lane, correct?
```

1      A.   Correct.

2      Q.   And do you know how much of that $24,000 is

3   allocated to Shady Lane?

4      A.   Of that 24,000, I mean, I would have to break them

5   up per property.  But it looks like if I -- we listed 25

6   piers installed, the bulk of it is going to be towards Shady

7   Lane because that's heavy work.  Re-lifting the whole house,

8   25 piers installed, which mean jackhammer, 30 feet of under

9   concrete -- yeah, this is actually when Chris came to the

10  property and he reviewed it.  He saw that there were workers

11  there.  That there was dirt all in the house.  And that we

12  were actively working on it.

13       He first went to --

14     Q.   Was this work that was done in excess of what was

15  the $25,000 allocated to Construction Consultants in the

16  prior exhibit?

17     A.   I don't know how to -- I don't know to say yes or

18  no, because I'm not sure exactly what was allocated from

19  each.  And I noted five properties right there.  So I'd have

20  to literally see the property and go through it to know what

21  I allocated for each property.

22     Q.   Okay.  Now, for a period of time you had an

23  assistant and requested payment for her, correct?

24     A.   Correct.

25     Q.   And what was your assistant's name?

1      A.   Christina Akerman.

2      Q.   Okay.  Did you also have a personal relationship

3  with her?

4      A.   No.

5      Q.   None at all?

6      A.   No.

7      Q.   Okay.

8                MR. NICOUD:  I'll pass the witness.

9                THE COURT:  All right.  Does anyone else wish

10  to examine this witness?

11      Any redirect?

12                MR. MITCHELL:  No, Your Honor.

13                THE COURT:  Thank you.

14      The witness is excused.

15      Any other evidence you wish to present?

16                MR. MITCHELL:  No, Your Honor.

17                THE COURT:  Any other evidence any other party

18  wishes to present?

19                MR. NICOUD: Yes, Your Honor.  This is John

20  Caldwell.

21                THE COURT:  Don't you have your own lawyer?

22                MR. NICOUD:  No.  This is Robert Nicoud

23  speaking on behalf of John Caldwell.  Sorry.

24                THE COURT:  I was a little confused.  But,

25  okay.  Yes, Mr. Nicoud.

1          MR. NICOUD:  Yes.  We have evidence that we

2   wish to present.  Myself as a witness and Mr. Caldwell.

3          THE COURT:  All right.  You may proceed.

4      Who are you going to call first?

5          MR. NICOUD:  First I'm going to call myself.

6          THE COURT:  Okay.  Let's swear the witness in.

7          (The witness was sworn by the courtroom deputy.)

8          THE COURT:  You may proceed.

9              ROBERT NICOUD

10   The witness, having been duly sworn to tell the truth,

11   testified on his oath as follows:

12              DIRECT EXAMINATION

13   BY MR. NICOUD (in narrative)

14          THE WITNESS:  My first testimony relates to

15   Exhibits A, D -- Caldwell Exhibits A, D, and C.

16      Exhibit A was prepared by me and it is a spreadsheet

17   that is derived from Plan Agent Exhibit 4.  The Plan Agent's

18   ledger.  The figures are all the same as what is in the

19   original report, except for the following.  I have added a

20   column called category where you can see I've put in an

21   allocation of how that particular transaction would be

22   applied.  I removed the running balance column.  And on a few

23   instances, for example, on August 4 of 2020, we've gone over

24   this in some prior exhibits, we had a single check that was

25   allocated to four or five properties.  And in that instance,

1   what I did is just allocated that payment equally to each of

2   the properties, since there was no other breakdown.

3         And the Court can see on page 9 of 9 the deposit and

4   disbursement columns both reconcile to the Trustee's original

5   report.  And so I would ask that Exhibit A be admitted.

6                    THE COURT:  Any objection?

7                    MR. MITCHELL:  No objection.  I think it

8   already was admitted.  But no objection.

9                    MR. NICOUD:  I think you're correct, it was.

10                    THE COURT:  Okay.  All right.  Hold on.  Let's

11   do this.  You all are taking up a lot more time than you

12   originally said you were going to and I have counsel on the

13   phone in a hearing who needs to go to another hearing.  So

14   I'm concerned about that.

15         But which exhibits does any -- that has not yet been

16   admitted does anyone wish to offer?

17                    MR. NICOUD:  I wish to offer, then, Exhibits

18   D, B -- Caldwell Exhibits B, C, D, E, F, and G.

19                    THE COURT:  Okay.  And for the record, that is

20   filed as docket number what?

21                    MR. NICOUD:  That is docket number 291-1 --

22                    THE COURT:  That's fine.  I've got it.  Okay.

23   These are documents attached to the witness and exhibit list

24   that's been filed as docket number 291.

25         Does anybody object to any of those exhibits?

1          MR. MITCHELL:  No objection.

2          THE COURT:  All right.  So Exhibits B, C, D,

3  E, F, and G filed as attachments to docket number 291 will be

4  admitted.

5      Is there any other evidence any other party wishes to

6  offer that had not already been admitted?

7          MR. MITCHELL:  Your Honor, the debtor would

8  like to admit -- we didn't file until today, admittedly, but

9  it's -- it's other versions of the Plan Agent's report.  We

10  filed it as an additional witness and exhibit list that's

11  found at docket number 299.  And we included Exhibits 12 and

12  13.  Those are versions of the Plan Agent report.  Mr. Nicoud

13  alluded to the fact that he removed the column and re-ordered

14  them.  To the extent that it mattered, we just wanted to have

15  in the record a full Plan Agent report.  Exhibit 12 is as of

16  May the 2nd, I believe, beginning of May.  And Exhibit 13 is

17  the same report as of, I believe it was yesterday.  So we

18  would ask that Exhibits 12 and 13 be admitted.

19          THE COURT:  Any objection?

20          MR. NICOUD:  No objection.

21          THE COURT:  All right.  So Exhibits 12 an 13

22  attached as exhibits to docket number 299 are admitted.

23      Okay.

24          MR. MITCHELL:  And that's all I have, Your

25  Honor.

1                    THE COURT:  Thank you.

2        Mr. Nicoud, you may continue with your testimony.

3                    THE WITNESS:  In particular, on Exhibit B --

4                    THE COURT:  B like boy, Mr. Nicoud?

5                    THE WITNESS:  B like boy.  B like boy.

6                    THE COURT:  Okay.

7                    THE WITNESS:  On the last page, page 8 of 8,

8    you can see there is a summary that I have prepared that

9    totals out the various categories that I had put in the Plan

10   Agent's report.  And, again, the total reconciles back to the

11   disbursements.  So from this, you can see how I have

12   allocated payments toward particular properties or if they

13   weren't for particular properties, toward the general areas.

14   And that is derived from the spreadsheet.

15       And for Exhibits D, E, F, and G, those communications

16   accurately represent the communications that I had with

17   Ms. Lindauer.  And that would conclude my testimony.

18                   THE COURT:  All right.  Does anyone wish to

19   cross?

20                   MR. MITCHELL:  I do not, Your Honor.

21                   THE COURT:  All right.  Mr. Nicoud, then, you

22   are excused as a witness.

23       Now, did you wish to call any other witnesses,

24   Mr. Nicoud?

25                   MR. NICOUD:  Yes.  We'd call John Caldwell.

1          THE COURT:  Mr. Caldwell --

2          MR. CALDWELL:  I'm here.

3          THE COURT:  Thank you.  Let's swear you in.

4          (The witness was sworn by the courtroom deputy.)

5                    JOHN CALDWELL

6   The witness, having been duly sworn to tell the truth,

7   testified on his oath as follows:

8                   DIRECT EXAMINATION

9   BY MR. NICOUD:

10     Q.   Mr. Caldwell, have you ever met Christine Ackerman?

11     A.   I cannot recall if I've ever met her.

12     Q.   Okay.  Have -- has Mr. Daneshmandi ever told you

13  anything about her?

14     A.   It was his girlfriend at the time.

15          MR. MITCHELL:  Objection, Your Honor.

16  Objection, Your Honor.  That calls for hearsay testimony.

17          THE COURT:  Objection's overruled.

18     Q.   Next, did you ever reach an agreement with

19  Mr. Daneshmandi regarding any expenses to be incurred in

20  installing a new air-conditioning unit on the Chatsworth

21  property?

22     A.   There was never an agreement.  Never even a chance

23  to make an agreement.  I went and looked at it twice.  And

24  once there was the older version and when I went back there

25  was a new version.  And that's all I could tell you.

1       Q.   Okay.  Was the -- when you say, new version, what

2   does that mean?

3       A.   A new outside unit that I could see.

4       Q.   Okay.  Was that new unit installed after October of

5   2019?

6       A.   Yes.

7       Q.   Okay.

8            MR. NICOUD:  I'll pass the witness.

9            THE COURT:  Okay.  Any cross of this witness?

10           MR. MITCHELL:  Just briefly, if I could, Your

11   Honor.

12           THE COURT:  You may.

13           CROSS-EXAMINATION

14   BY MR. MITCHELL:

15       Q.   Mr. Caldwell, what is your -- what is your position

16   regarding what is in the best interest of the debtor and all

17   of the creditors in this case?

18       A.   What is my position?  Let me think about that.

19       Q.   Let me be more specific.  Let me be more specific.

20        Is it your position that conversion of this case to

21   Chapter 7 is in the best interest of all the creditors and

22   the debtor?

23       A.   I feel with how the money was spent before, that

24   how it is now (indecipherable word) involved, at least with

25   no oversight, is in now way in the best interest of the

1    creditors.

2              MR. MITCHELL:  Objection; non-responsive.

3              THE COURT:  Objection sustained.

4         You need to answer the question posed.

5    A.    Can you repeat the question for me, please?

6    Q.    Do you -- sure.  Do you believe that Chapter 7 is

7    in the best interest of the creditors and the debtor in this

8    case?

9    A.    Yes.  I believe that is the best solution.

10   Q.    Have you reviewed other options?

11   A.    As in -- be more specific, please.

12   Q.    As in anything other than Chapter 7.

13   A.    I'd have to say not really reviewed.  I have

14   nothing to go on to review.

15   Q.    Do you recall -- without getting into specific

16   settlement discussions, do you recall receiving proposals

17   from the debtor that were alternatives to Chapter 7?

18   A.    Yes.

19             MR. MITCHELL:  I have no further questions.

20             THE COURT:  All right.  Thank you.

21        No further questions for this witness.  Does anyone

22   else have any further questions?

23             MR. NICOUD:  Nothing further from

24   Mr. Caldwell.

25             THE COURT:  Thank you.  The witness is

1  excused.

2      Does anybody have any further arguments -- I mean any

3  further evidence they wish to present?

4      I'll take that as a no.

5      Are you all going to be able to wrap up your final

6  closing arguments by 1:00?

7              MR. MITCHELL:  Your Honor, this is Greg

8  Mitchell.

9      To the extent that it makes a difference, at the risk

10 of violating the Court's (inaudible word due to audio cutting

11 out), I am almost to my destination.

12             THE COURT:  Oh, I can tell.

13             MR. MITCHELL:  If you will give me -- I

14 believe if you will give me 5 minutes, I'll actually be at my

15 destination.  If you will let somebody else go first, I'm

16 prepared to make closing arguments so that we can get this

17 wrapped up.  And I think I can do it before 1.  And since I

18 will be at my destination, I think we've got until maybe

19 1:15.

20             THE COURT:  Okay.  All right.  It's

21  Mr. Moser's motion, so I'm going to let him go first.

22             MR. MOSER:  Yes, Your Honor.

23      Very briefly.  Just to summarize everything.  I have

24 $357,000 in the account.  And depending on what this Court

25 wants to do, it seems to me to make a distribution, a

1    sizeable distribution to unsecured creditors who have been

2    waiting quite a while is in the best interest of the estate.

3    Having said that, if the thought is that there's going to be

4    further construction, remodeling, et cetera, how much of a

5    distribution we can make is going to be the question.  The

6    proposal I have right now basically would have left me with

7    about 20 grand in the bank, which isn't a whole lot to do

8    further rehab, et cetera.  Which would mean that we'd

9    basically have to sell the houses as-is would be the thought.

10       If everybody were on page -- on the same page to do

11   that, I'd propose to basically distribute, you know,

12   everything except for 25, 20, $25,000 right now.  In addition

13   to unsecured creditors, there are attorneys who I have been

14   authorized to pay.  And they are for the services that you've

15   heard about about the specific performance case, et cetera,

16   Mr. Mitchell, Plan Agent fees, et cetera.  Those probably

17   come to roughly 40 grand.  I'd have to get the exact number.

18   But I'd like to pay those also.

19       My request also requested to pay Mr. Daneshmandi three

20   months of $7,500, which is January, February, and March.  I'd

21   need to verify that he's done some work in those months,

22   which I believe he has.  But my request would also include

23   paying him.

24       So long story short, if we're going to just liquidate

25   the houses without fixing them up, I'd say let's pay as much

1    money out as possible right now as an interim distribution.

2    And then if the monies come in just distribute on a

3    going-forward basis.   The only monies I really need is

4    Statebridge has a mortgage payment that I need to pay and

5    insurance on that.   So it's not -- the carry costs aren't

6    going to be that expensive, if we're not remodeling the

7    houses.   But if we're remodeling the houses, I'm going to

8    need some input from people who know a lot more than me about

9    what the projected costs of construction are going to be.

10        With that, I conclude.

11             THE COURT:   Thank you.

12        All right.   Does anyone else wish to be heard in

13   closing?

14             MR. NICOUD:   This is Robert Nicoud.

15        Your Honor, we're on a somewhat unusual procedural

16   path.   We came before the Court back in March on Caldwell's

17   motion to modify the plan to deal with what had previously

18   been an undisclosed lease of property income to the estate

19   that was not explicitly dealt with in the plan because,

20   frankly, nobody envisioned it.   The Court didn't rule

21   specifically on that.   But the Court did enter an order that

22   found that the debtor was in default under the plan and gave

23   the debtor 14 days to either file to modify the plan or to

24   come into compliance with the plan.

25        They clearly did not file anything.   And so their

1  effort was to propose to the Plan Agent to make this interim

2  distribution.  And that would then bring them into

3  compliance.  And if they failed on either of those tasks,

4  then the order provides that the case would be converted to

5  Chapter 7.  So the Trustee submitted his motion for interim

6  distribution and, therefore, carries with it the issue of did

7  the debtor meet its obligations under this Court's order of

8  March 12, 2021.

9      We contend that the debtor has not cured its default.

10  That making an interim distribution doesn't cure it in this

11  amount.  And based on the testimony, or lack thereof from

12  Mr. Daneshmandi, I don't know how we can ever really

13  determine what would be necessary to bring the debtor into

14  compliance since his testimony was, he doesn't keep records.

15  So we don't know what has really been spent on these

16  properties.  All we know is that there's been a lot of money

17  requested and paid by the Plan Agent.

18      I think there's ample evidence that this case should be

19  converted to Chapter 7.  We have a history of non-compliance,

20  that being payment requests on barely enough information.  As

21  I'll get into later, there's been active misrepresentation

22  concerning the status of properties and their conditions.

23  The debtor entered into an undisclosed lease of property,

24  which from Mr. Daneshmandi's own testimony, well, since it's

25  not part of the plan, we don't have to report about it.  They

1   have -- the debtor has pursued lawsuits without adequate

2   consultation with the Plan Agent as required by Section

3   4.04.4 of the plan.  And the debtor has increased his salary

4   from $4,000, which is what it was during the case per Court

5   order to $7,500.  And has employed his girlfriend.  So we've

6   had thousands of dollars spent with no distribution to

7   unsecured creditors.

8          Now, I want to run down one particular property.  That

9   being the property on Mays to just show how the size of the

10  problem we got here.  If the Court looks at Caldwell's

11  Exhibit E, that being a letter from Joyce Lindauer in

12  response to a letter from me.  And she's representing that

13  several properties are going to be sold.  That -- in

14  paragraph 4 on page 2, 6012 Mays, the debtor has about a week

15  left on this property, one week, seven days.  This is in

16  February of 2020.  Next go to Caldwell Exhibit G.  Again, a

17  message from Ms. Lindauer also addressing Mays.  And in March

18  of 2020, Mays just needs a custom window and minor touch-up

19  and it's ready to go.  Next go to Exhibit H.  We have an

20  invoice submitted by Mr. Daneshmandi which says that I want

21  $50,000 more in June of 2020 to work on Mays, which in March

22  of 2020 was one week away from being ready for sale.

23         Now, fortunately, that money was not paid out.  Then we

24  move to Exhibit J, an invoice from Mr. Daneshmandi for

25  $24,000 which, again, includes substantial work on the Mays

1   property.  Then Exhibit K.  Mr. Daneshmandi wants another

2   $50,000 for work on the Mays' property, when it had been

3   represented in February of 2020 that it is one week away from

4   sale.  We, of course, have absolutely no backup for any of

5   the amounts that were actually spent by GRC on these

6   properties, because he doesn't keep records.  But you can see

7   from Exhibit B that we spent -- and I'll say, we.  Creditors

8   spent on the Mays' property $114,750 after it was represented

9   it was one week away from selling.  That's who we're dealing

10  with.

11       We have got unaccounted for thousands of dollars.  And,

12  frankly, unknown how we're ever going to account for it.  The

13  proposal to simply say, okay, yeah, you got us, here's a few

14  hundred thousand dollars, that doesn't fix the problem.  It's

15  certainly not a plan modification.  And it doesn't bring this

16  debtor into compliance with what the Court determined the

17  debtor was supposed to be doing.  But it improperly spent

18  money from the unsecured creditors' pool.  There's been no

19  distributions.  Given the evidence that's before the Court

20  today, we think the only solution is the appointment of a

21  Trustee or conversion to Chapter 7.

22       That concludes my argument.

23            THE COURT:  Okay.  Are you suggesting that

24  Mr. Moser paid -- that were improper, or made distributions

25  that were somehow improper, Mr. Nicoud?

1          MR. NICOUD:  Well, that it was certainly

2    requested of him.  Not in compliance with the -- with

3    insufficient justification.  Just to say, oh, I want $50,000

4    for this general work on Mays.

5          THE COURT:  Okay.  But, again, I'm not

6    understanding your argument.

7          Are you suggesting that Mr. Moser somehow made

8    distributions under the plan that were improper?  Or are you

9    simply saying some of the requests that the debtor made, or

10   the debtor's principal made were somehow improper?  But I

11   don't see where Mr. Moser actually paid out on these that was

12   improper.  That's what I'm trying to understand.

13         MR. NICOUD:  It was improper for

14   Mr. Daneshmandi to make requests and get paid on the invoices

15   that were not in compliance with the plan.  So that is the

16   improper act.  Further is improper for him to,

17    Mr. Daneshmandi, not to maintain records of what the debtor

18   then spends on its subcontractors and what other expenses it

19   may have.

20         THE COURT:  Okay.  But, again, I'm still not

21   understanding.  Explain this to me.  Okay?

22         You're asking for a Trustee to be appointed, or the

23   case to be converted.  I understand that that's what you're

24   asking for.  But we already have a Plan Trustee who makes

25   determinations about what gets paid and what doesn't get

1   paid.  So unless he's doing something wrong, I don't really

2   understand what the purpose would be of appointing a Chapter

3   11 Trustee, or converting the case, at this juncture.  So can

4   you explain that to me?

5                    MR. NICOUD:  Okay.  The Plan Agent's role was

6   defined by the plan, which is to take the money in and pay

7   the money out.  The Plan Agent was not responsible for

8   getting -- for working with subcontractors.  Not responsible

9   for supervising the work being done.  His role is limited.  A

10  Trustee would take complete control of everything from

11  beginning to end.

12                   THE COURT:  Again, here's my question, though.

13  The Plan Trustee was put in place to make plan distributions

14  and make payments on any invoices and make plan

15  distributions.  Is that not correct?

16                   MR. NICOUD:  Yes, that's correct.

17                   THE COURT:  Okay.  So the thing that you're

18  complaining about is that there were somehow distributions

19  made, payments made to the debtor's principal that were

20  somehow improper, right?  But that also goes to -- so what

21  you're saying is, in effect, that Mr. Moser made plan

22  distributions that were improper and so now we need a full-on

23  Trustee.  I guess what I'm trying to understand, again,

24  Mr. Nicoud, is the issue that you're complaining about has to

25  do with, you know, the disbursements.  That funds were paid

1   out that should have been paid out to unsecured creditors

2   rather than to the various contractors and/or the debtor's

3   principal, and they should not have been paid out.  So you

4   are, in fact, saying that Mr. Moser did something improper

5   and we need a different Trustee who has more -- broader

6   rights.  Except the issue still relates to the disbursements,

7   which he does have a role in.

8            MR. NICOUD:  Well, what you said is correct.

9   The Court previously found that the debtor was in default

10  under the plan.  How that default came about would be a

11  combination.  It's improper request/improper payment.  And

12  that the only way around that I see -- and I think the flaw

13  is that the Plan Agent is not a Trustee.  And that we need a

14  Trustee, someone in here who can control this from beginning

15  to end.  Because we're going to end up somewhere down the

16  line where all of these assets are sold and we've got a

17  couple of thousand dollars in the account and that's it.

18           THE COURT:  And somehow having a Chapter 11

19  Trustee in place is going to change that?

20           MR. NICOUD:  Yes.

21           THE COURT:  Okay.  Explain that to me.  I'm

22  trying to understand exactly what we're talking about, what

23  you are talking about.

24           MR. NICOUD:  The Chapter 11 Trustee will have

25  the power to say, we're not doing any more work on this

1   house, or that house.  I'm listing it for sale.  Here's the

2   price we're going to list it at.  Or, the Chapter 11 Trustee

3   can say, okay.  I've looked at this.  Here's what I think we

4   should spend.  You file a proper motion with the Court.

5   Whatever procedure has to be in place so we know down to the

6   penny where the money is going, what it's supposed to be for.

7   And if creditors disagree with how it's being spent, the

8   Court can resolve that issue.

9          THE COURT:  Okay.  All right.

10         Let me hear from the other parties.

11         MR. MITCHELL:  Your Honor, this is Greg

12  Mitchell for the debtor.

13         We obviously would request that the Court grant the

14  Plan Agent's motion.  Allow the distributions to be made.

15  Allow the debtor to continue to maximize the value of the

16  estate by repairing and remodeling the remaining properties

17  prior to their sale.

18         Mr. Caldwell has put on evidence here today that we

19  believe simply focuses on the existence of a default.  And to

20  some extent out of fear that the Court might focus on that

21  evidence, we've spent much of our time responding to that

22  evidence.  But we would submit that most of that evidence is

23  irrelevant to the issues before the Court today, which we

24  believe to be fairly narrow, including, number one, the

25  actions proposed in the Plan Agent's motion bring the debtor

1   into compliance with the plan as confirmed.  And, number two,

2   if not, what result makes sense in terms of the best interest

3   of all parties.  Does it make sense to push the parties

4   either to continue as they're doing now to try to maximize,

5   maybe mediate the issues, the differences in an attempt to

6   maximize, or simply converting to Chapter 7?

7       Mr. Nicoud has thrown around numbers that without any

8   context don't really mean anything.  There was an $800,000

9   number that was thrown out without really considering the

10  authorized expenses that GRC incurred every month; mortgage

11  payments, ad valorem taxes, attorney's fees, Trustee fees,

12  Plan Agent fees, administrative costs, payments to pay

13  utilities for each of the properties.  It's not as if the

14  debtor has been running around, you know, gambling with the

15  money.  The money was spent on expenses that needed to be

16  paid, which is entirely consistent with the confirmed plan.

17  I think the lack of context substantially decreases the

18  credibility of the complaint.

19      As to the first issue, as far as coming into

20  compliance.  Once again, we believe it does.  We believe that

21  the focus of the Court's finding regarding breach was the

22  failure  to provide distributions.  We do not believe that

23  the Court found nor do we believe that the confirmed plan

24  prohibits the debtor spending funds to maximize the value of

25  the properties, or the making of payments to the debtor's

1  principal.  We believe that the plan contemplates the type of

2  conduct that the debtor engaged in in order to maximize the

3  value of the property.  The notion of value maximization by

4  development is not exactly a novel concept.  I mean, the

5  whole reason that developers develop properties is their

6  belief that by doing so, they will realize a greater return

7  than they would by simply selling the property as is.

8      I would also point out that the notion of developing

9  the properties to maximize value is not inconsistent with a

10  liquidating plan.  Because, again, we believe that the plan

11  fully contemplated a liquidation plan that maximizes value by

12  fixing up the properties prior to sale.  And that that effort

13  would necessarily involve expenses.  And I think you don't

14  have to look any further than the budget that was attached to

15  the disclosure statement that was filed two years ago to see

16  that there was several hundred thousand dollars contemplated

17  as expenses that would need to be incurred, in order to bring

18  the properties up to sale and maximize the value to the

19  estate.

20      Mr. Caldwell argues that the efforts took longer than

21  expected.  And to that point, we do not disagree.  At the

22  risk of stating the obvious, we're just now starting to

23  emerge from the year long pandemic that did not by any means

24  spare the real estate industry.  Labor shortages existed,

25  supply chains were disrupted, and, you know, costs

101

1   mushroomed.  And despite all of the challenges, this debtor

2   managed to fix up and sell some of its property.  Yes, it

3   took a little longer than expected.  But we submit the result

4   is consistent with the results contemplated by the plan.

5   Much of that success we would submit comes as a result of the

6   efforts of the debtor's principal, who did much of the work

7   himself.  That effort led to a couple of the facts being

8   argued here today.  Both that the effort took a little longer

9   and that the debtor's principal was paid for his efforts.  We

10  don't think that was inappropriate at all.  But it's not

11  necessary for the Court to make a determination as to the

12  efforts of the debtor's principal today.  It's only necessary

13  for the Court to determine that the proposed actions of the

14  Plan Agent bring the debtor into compliance with its

15  confirmed plan.  And we believe it does.

16      As a last point in the first issue, we would point out

17  that the Court's ruling in which it found a brief, which we

18  attached as Exhibit 7 to our witness and exhibit list,

19  contemplated an either or scenario.  Either come into

20  compliance what the plan confirmed, or that the debtor

21  properly modify the plan.  We believe that the Court's ruling

22  implies that coming into compliance is an option.  And we

23  believe that the Plan Agent's motion does just that.

24      Turning to the second issue.  If and only if the Court

25  were to find for some reason that the Plan Agent's motion

1   does not bring the debtor into compliance, what is in the

2   best interest of the creditors and the estate?  As a

3   technical matter, I'm not sure this issue is before the

4   Court.  But if the Court goes this direction, we would

5   certainly want the opportunity to weigh in.  And I don't want

6   to ignore it, in case the Court is prepared to go that

7   direction today.

8        Mr. Caldwell argues that Chapter 7 is in the best

9   interest.  We believe we have shown today that Mr. Caldwell's

10  position is driven by more emotional consideration based on

11  his clear lack of trust of the debtor's principal.  Whether

12  or not that lack of trust is justified or not is not really

13  relevant.  He admitted that he didn't even consider other

14  alternatives to Chapter 7.  He admits that he received some

15  proposals, but he never read them.  We believe Mr. Caldwell's

16  position doesn't take into account the consideration of

17  anyone but Mr. Caldwell.  And, ultimately, we don't really

18  believe that Chapter 7 is even in Mr. Caldwell's best

19  interest.  We believe he probably realizes this.  It's just

20  that his mis-trust of the debtor's principal overrides any

21  attempt at a rational analysis.

22       As we noted in our reply to Mr. Caldwell's objection,

23  and I believe Mr. Daneshmandi referenced in his comments

24  today, the debtor has made a proposal that it believes will

25  return somewhere between 45 and 50 percent to Mr. Caldwell,

103

1    whereas we believe that a Chapter 7 would lead to somewhere

2    closer to a 25 to 30 percent return.  That at least warrants

3    further consideration, which we don't believe Mr. Caldwell

4    has done.  And that is why we propose as an alternative to

5    approving the Plan Agent's motion, to the extent the Court is

6    not going to grant that, then he returns to mediation, prior

7    to giving up on it and throwing in the towel.  The hope would

8    be that a mediator could bring the parties together in a way

9    that would allow for the maximization of value to occur in a

10   way that addresses both parties' concerns and which has

11   really just been the debtor's goal all along.

12         Finally, I would just kind of echo some of the comments

13   that the Court made by way of its questions to Mr. Nicoud.

14   And that is, despite whatever concern there was about

15   payments that were made to Mr. Daneshmandi or made on behalf

16   of the debtor, there was regular communication with

17   Mr. Moser.  And Mr. Moser, you know, testified today that he

18   didn't simply pay an invoice simply because it was presented

19   to him.  He would ask questions.  And we saw evidence today

20   that -- where he did ask questions.  And we saw where the

21   supporting documentation was provided.  And we saw -- we

22   heard Mr. Moser tell us that he actually went out to visit

23   some of the properties to make sure that the work that he was

24   paying for was being done.

25         We believe, you know, if you're going to listen to

1   anybody in terms of credibility, you know, you've got two

2   parties here today that are clearly invested, Mr. Caldwell

3   and Mr. Daneshmandi.  If you're having trouble weighing

4   those, consider Mr. Moser's testimony.  Because he's a

5   disinterested third party.  I don't think he cares one way or

6   the other whether one party wins.  He testified credibly that

7   he verified payments.  He made payments where he thought it

8   was appropriate.  And we believe that's where we are.  And we

9   believe that his motion does what the Court directed and it

10  brings into compliance the debtor.  And we would ask the

11  Court to approve the motion.

12          THE COURT:  Thank you.

13      All right.  Having considered the evidence, having

14  heard arguments of counsel, and reviewed the pleadings filed

15  in this case, the Court finds that the motion to make a

16  distribution should be granted.

17      Mr. Moser, it's your motion, so I'm going to ask that

18  you submit an order consistent with the Court's ruling.

19          MR. MOSER:  Yes, ma'am.

20          THE COURT:  Thank you.  All right.  Parties

21  are excused and we're adjourned.

22              (End of Proceedings.)

23

24

25              C E R T I F I C A T E

```
 1            I, CINDY SUMNER, do hereby certify that the

 2    foregoing constitutes a full, true, and complete

 3    transcription of the proceedings as heretofore set forth in

 4    the above-captioned and numbered cause in typewriting before

 5    me.

 6

 7

 8

 9

10

11

12

13                                    /s/Cindy Sumner

14                          _____

15                            CINDY SUMNER, CSR #5832
                              Expires 10-31-2022
16                            Cindy Sumner, CSR
                              5001 Vineyard Lane
17                            McKinney, Texas 75070
                              214 802-7196
18

19

20

21

22

23

24

25
```

NO. _____

| | | |
|---|---|---|
| **GRCDALLASHOMES, LLC** | § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **_____ JUDICIAL DISTRICT** |
| | § | |
| **STATEBRIDGE COMPANY, LLC AND** | § | |
| **DB RR, LLC** | § | |
| **Defendants.** | § | **OF DENTON COUNTY, TEXAS** |

## PLAINTIFF'S ORIGINAL PETITION

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COMES GRCDallasHomes, LLC, hereinafter called Plaintiff, complaining of and about Statebridge Company, LLC and DB RR, LLC, hereinafter called Defendants, and for cause of action shows unto the Court the following:

### DISCOVERY CONTROL PLAN LEVEL

1.      Plaintiff intends that discovery be conducted under Discovery Level 2.

### PARTIES AND SERVICE

2.      Plaintiff, GRCDallasHomes, LLC, is a Limited Liability Company whose address is 13220 Beach Club Road, The Colony, Texas 75056.

3.      Defendant Statebridge Company, LLC, a Nonresident Limited Liability Company, may be served with process by serving the registered agent of said company, InCorp Services, Inc., at 36 South 18th Avenure, Suite D, Brighton, CO, 80601, its registered office. Service of said Defendant as described above can be effected by certified mail, return receipt requested.

4.      Defendant DB RR, LLC, a Nonresident Limited Liability Company, may be served with process by serving the registered agent of said company, THE CORPORATION TRUST COMPANY, at 1209 ORANGE ST, WILMINGTON, New Castle, DE, 19801, its

1

registered office.  Service of said Defendant as described above can be effected by certified mail, return receipt requested.

<center>**JURISDICTION AND VENUE**</center>

5.  The subject matter in controversy is within the jurisdictional limits of this court.

6.  Plaintiff seeks:

a.  only monetary relief of $250,000 or less, excluding interest, statutory or punitive damages and penalties, and attorney fees and costs.

7.  This court has jurisdiction over Defendant Statebridge Company, LLC, because said Defendant purposefully availed itself of the privilege of conducting activities in the state of Texas and established minimum contacts sufficient to confer jurisdiction over said Defendant, and the assumption of jurisdiction over Statebridge Company, LLC will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

8.  Furthermore, Plaintiff would show that Defendant Statebridge Company, LLC engaged in activities constituting business in the state of Texas as provided by Section 17.042 of the Texas Civil Practice and Remedies Code, in that said Defendant contracted with a Texas resident and performance of the agreement in whole or in part thereof was to occur in Texas.

9.  This court has jurisdiction over Defendant DB RR, LLC, because said Defendant purposefully availed itself of the privilege of conducting activities in the state of Texas and established minimum contacts sufficient to confer jurisdiction over said Defendant, and the assumption of jurisdiction over DB RR, LLC will not offend traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

10.  Venue in Denton County is proper in this cause under Section 15.011 of the Texas

<center>2</center>

Civil Practice and Remedies Code because this action involves real property as provided by said Section, and this county is where all or part of the real property is located.

## FACTS

11.     Statebridge issued loans to GRC for a property located at 6012 Mayes Place, The Colony, Texas 75056. DB RR, LLC purchased the loans from Statebridge. Statebridge remained the servicer of the loans. GRC filed for Bankruptcy on May 3, 2019.

12.     On March 9, 2022 Statebridge sent GRC a Notice of Accelleration and Notice of Trustee's Sale. Shortly after receiving this notice, GRC requested a payoff statement from Statebridge. GRC submitted the payoff request to Statebridge on March 22, 2022. Statebridge's counsel responded,

> "Hi Ryan, received. GRC has no ability or basis to convert to Chapter 7. Any attempt to do so is pretextual. Regardless, and with the facts before us, a conversion to Chapter 7 (even if allowed) would not reimpose the 362 stay. DB RR, LLC intends to proceed with foreclosure as scheduled. Since GRC has no good faith intent to pay off the lien (as is made apparent in this message) DB RR, LLC will not be providing payoff information. For conference purposes, DB RR, LLC opposes any motion to convert on the grounds that such action is dilatory and there is no fact or law to support it."

13.     On March 31, 2022 Statebridge sent Plaintiff a payoff statement. The amount of the total payoff was $190,720.52. Plaintiff contends that the amount of the payoff is incorrect.

## BREACH OF CONTRACT

14.     Plaintiff incorporates by reference paragraphs 11-14 herein,

15.     A valid contract existed between the Parties.

16.     Defendants had a duty to provide an accurate payoff statement by the eighth business day after the date the request is received, pursuant to Title 7, Section 155.3 of the Texas Administrative Code.

17.     Plaintiff performed or tendered performance under the contract.

18.    Defendant breached the contract.

19.    Plaintiff was damaged because of the breach.

## FRAUD

20.    Plaintiff incorporates by reference paragraphs 11-14 herein,

21.    Defendant made a representation to the Plaintiff.

22.    The representation was material.

23.    The representation was false.

24.    Defendant made the representation knowingly or recklessly

25.    Defendant made the representation with the intent that the Plaintiff act on it.

26.    Plaintiff relied on the representation.

27.    The representation caused the Plaintiff injury.

## DAMAGES FOR PLAINTIFF, GRCDALLASHOMES, LLC

28.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff, GRCDallasHomes, LLC, was caused to suffer economic losses of $8,336.51 and attorney fees.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff, GRCDallasHomes, LLC, respectfully prays that the Defendants be cited to appear and answer herein, and that upon a final hearing of the cause, judgment be entered for the Plaintiff against Defendants, jointly and severally, for damages in an amount within the jurisdictional limits of the Court; together with pre-judgment interest at the maximum rate allowed by law; post-judgment interest at the legal rate, costs of court; and such other and further relief to which the Plaintiff may be entitled at law or in equity.

Respectfully submitted,

By: /s/ Ryan Rouz
       Ryan Rouz
       Texas Bar No. 24093079
       Email:  ryan@rouzlaw.com
       1111 S. Akard St. #405
       Dallas, TX 75215
       Tel. (469) 777-1451
       Fax. (469) 666-9291
       Attorney for Plaintiff

**PLAINTIFF HEREBY DEMANDS TRIAL BY JURY**

## Statebridge Mayes lawsuit

ryan rouz <ryan@rouzlaw.com>
Thu 4/7/2022 7:22 PM
To: kaz danesh <cancunkaz@hotmail.com>

Rouz Law P.C.
Attorney Ryan Rouz
1111 S. Akard St. Ste. 405
Dallas, TX 75215
Phone: 469-777-1451
Fax: 469-666-9291
www.sandersrouz.com



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

shady lane pop

ryan rouz <ryan@rouzlaw.com>
Thu 4/7/2022 8:34 PM

To: kaz danesh <cancunkaz@hotmail.com>

Rouz Law P.C.
Attorney Ryan Rouz
1111 S. Akard St. Ste. 405
Dallas, TX 75215
Phone: 469-777-1451
Fax: 469-666-9291
www.sandersrouz.com



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone or by return E-mail and delete this message, along with any attachments, from your computer. Thank you.

**Cc:** Farid Moghadassi <faridm@dfwlawgroup.com>
**Subject:** RE: Loan #39786 GRC Dallas Homes LLC - Statebridge; Estate Bank Balance = $5,937.66

Rod,

The buyer/realtor is Marcus Sallis. His phone is 214-566-0093. His email is
mdsallis@greenwoodap.com.

Marcus has bought troubled houses from me once before in another trustee case of mine. He has
the ability to close.

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**

---

**From:** Rod Khavari <rodk@dfwlawgroup.com>
**Sent:** Thursday, July 29, 2021 11:09 AM
**To:** Christopher Moser <cmoser@qslwm.com>
**Cc:** Farid Moghadassi <faridm@dfwlawgroup.com>
**Subject:** RE: Loan #39786 GRC Dallas Homes LLC - Statebridge; Estate Bank Balance = $5,937.66
**Importance:** High

Chris:

I have reviewed the correspondence below and I am disappointed to see that GRC's confidential information ( *e.g.* account status/balance) has been released to Robert Nicoud without authorization by GRC. Mr. Nicoud has channels through which he can properly obtain that information (*e.g.* discovery, subpoenas, etc.). Mr. Nicoud also knew that he is not necessarily entitled to that information, as suggested by his own email below inquiring about whether Padgett has authorization to release the information to Mr. Nicoud. As Plan Agent, your role is clearly defined by the Plan and assisting the Creditors in gathering information that can be used against the Debtor is not one of those authorities.

That said, unless authorized by the Plan or by order of the bankruptcy judge, you are not authorized to release any information to other parties without GRC's consent.

Finally, during the TRO hearing, you had indicated that you spoke to a realtor regarding pricing on the homes that remain in the Estate. Please share that information with GRC, as well.

Please let me know if you have any questions or would like to discuss this matter further.

Thank you,

**Rod B. Khavari**
*Attorney and Counselor at Law*

**Khavari & Moghadassi, Attorneys at Law, P.C.**
16818 Dallas Parkway
Dallas, Texas 75248
Tel: 972.225.4444
Fax: 972.225.4445
E-Mail: rodk@dfwlawgroup.com

Visit our website: http://www.dfwlawgroup.com

** Please take note of our new address **

Connect With Us: Facebook | Twitter | Google+ | LinkedIn

IMPORTANT/CONFIDENTIAL: This message from the law firm of KHAVARI & MOGHADASSI, ATTORNEYS AT LAW, P.C., is intended only for the use of the addressees shown above. It contains information that may be privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, you are hereby notified that the copying, use or distribution of any information or materials transmitted in or with this message is strictly prohibited. If you received this message by mistake, please immediately call us at 972.225.4444 and destroy the original message. Thank you.

NOTICE: Pursuant to the PATRIOT Act, all electronic transmissions are subject to government scrutiny without a court order.

---

**From:** Kimberly Hill <kimhill@qslwm.com>
**Sent:** Thursday, July 29, 2021 10:50 AM
**To:** Christopher Moser <cmoser@qslwm.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>; Rod Khavari <rodk@dfwlawgroup.com>
**Subject:** RE: Loan #39786 GRC Dallas Homes LLC - Statebridge; Estate Bank Balance = $5,937.66
**Importance:** High

The estate bank balance is $5,937.66. See attached Form 2

Kimberly Hill
Paralegal to Chapter 7 Trustee, Christopher Moser
Quilling, Selander, Lownds, Winslett & Moser, P.C.
2001 Bryan Street Suite 1800
Dallas, TX 75201
214-871-2100 (main)

214-880-1817 (direct)
214-871-2111 (fax)

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Thursday, July 29, 2021 10:48 AM
**To:** kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>; Rod Khavari <rodk@dfwlawgroup.com>
**Cc:** Kimberly Hill <kimhill@qslwm.com>
**Subject:** FW: [EXTERNAL] - RE: Loan #39786 GRC Dallas Homes LLC - Statebridge

Do you want me to pay Statebridge?

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**
**Texas Board of Legal Specialization**
**Quilling, Selander, Lownds, Winslett & Moser, P.C.** | 2001 Bryan Street, Suite 1800, Dallas TX 75201
**Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email:** cmoser@qslwm.com

---

**From:** Carlos Hernandez <Carlos.Hernandez@padgettlawgroup.com>
**Sent:** Wednesday, July 28, 2021 4:12 PM
**To:** Christopher Moser <cmoser@qslwm.com>; Robert Nicoud <rmnicoud@dallas-law.com>
**Cc:** Cheyenne Zokaie <Cheyenne.Zokaie@padgettlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>; Kimberly Hill <kimhill@qslwm.com>; Rod Khavari <rodk@dfwlawgroup.com>
**Subject:** RE: [EXTERNAL] - RE: Loan #39786 GRC Dallas Homes LLC - Statebridge

Herein the amounts owed:

June payment: $1021.67
July payment: $1021.67
*Potentially* August payment: $1021.67
Suspense ($206.72)
Escrow installment
June: $162.11
July: $162.11
*Potentially* August $162.11

Thank you Trustee Moser! Please let me know when they are  issued and sent, so I can inform my client!
Regards,
Carlos Rafael



**Carlos R. Hernandez-Vivoni***
**Bankruptcy Attorney - Texas**
5501 East LBJ Frwy, Ste. 925
Dallas, TX 75240
850.422.2520 x 7144 (Phone)
850.422.2567 (Fax)
866.480.9372 (Toll Free)
Carlos.Hernandez@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Puerto Rico

Escalation Contact: Cheyenne M. Zokaie, Supervising Attorney-Texas, Cheyenne.Zokaie@padgettlawgroup.com

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Wednesday, July 28, 2021 2:52 PM
**To:** Carlos Hernandez <Carlos.Hernandez@padgettlawgroup.com>; Robert Nicoud <rmnicoud@dallas-law.com>
**Cc:** Cheyenne Zokaie <Cheyenne.Zokaie@padgettlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>; Kimberly Hill <kimhill@qslwm.com>; Rod Khavari <rodk@dfwlawgroup.com>
**Subject:** RE: [EXTERNAL] - RE: Loan #39786 GRC Dallas Homes LLC - Statebridge

What do you show as past due? I'll get it paid.

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**
**Texas Board of Legal Specialization**
**Quilling, Selander, Lownds, Winslett & Moser, P.C. | 2001 Bryan Street, Suite 1800, Dallas TX 75201**
**Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email:** cmoser@qslwm.com

---

**From:** Carlos Hernandez <Carlos.Hernandez@padgettlawgroup.com>
**Sent:** Wednesday, July 28, 2021 12:15 PM
**To:** Christopher Moser <cmoser@qslwm.com>; Robert Nicoud <rmnicoud@dallas-law.com>
**Cc:** Cheyenne Zokaie <Cheyenne.Zokaie@padgettlawgroup.com>
**Subject:** RE: [EXTERNAL] - RE: Loan #39786 GRC Dallas Homes LLC - Statebridge

Good afternoon Trustee Moser:
My client wants to move with a Notice of Default under the plan, as the mortgage is currently due for 6/1/2021.
Just wondering if those payments are in transit, or are to be paid soon, in order to avoid unnecessary efforts.
Please let me know!
Best Regards,
Carlos Rafael



**Carlos R. Hernandez-Vivoni***
**Bankruptcy Attorney - Texas**
5501 East LBJ Frwy, Ste. 925
Dallas, TX 75240
850.422.2520 x 7144 (Phone)
850.422.2567 (Fax)
866.480.9372 (Toll Free)
Carlos.Hernandez@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Puerto Rico

Escalation Contact: Cheyenne M. Zokaie, Supervising Attorney-Texas, Cheyenne.Zokaie@padgettlawgroup.com

---

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Thursday, May 20, 2021 9:52 AM
**To:** Robert Nicoud <rmnicoud@dallas-law.com>; Carlos Hernandez <Carlos.Hernandez@padgettlawgroup.com>
**Subject:** RE: [EXTERNAL] - RE: Loan #39786 GRC Dallas Homes LLC - Statebridge

Carlos,

Please give Mr. Nicoud and me the unpaid balance of the loan.

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**
**Texas Board of Legal Specialization**
**Quilling, Selander, Lownds, Winslett & Moser, P.C. | 2001 Bryan Street, Suite 1800, Dallas TX 75201**
**Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email:** cmoser@qslwm.com

---

**From:** Robert Nicoud <rmnicoud@dallas-law.com>
**Sent:** Thursday, May 20, 2021 9:44 AM
**To:** Carlos Hernandez <Carlos.Hernandez@padgettlawgroup.com>
**Cc:** Christopher Moser <cmoser@qslwm.com>
**Subject:** [EXTERNAL] - RE: Loan #39786 GRC Dallas Homes LLC - Statebridge

Carlos:

Do you have permission to tell me the current balance. I am including Chris Moser in this email as he is the post-confirmation plan agent who is handling payments for GRC.

Thanks for your assistance.

*Robert M. Nicoud, Jr.*
(214) 540-7542

---

**From:** Carlos Hernandez <Carlos.Hernandez@padgettlawgroup.com>
**Sent:** Wednesday, May 12, 2021 11:10 AM
**To:** Robert Nicoud <rmnicoud@dallas-law.com>
**Subject:** Loan #39786 GRC Dallas Homes LLC - Statebridge

Hello brother counsel Nicoud:
Herewith my contact information to open the channels of communication on this matter .
Regards,
Carlos Rafael
P.S.
I'm sharing here with you the Deed of Trust, as this one is public information.



**Carlos R. Hernandez-Vivoni***
**Bankruptcy Attorney - Texas**
5501 East LBJ Frwy, Ste. 925
Dallas, TX 75240
850.422.2520 x 7144 (Phone)
850.422.2567 (Fax)
866.480.9372 (Toll Free)
Carlos.Hernandez@Padgettlawgroup.com
www.padgettlawgroup.com
*Licensed in Texas & Puerto Rico

Escalation Contact: Cheyenne M. Zokaie, Supervising Attorney-Texas, Cheyenne.Zokaie@padgettlawgroup.com

ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.
ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.
ATTENTION: Privileged and/or confidential information, including attorney-client communication and/or attorney work product may be contained in this message and is legally privileged pursuant to the Federal Electronic Communication Privacy Act 18 U.S.C. §§ 2510-2521. This email message is intended only for the individual or individuals to whom it is directed. If you are not an intended recipient of this email message, or responsible for delivery of this message to such person, any dissemination, distribution or copying of this communication is strictly prohibited and may be a crime. If you received this message in error, please immediately notify the sender by responding to this e-mail message and immediately delete this e-mail message and all copies of it from your system and destroy any hard copies of it. THIS LAW FIRM MAY BE DEEMED A "DEBT COLLECTOR" UNDER THE FAIR DEBT COLLECTION PRACTICES ACT. ANY AND ALL INFORMATION OBTAINED WILL BE USED FOR THE PURPOSE OF COLLECTING A DEBT. This is in no way an attempt to collect a debt from you if your personal liability for said debt has been modified or extinguished by a discharge in bankruptcy. Thank you for your time and attention to this matter.

## General Warranty Deed

**Date:** April 14, 2022

**Grantor:** GRC DALLAS HOMES, LLC

**Grantor's Mailing Address:** 13220 Beach Club Rd., The Colony, Texas 75056

**Grantee:** Ryan Rouz

**Grantee's Mailing Address:** 1111 S. Akard St. #405
Dallas, TX 75215

**Consideration:** Paid off promissory note to Statebridge and paid off outstanding property taxes.

**Property (including any improvements):**

Lot 13, Block 2, BUCHANAN SUBDIVISION, an Addition to the City of Keller, Tarrant County, Texas, according to the map and or plat thereof recorded in Volume 388-10, Page 14, Plat Records of Tarrant County, Texas.

Known locally as: 1005 Shady Lane North, Keller, Texas 76248

**Reservations from Conveyance:**

None

**Exceptions to Conveyance and Warranty:**

None

Grantor, for the Consideration and subject to the Reservations from Conveyance and the Exceptions to Conveyance and Warranty, grants, sells, and conveys to Grantee the Property, together with all and singular the rights and appurtenances thereto in any way belonging, to have and to hold it to Grantee and Grantee's heirs, successors, and assigns forever. Grantor binds Grantor and Grantor's heirs and successors to warrant and forever defend all and singular the Property to Grantee and Grantee's heirs, successors, and assigns against every person whomsoever lawfully claiming or to claim the same or any part thereof, except as to the

D222103006
04/21/2022 12:09 PM          Page: 1 of 2          Fees: $23.00
DEED
SUBMITTER: ROUZ & ASSOCIATES PLLC

Mary Louise Nicholson
MARY LOUISE NICHOLSON
COUNTY CLERK

Reservations from Conveyance and the Exceptions to Conveyance and Warranty.

When the context requires, singular nouns and pronouns include the plural.

_____
Kazem Daneshmandi
*Principal of GPC Dallas Homes, LLC*

**FILED AS RECEIVED**

STATE OF TEXAS            )

COUNTY OF TARRANT        )

This instrument was acknowledged before me on _____April 5th_____, 2022, by

*Kazem Daneshmandi*
~~Keronna Henderson~~ .

_____
Notary Public, State of Texas

KERONNA HENDERSON
NOTARY PUBLIC
STATE OF TEXAS
ID# 131824944
EXPIRES 12-13-2022

FILED AND RECORDED
OFFICIAL PUBLIC RECORDS OF
TARRANT COUNTY, TEXAS
04/21/2022 12:09 PM

D222103006
DEED
Pages: 2
Fees: $23.00



MARY LOUISE NICHOLSON
COUNTY CLERK

2

**Sent:** Friday, June 4, 2021 1:38 PM
**To:** Chris Moser <cmoser@qslwm.com>; Gregory Mitchell <gmitchell@freemanlaw.com>; Rod Khavari <rodk@dfwlawgroup.com>; ryan rouz <ryan@rouzlaw.com>
**Cc:** Robert Nicoud <rmnicoud@dallas-law.com>
**Subject:** Re: Order and payment

Chris,
I'm trying to do what's best for all creditors and for all creditors the best thing is to keep GRC afloat and continued moving so both Greg and Rod the attorney's for GRC have agreed to the order.
Let's get this order done per your approved motion and like I said we can deal with Nicoud after we jointly look at what we have for expenses coming up which is what is best for the allowed Creditors
This order should be a straightforward order the judge said go ahead and pay and make your disbursements per your motion and upload the order. That was yesterday at 1o'clock 24 hours ago and now all we're doing is eating away at more attorney bills.
Judge Rhodes decision like she's done in the past saying hey here's my decision please make an order or do as she says, and then next thing we know I have you saying Nicoud will agree IF..... and it's something unrelated to the motion on the table
The Judge is giving you a decision and action I don't understand why Mr. Nicoud is completely going against what the judge points out. Actually I do.
The truth of the matter and you know this is yet again Caldwell is buying time to try to get another writ of garnishment so that he can single-handedly sabotage GRC's for his emotional self centered benefit NOT the benifit of all creditors and by doing so destroying all the other creditors chance of recouping the most they can in the bankruptcy plan as confirmed. And I feel your on board with these stalling efforts. This is not in the best interest of allowed creditors
I've pointed out to you multiple times please pay the creditors now

OC as proven time and time again have done multiple motions for writ of garnishments which have had you hold the money and not distribute which I agree with while a pending solution comes from the state judge then he just withdraws his motion and files it again and he's forced GRC's and Myself to now over the last six months have to do a special circumstance hearing and battle for wages and salary to not get garnished in a NON GARNISHING state.

You're supposed to be a neutral party that does what is best for all creditors as well helps the debtor to maximize profits per the plan I feel as though you've been letting Robert Nicoud control the company none of the other creditors and none of the other attorneys have ever made any disagreements of anything they've all supported GRC and that is why we have over 350k waiting to go out.
You  continue to let Nicoud and Caldwell destroy GRC' and by doing so destroy all creditors best interest.
We have been trying to get thru with Covid-19 please stop allowing Caldwell-19 to drive the bus.

Sent from my iPhone

> On Jun 4, 2021, at 1:06 PM, Gregory Mitchell <gmitchell@freemanlaw.com> wrote:
>
> My client cannot agree to something that the Court did not order.  The Court's order did not include any contingencies.
>
> Greg Mitchell
>
> ---
> **From:** Robert Nicoud <rmnicoud@dallas-law.com>
> **Sent:** Friday, June 4, 2021 12:52 PM
> **To:** Christopher Moser <cmoser@qslwm.com>; Gregory Mitchell <gmitchell@freemanlaw.com>; Rod Khavari <rodk@dfwlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>
> **Cc:** John Caldwell <johndcaldwell@yahoo.com>
> **Subject:** RE: Order and payment
>
> Chris:
>
> You may upload the order noting my approval as to form only if AND ONLY IF John Caldwell's admin claim is to be paid at the same time as the distribution.

*Robert M. Nicoud, Jr.*
(214) 540-7542

---

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Friday, June 4, 2021 12:39 PM
**To:** Robert Nicoud <rmnicoud@dallas-law.com>; Gregory Mitchell <gmitchell@freemanlaw.com>; Rod Khavari <rodk@dfwlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>
**Subject:** Order and payment

Please confirm:

1. I can upload the attached order; and
2. There is no objection to me paying Mr. Caldwell's administrative expense when I cut the checks for the interim distribution.

**Chris**

*Christopher J. Moser* |**Chapter 7 Trustee** |**Attorney**
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**
**Texas Board of Legal Specialization**
**Quilling, Selander, Lownds, Winslett & Moser, P.C.** | **2001 Bryan Street, Suite 1800, Dallas TX 75201**
**Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email:** cmoser@qslwm.com

## Fw: [EXTERNAL] - RE: Order and payment

**kaz danesh** <cancunkaz@hotmail.com>
Thu 5/19/2022 10:38 PM
To: ryan rouz <ryan@rouzlaw.com>

---

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Friday, June 4, 2021 2:54 PM
**To:** Gregory Mitchell <gmitchell@freemanlaw.com>; Robert Nicoud <rmnicoud@dallas-law.com>; Rod Khavari <rodk@dfwlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>
**Cc:** John Caldwell <johndcaldwell@yahoo.com>
**Subject:** RE: [EXTERNAL] - RE: Order and payment

I'll upload the order and once entered I'll make all the payments in the order. I will also pay Mr. Caldwell per his court order and per the direction of the plan.

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
**Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law**
**Texas Board of Legal Specialization**
Quilling, Selander, Lownds, Winslett & Moser, P.C. | 2001 Bryan Street, Suite 1800, Dallas TX 75201
Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email: cmoser@qslwm.com

---

**From:** Gregory Mitchell <gmitchell@freemanlaw.com>
**Sent:** Friday, June 4, 2021 1:06 PM
**To:** Robert Nicoud <rmnicoud@dallas-law.com>; Christopher Moser <cmoser@qslwm.com>; Rod Khavari <rodk@dfwlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>
**Cc:** John Caldwell <johndcaldwell@yahoo.com>
**Subject:** [EXTERNAL] - RE: Order and payment

My client cannot agree to something that the Court did not order. The Court's order did not include any contingencies.

Greg Mitchell

---

**From:** Robert Nicoud <rmnicoud@dallas-law.com>
**Sent:** Friday, June 4, 2021 12:52 PM
**To:** Christopher Moser <cmoser@qslwm.com>; Gregory Mitchell <gmitchell@freemanlaw.com>; Rod Khavari <rodk@dfwlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>
**Cc:** John Caldwell <johndcaldwell@yahoo.com>
**Subject:** RE: Order and payment

Chris:

You may upload the order noting my approval as to form only if AND ONLY IF John Caldwell's admin claim is to be paid at the same time as the distribution.

*Robert M. Nicoud, Jr.*
(214) 540-7542

---

**From:** Christopher Moser <cmoser@qslwm.com>
**Sent:** Friday, June 4, 2021 12:39 PM
**To:** Robert Nicoud <rmnicoud@dallas-law.com>; Gregory Mitchell <gmitchell@freemanlaw.com>; Rod Khavari <rodk@dfwlawgroup.com>; kaz danesh (cancunkaz@hotmail.com) <cancunkaz@hotmail.com>
**Subject:** Order and payment

Please confirm:

1. I can upload the attached order; and

2. There is no objection to me paying Mr. Caldwell's administrative expense when I cut the checks for the interim distribution.

**Chris**

*Christopher J. Moser* |Chapter 7 Trustee |Attorney
Board Certified Business Bankruptcy Law and Consumer Bankruptcy Law
Texas Board of Legal Specialization
Quilling, Selander, Lownds, Winslett & Moser, P.C. | 2001 Bryan Street, Suite 1800, Dallas TX 75201
Direct: (214) 880-1805 | Fax: (214) 871-2111 | Email: cmoser@qslwm.com