1                   IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE EASTERN DISTRICT OF TEXAS
2                         SHERMAN DIVISION

3

4    IN RE:                    )   BK. NO:  19-41186-BTR

5                              )

6    GRCDALLASHOMES, LLC      )

7         D E B T O R.        )

8

9

10                  *   *   *   *   *   *   *   *   *   *

11                   TRANSCRIPT OF PROCEEDINGS

12                  *   *   *   *   *   *   *   *   *   *

13

14

15

16

17

18

19

20        BE IT REMEMBERED, that on the 3rd day of June, 2021,

21   before the HONORABLE BRENDA T. RHOADES, United States

22   Bankruptcy Judge at Plano, Texas, the above styled and

23   numbered cause came on for hearing, and the following

24   constitutes the transcript of such proceedings as hereinafter

25   set forth:

1                        <u>I N D E X</u>

2                                                        <u>PAGE</u>

3   <u>CHRIS MOSER</u>

4        DIRECT EXAMINATION
             BY:  Mr. Moser in Narrative          17
5        CROSS-EXAMINATION
             BY:  Mr. Mitchell                    19
6            BY:  Mr. Nicoud                      20
         RECROSS-EXAMINATION
7            BY:  Mr. Mitchell                    30
             BY:  Mr. Nicoud                      35
8
    <u>KAZEM DANESHMANDI</u>
9
         DIRECT EXAMINATION
10           BY:  Mr. Mitchell                    37
         VOIR DIRE EXAMINATION
11           BY:  Mr. Nicoud                      64
         DIRECT EXAMINATION CONTINUED
12           BY:  Mr. Mitchell                    65
         CROSS-EXAMINATION
13           BY:  Mr. Nicoud                      73

14  <u>ROBERT NICOUD</u>

15       DIRECT EXAMINATION
             BY:  Mr. Nicoud in Narrative         82
16
    <u>JOHN CALDWELL</u>
17
         DIRECT EXAMINATION
18           BY:  Mr. Nicoud                      86
         CROSS-EXAMINATION
19           BY:  Mr. Mitchell                    87

20

21

22

23

24

25

1                    E X H I B I T   I N D E X

2                                        <u>PAGE FIRST REFERENCED</u>

3  Plan Agent Exhibit 4                          20

4  Debtor Exhibit 1                              31

5  Debtor Exhibit 2                              50

6  Debtor Exhibit 3                              60

7  Debtor Exhibit 4                              60

8  Debtor Exhibit 5                              61

9  Debtor Exhibit 6                              65

10  Debtor Exhibit 8                             67

11  Debtor Exhibit 9                             68

12  Debtor Exhibit 10                            69

13  Caldwell Exhibit A                           32

14  Caldwell Exhibit H                           21

15  Caldwell Exhibit I                           22

16  Caldwell Exhibit J                           24

17  Caldwell Exhibit K                           25

18  Caldwell Exhibit L                           26

19  Caldwell Exhibit M                           26

20  Caldwell Exhibit N                           27

21  Caldwell Exhibit O                           28

22

23

24

25

1                    P R O C E E D I N G S

2              COURTROOM DEPUTY:  GRCDallasHomes, LLC.  Case

3    number 19-41186.  Plan Agent motion for authority, motion for

4    sanctions, and motion to compel debtor and creditor.

5              THE COURT:  Appearances.

6              MR. MITCHELL:  Good morning, Your Honor.  This

7    is Greg Mitchell on behalf of the debtor.

8              MR. NICOUD:  Robert Nicoud on behalf of

9    creditor, John Caldwell.

10             MR. MOSER:  Chris Moser, Plan Agent.

11             MR. CAVARI:  Rod Cavari, I'm observing for

12   GRC.

13             THE COURT:  Okay.  All right.  Where are we?

14             MR. MOSER:  This is Chris Moser.  This is my

15   motion for interim distribution.  But perhaps we probably

16   need to deal with the sanction motion beforehand, would be my

17   suggestion.

18             MR. NICOUD:  This is Robert Nicoud, and I

19   would concur.

20             THE COURT:  Okay.  All right.  You may

21   proceed.

22             MR. NICOUD:  Your Honor, Robert Nicoud on

23   behalf of John Caldwell.

24        We have filed a motion for sanctions seeking a unique

25   form of relief.  We had submitted as part of this hearing a

CINDY SUMNER, CSR (214) 802-7196

1   request for production to the debtor requesting documents

2   relevant to the monies that had been spent by the estate

3   since confirmation.  We received -- at the time the motion

4   was filed, we had received absolutely no response, although

5   counsel for the debtor had asked for an extension of time

6   earlier.  Last night at 7:35 p.m. I did receive a form of

7   response.  We think the Court should disregard the response

8   and just treat this matter as if it had not been responded

9   to.

10      Now, we don't want the hearing rescheduled because of

11  lack of discovery.  That just rewards the debtor for not

12  complying.  So what I'm asking the Court to do is to

13  basically have a conclusion that the debtor has failed to

14  maintain appropriate records to account for the funds and the

15  property that the debtor was holding for the benefit of

16  creditors.  And that the Court should consider that failure

17  to maintain records as an additional ground for possible

18  conversion of this case to Chapter 7.

19      And we cite the Court's inherent authority to fashion a

20  unique response to failure to comply with discovery citing

21  the U.S. Supreme Court case of Goodyear Tire & Rubber versus

22  Hager where a Court had to deal with a discovery breach that

23  was not found out or not discovered until long after the case

24  had settled.  And in that case, the U.S. Supreme Court

25  recognized that the Trial Court still had the inherent

1    authority to in that case issue a sanctions order and force

2    Goodyear to pay attorney's fees to the other party.  In the

3    same vein, our position is that the Court now has authority

4    here to make this determination as a law of the case that the

5    debtor has failed to maintain proper records for the property

6    that has been in the debtor's position.  And so we would ask

7    the Court to issue such a ruling as a sanction prior to the

8    start of the hearing on the merits.

9         And that concludes my argument.

10             THE COURT:  Okay.  Prior to the start of the

11   hearing on the merits of what?

12             MR. NICOUD:  Of the -- what brought us here,

13   which is the Plan Agent's motion for authority.

14             THE COURT:  Okay.  Just so we're clear.

15   You're asking for -- is that the Court convert the case; is

16   that correct?

17             MR. NICOUD:  Ultimately, yes.  That issue is

18   before the Court today.

19             THE COURT:  Okay.  All right.  Did you wish --

20   did anyone else wish to make an opening statement?

21             MR. MITCHELL:  Your Honor, this is Greg

22   Mitchell.  I do have a couple of comments regarding the

23   sanctions motion, if I may.

24             THE COURT:  You may.

25             MR. MITCHELL:  First of all, the parties have

1  been and were doing so up until the last minute engaged in

2  active efforts to resolve this issue.  The -- the -- I want

3  to point out that, as the Court is probably aware, in the --

4  in the last several months, the debtor has not really had

5  anybody that is being paid to do any work for it.

6  Mr. Daneshmandi, the debtor's representative, is doing his

7  best to keep the debtor on track.  And, you know, as we'll

8  discuss in more detail, he hasn't been paid for this entire

9  year.  And so to expect the debtor to spend hours and hours

10 responding to discovery requests is a little unrealistic.

11       But with that being said, the reality, as we focused on

12 the productions that we did respond to, albeit late, the

13 questions that were being asked was not asking for

14 information that is -- it is not all completely within the

15 realm of this creditor's ability to obtain.  And, in fact, we

16 believe they already have all of the information that they're

17 asking for.  There's only three requests there.  The first

18 one asks for information related to payment requests

19 submitted to the Plan Agent.  Mr. Nicoud has been in repeated

20 communications with Mr. Moser, the Plan Agent, requesting

21 documents.  And we believe he has everything that he's asking

22 for.  And he certainly has the -- all of the Plan Agent's

23 reports.  And so that's not -- that's not going to provide

24 any new information that he doesn't already have.

25       The second request asks for information related to any

1  revenue of the debtor, which is all represented in the Plan

2  Agent's report.  And then finally, the third one asks for

3  1099s issued by GRCDallasHomes.  The debtor's representative

4  has looked and has not been able to locate -- there was an

5  issue with a server.  But, again, that information is not

6  something that is not readily accessible via the Plan Agent's

7  report.  So we would reject the notion that any sanction is

8  appropriate.  We certainly don't believe that it has any

9  bearing on the motion that's before the Court today, which is

10 simply to determine whether or not the Plan Agent's motion is

11 appropriate.

12      And we would also submit to the Court that the issue of

13 a conversion to Chapter 7 is not before the Court today.

14 Mr. Cardwell did not file a motion asking for that relief.

15 As the Court may recall, the Court's order that ultimately

16 culminated in the Plan Agent's motion said that based on its

17 findings that the debtor either needed to come into

18 compliance, or file a motion to amend or modify its plan.

19 And only then would the Court consider conversion.  It did

20 not say that it would automatically be converted if a motion

21 was filed and was found not to be appropriate.

22      So I guess just to lay the groundwork for the

23 procedural posture that we believe the case is in, we don't

24 believe that the result of the motion today, even if it's not

25 granted, should automatically lead to a conversion to Chapter

1  7.  We believe that there are multiple options for that,

2  including the motion that we filed which -- I don't know

3  exactly where the Court wants to take that up in the sequence

4  of events, but as the Court is aware, we filed a motion for

5  mediation that is included as part of what's to be considered

6  today.  It was really -- it was really in the alternative to

7  the Plan Agent's motion.  So I guess our suggestion would be

8  to take up the Plan Agent's motion.  And if for some reason

9  the Court does not believe that the Plan Agent's motion is

10  appropriate, then we would urge the Court to consider our

11  mediation motion.  We sincerely believe that it's not in the

12  best interest of all the parties involved, including all of

13  the creditors except for Mr. Caldwell, for this case to be

14  converted to Chapter 7.

15      And that concludes my remarks on the -- on the motion

16  for sanctions.  I do have some additional remarks regarding

17  the Plan Agent's motion, when we get to that point.

18      THE COURT:  All right.  Mr. Nicoud, this is

19  essentially a discovery sanction motion, correct.

20      MR. NICOUD:  Correct.

21      THE COURT:  Okay.  So what has been requested

22  and not produced?

23      MR. NICOUD:  Well, what was requested was --

24  well, Mr. Mitchell when through that.  We -- this comes

25  before the Court based on the Court's finding that the way

1   the debtor has been operating was a breach of the plan.  We

2   wanted to find out, yes, the debtor has made payment requests

3   to the Plan Agent.  But they are just -- as I think the

4   evidence will ultimately show, they're just one or two page

5   requests.  We want $10,000 to do X, Y, Z on these properties.

6   And what we're wanting to find out is, what was that $10,000,

7   what was it spent on?  Who got the money?  You must have

8   hired subcontractors.  Where did the money go?  What did we

9   get out of it, other than a report that we wanted $10,000 to

10  spend on this property?

11        I don't think it's an extraordinarily difficult matter

12  to comply with.  These are records that should be kept in the

13  normal course of any business.  And that they would be

14  relatively easy to produce.  With regard to the issue on

15  revenue, again, this may come up, but this came before the

16  Court because we discovered that the debtor had entered into

17  a lease of one of the properties post-confirmation with no

18  accounting for that lease income.  Nothing was turned over to

19  the Plan Agent.  It's not in the Plan Agent's reports.  We

20  want to know, are there any other leases?  Are there any

21  other sources of income, other than from sales of property

22  that we as creditors don't know about?  So those are the

23  matters that we are -- we were trying to explore with our

24  requests for production.  And, again, all of the grounds

25  raised by the debtor could have been included in a formal

1    response or even an informal response.  But we received

2    nothing other than a request for a 7 day delay in responding,

3    which we granted.  And only with that time period expired,

4    did we file the motion.

5                    MR. MITCHELL:  Your Honor, if I may respond

6    briefly to the last points.

7                    THE COURT:  Hold on just one moment, please.

8         Okay.  Where is -- this is a discovery dispute, in the

9    first instance.  So which requests for production has not

10   been complied with?

11                   MR. NICOUD:  Well, it was attached to the

12   motion served on April 16, 2021.  And it would be document

13   287.

14                   THE COURT:  I see it.  Okay, I see it.  I see

15   three line items, document requests.  All documents

16   reflecting or relating to all documents which reflect or

17   relate to any revenue of GRC.  And then the third is the all

18   IRS Form 1099s issued by the debtor.

19        So my question is, which one of these has not been

20   complied with, in your judgment?

21                   MR. NICOUD:  None.  At the time the motion was

22   filed, we had received no response at all.

23                   THE COURT:  Okay.  And now?

24                   MR. NICOUD:  At 7:35 p.m. last night, I

25   received an email with 25 pages of documents attached, which

1   I've briefly reviewed.  All of which are -- consist of emails

2   between Mr. Daneshmandi and Mr. Moser.  There's one invoice

3   for a third party.  And then there was a formal response that

4   said that the debtor had had computer problems and,

5   therefore, couldn't generate the 1099s.  Again, that came at

6   7:35 p.m. last night.

7            THE COURT:  All right.  I'll hear response

8   from Mr. Mitchell.

9            MR. MITCHELL:  Thank you, Your Honor.

10       So as I pointed out initially, as far as the requests,

11  we would submit that every document that we could produce in

12  response to numbers 1 and 2, Mr. Caldwell and Mr. Nicoud

13  already had.  And if they didn't have it, the Plan Agent has

14  it, because the request itself specifically says, related to

15  payment requests submitted to the Plan Agent.  And then the

16  Plan Agent has all of the information related to the revenue.

17  So we believe the request was really just an attempt to

18  harass.  And we tried to respond in good faith.  But as I

19  pointed out, the debtor has nobody being compensated to do

20  anything.  And so while Mr. Daneshmandi is attempting to do

21  as much as he can, he's also left without an income to make a

22  living.  And so he has to figure out how to do that, in

23  addition to all of this other stuff.

24       We admit to the late response.  The only -- I'm not

25  going to try to make excuses for the late response.  We admit

1  to the late response.  We were trying to pull anything

2  together that we thought was -- might be in addition to what

3  the -- Mr. Caldwell and his attorney should already have.

4       The other thing that I wanted to point out, Your Honor,

5  though, is all of the issues raised by Mr. Nicoud and that

6  are being raised by the requests that are being made we

7  submit are completely irrelevant to the issue before the

8  Court today.  It appears as if Mr. Caldwell is simply trying

9  to mitigate the issue of whether the debtor was in default of

10 its plan. And the Court has already ruled on that.  The Court

11 ruled that the debtor was in default on its plan.  So we're

12 kind of past that.  And the motion before the Court today is

13 whether or not the Plan Agent's motion can do what the Court

14 said that the debtor had to do.  And the Court said in its

15 ruling that the debtor either needs to, one, come into

16 compliance with the confirmed plan.  Or, number, two, modify

17 its plan so that whatever it does or has done can be -- can

18 be ratified going forward.

19      And so when -- our decision was to work with the Plan

20 Agent to file the motion that has now been filed, which we

21 submit brings the debtor into compliance.  And so a lot of

22 these issues that focus on whether or not the debtor, you

23 know, was in default of its plan are kind of irrelevant,

24 since the Court has already made that ruling.  So we would

25 submit that notwithstanding any issues regarding, you know,

1   the timing of our response, that none of these requests have

2   anything to do with any issue that's going to be presented to

3   the Court today.

4            THE COURT:   Okay.   Mr. Nicoud, what do the

5   three requests have to do with the matter before the Court

6   today?

7            MR. NICOUD:   Okay.   All right.   Procedurally

8   we are before the Court because on March 12th, this Court

9   issued an order that required that the debtor had to either

10  within 14 days of that order file a proposed plan

11  modification, or come into compliance with the plan as

12  previously confirmed.   So the issue is does their proposal to

13  the -- what we want to show is that they have not -- they

14  have not submitted a modification.   And the debtor has not

15  come into compliance with the defaults under the plan.   They

16  have -- the debtor has mis-spent money that should have gone

17  to the unsecured creditor's pool.   These issues are relevant

18  to see how the debtor has, in fact, spent the money that

19  could have gone into the unsecured creditor's pool.   So that

20  is why it is relevant to the hearing today.

21        Next matter is, if the debtor thinks that it is

22  irrelevant or burdensome, there's a procedure for addressing

23  that, which is that you file a timely formal response stating

24  your grounds.   You don't just don't do anything.

25            That's my response.

1                    THE COURT:  All right.  Does anyone wish to

2     present any evidence in support of their position?

3                    MR. NICOUD:  Robert Nicoud.  I would just ask

4     the Court to -- to the extent necessary, I'm representing

5     that, in fact, the request for production was forwarded to

6     counsel for the debtor, as represented in the motion for

7     sanctions.  And that until 7:35 last night, I had not

8     received any formal response.

9                    THE COURT:  All right.  Is there any dispute

10    about that, Mr. Mitchell?

11                   MR. MITCHELL:  Your Honor, no.  The time --

12    the timing of the response is not in dispute.

13                   THE COURT:  All right.  So no evidence from

14    anybody about anything, right?  Is that what I'm

15    understanding?

16                   MR. NICOUD:  Well, my -- I guess I just

17    testified.

18                   THE COURT:  Right.  Other than the failure to

19    respond prior to 7 -- is it 7:25 yesterday evening?

20                   MR NICOUD:  7:35.

21                   THE COURT:  7:35 yesterday evening.

22        Okay.  So -- all right.  Given the debtor's failure to

23    respond timely without any excuse, and I'm talking about

24    legal excuse, the Court finds cause to award sanctions.  ==The==

25    ==Court will award a sanction, the cost associated with the==

1  filing of the motion for sanctions, as well as -- as well as

2  the hearing on the motion.

3       Mr. Nicoud, you're to file with the Court what your

4  fees and expenses were associated with the filing of this

5  motion and prosecuting it.  That needs to be filed within 7

6  calendar days.  Okay?  And then we'll determine the amount of

7  attorney's fees and expenses to be awarded upon the filing of

8  that motion -- I'm sorry, from the filing your expenses and

9  fees.  Okay?

10            MR. NICOUD:  I believe I understand.

11  Otherwise, the balance of the request is not granted?

12            THE COURT:  The balance is denied.  It seems

13  to me that the debtor is -- it's a discovery dispute.  And

14  that's what it's asked for right now.

15       Now let's turn to the balance of the matter on the

16  Court's docket.  Mr. Moser, it's your motion.

17            MR. MOSER:  Yes, ma'am.  I -- the opening I

18  have is also going to be my direct testimony.  I'd ask the

19  Court's guidance of whether I could be just sworn in to avoid

20  doing duplicatives, saying the same thing twice and then have

21  people cross-examine me.

22            THE COURT:  Okay.  We can certainly swear you

23  in.

24       Let's swear in Mr. Moser.

25            (The witness was sworn by the courtroom deputy.)

1                    <u>CHRIS MOSER</u>

2    The witness, having been duly sworn to tell the truth,

3  testified on his oath as follows:

4                  <u>DIRECT EXAMINATION</u>

5  BY MR. MOSER (in narrative).

6                  THE WITNESS:  Your Honor, I'm Chris Moser.

7  I'm the Plan Agent under the debtor's second amended plan of

8  reorganization, which was confirmed a little over two years

9  ago.  My duties as Plan Agent include accounting for the

10  monies that I receive from the sales of the properties, to

11  make plan payments as directed by the debtor, and to consult

12  with the debtor's principals regarding maximizing recovery to

13  unsecured creditors.

14      When I first got this job just as two years ago, there

15  were ten houses that the debtor owned, plus a one-third

16  interest in another house.  Since the time I've been Plan

17  Agent, five of the ten houses have sold.  Those five houses

18  have generated gross sale proceeds that have hit my bank

19  account of approximately $1.55 million.  That's what's been

20  collected.  From the $1.55 million, I've written checks or

21  disbursed in round numbers $800,000 of that amount for

22  improvements to the ongoing houses, to pay salaries, and to

23  pay legal fees.  So today that leaves me with holding the

24  amount of $353,000 from the $1.55 million that I have.

25      The plan was confirmed over two years ago.  I have made

1  zero, no distributions to unsecured creditors.  And speaking

2  of unsecured creditors, if you take out the subordinated

3  creditors, which are Mr. Daneshmandi's mother, there's $1.4

4  million of general unsecured creditors in the estate.  Of

5  this amount, Mr. Caldwell is the largest.  He's owed about

6  $607,000.  So that would put him at 43, 44 percent of the

7  entire unsecured creditor pool.

8       Like Mr. Nicoud said, three months ago this Court did

9  find that the debtor was in default of its plan for failing

10 to make distributions to creditors for the time period that's

11 been post-confirmation.  And gave the debtor 14 days to

12 either cure the default or to modify the plan.  Once this

13 ruling came down, I spoke with the debtor's principal and the

14 decision was made to file this motion for interim

15 distribution.  And the concept of the motion is that of the

16 $353,000 I have, I was asking to distribute right at $275,000

17 to general unsecured creditors and to also pay some

18 administrative costs, like for legal fees and salaries.

19      Mr. Caldwell has opposed the motion for the reasons

20 Mr. Nicoud stated.  He doesn't think that the past defaults

21 are cured by money, that money cures it.  He would like the

22 case converted to Chapter 7 and have a fiduciary in charge to

23 sell the houses and to pay creditors.  But as Plan Agent, my

24 thought was it was better to get money out to creditors as

25 soon as possible, to make a distribution.  It's been quite

1  some time.  And then we'll see where we go from there.

2       There are five houses that are still left.  And as was

3  alluded to, Mr. Daneshmandi has been fixing up the houses and

4  improving them.  But during the course of the case, he had

5  gotten garnished by Mr. Caldwell and as a result, was not

6  getting a paycheck.  And with all of the other issues about

7  the default, there have been no payments to Mr. Daneshmandi

8  since December of last year.

9       And that would conclude my testimony.

10            THE COURT:  Thank you.

11  Does anyone wish to cross?

12            MR. MITCHELL:  Your Honor, this is Greg

13  Mitchell for the debtor.  I do have a few questions.  I also

14  wanted to make an opening statement.  But I can -- I can do

15  either of those in any order.  If the Court would rather me

16  ask Mr. Moser my questions first, I can -- I would like to do

17  that.

18            THE COURT:  All right.  I'll let you cross

19  right now and I'll take any statements from you in closing.

20  Okay?

21            MR. MITCHELL:  That will be fine.

22            THE COURT:  Thank you.

23            <u>CROSS-EXAMINATION</u>

24  BY MR. MITCHELL:

25       Q.   Mr. Moser, regarding the amounts that were paid out

1    you referenced throughout the course of the plan, was it your

2    belief when you made distributions that those distributions

3    were either approved or authorized under the confirmed plan?

4         A.   Yes.   That was my belief.

5         Q.   Okay.

6              MR. MITCHELL:   I think that's the only

7    question I wanted to ask at this time.

8              THE COURT:   Thank you.

9         Does anyone else wish to cross-examine this witness?

10             MR. NICOUD:   Yes.   This is Robert Nicoud.

11             <u>CROSS-EXAMINATION</u>

12   BY MR. NICOUD:

13        Q.   Mr. Moser, your exhibit -- or Plan Agent Exhibit

14   Number 4, found at document number 282-4, would you explain

15   what that document is?

16        A.    That is my cash -- Exhibit Number 4 is my cash

17   receipts and disbursement record through, I believe, for the

18   one that I had filed was through May 5th.   It shows all the

19   money in and all the money out.

20        Q.   Okay.   So it's a true and accurate representation

21   of all of the money in and all of the money out?

22        A.   Yes, it is.

23        Q.   Okay.

24             MR. NICOUD:   Unusual, but we move for

25   admission of Plan Agent Exhibit 4.

1                    THE COURT:  Okay.  Where is that at?

2                    THE WITNESS:  It is at docket number 282,

3    Exhibit Number 5.

4                    MR. NICOUD:  4.

5                    THE WITNESS:  Number 4, excuse me.

6                    THE COURT:  All right.  Any objection?

7                    MR. MITCHELL: No objection.

8                    THE COURT:  Exhibit 5 is an attachment to the

9    exhibit and witness list which has been docketed as docket

10   number 282, Exhibit 4 is admitted.

11       Q.   All right.  Next I'm going to go through a series

12   of exhibits on the Caldwell exhibit list.  And that is found

13   at document 291.

14       So tell me when you're --

15       A.   I found it.  I have it.

16       Q.   Okay.  If you'll look at Caldwell Exhibit H found

17   at document number 291-8

18       A.   I see it.

19       Q.   Okay.  Just what is this document?

20       A.   It was an invoice I received from Construction

21   Consultants regarding $150,000 draw that they wanted.  And

22   that was paid.

23       Q.   Well, was it -- was every bit of it paid?

24       A.   Part -- part of it was paid.  Part of it was not.

25       Q.   Okay.  And how did you receive this?

1      A.   It was an email from Mr. Daneshmandi.

2      Q.   Okay.  Other than this page, did you receive any

3 other information concerning this payment request?

4      A.   No.  This is the extent of the payment request.

5      Q.   Okay.  But you maintained this in your normal

6 records?

7      A.   I did.

8           MR. NICOUD:  Okay.  Move for admission of

9 Caldwell Exhibit H.

10          THE COURT:  Where is that for the record?

11          MR. NICOUD:  I'm sorry?

12          THE COURT:  Where is that for the record?

13          MR. NICOUD:  Oh, document number 291-8.

14          THE COURT:  Okay.  H, as in --

15          MR. NICOUD:  Harold.

16          THE COURT:  Okay.  All right.  I just wanted

17 to make sure.

18      All right.  Any objection?

19          MR. MITCHELL:  None, Your Honor.

20          THE COURT:  Thank you.

21      Exhibit H, which was attached to the exhibit and

22 witness list docketed as docket number 291 is admitted.

23      Q.   Okay.  Turning to Caldwell Exhibit I, found at

24 document 291-9.

25      A.   I see it.

1      Q.    And what is this?

2      A.    It's an email exchange between myself and

3  Mr. Daneshmandi and my paralegal.

4      Q.    Okay.  And -- and is Mr. Daneshmandi requesting

5  payments?

6      A.    Yes.

7      Q.    Okay.  Is this a typical exchange when

8  Mr. Daneshmandi is requesting a payment?

9      A.    It would usually sometimes start with a phone call.

10 But it would always follow up with an email of some sort,

11 yes.  So it's typical.

12     Q.    Okay.  And was this maintained in the normal course

13 of your business?

14     A.    Yes, it was.

15     Q.    Okay.  Was any additional documentation regarding

16 the payment request submitted with this request?

17     A.    Not with this request, no.  And I don't recall

18 receiving any.

19     Q.    Okay.

20            MR. NICOUD:  Move for admission of Caldwell

21 Exhibit I, found at docket number 291-9.

22            THE COURT:  Any objection?

23            MR. MITCHELL:  No objection.

24            THE COURT:  Okay.  Exhibit I attached to the

25 witness and exhibit list which has been docketed at docket

1   number 291 is admitted.

2        Q.   Next turning to Caldwell Exhibit J, found at

3   document number 291-10.

4        A.   Yes, I have it.

5        Q.   Okay.  And what is this?

6        A.   That's an invoice from Mr. Daneshmandi for a

7   $24,000 payment.

8        Q.   And on the last page it refers to requesting three

9   separate checks of $8,000?

10       A.   Yes.

11       Q.   And was this received from Mr. Daneshmandi?

12       A.   Yes, it was.

13       Q.   Okay.

14            THE COURT:  I don't see where it says that

15   he's requesting three checks of $8,000.  Is that --

16            MR. NICOUD:  That would be -- that's on page 2

17   of document number 291-10 at the very top.

18            THE COURT:  We're talking about Exhibit J,

19   right?

20            MR. NICOUD:  Yes.

21            THE COURT:  Okay.  I'm looking at Exhibit J

22   and I don't see -- oh,  I see, please remit three checks --

23   second page.  Thank you.

24            MR. NICOUD:  Okay.  And we move for admission

25   of Caldwell Exhibit J.

1          THE COURT:  Any objection?

2          MR. MITCHELL:  No objection.

3          THE COURT:  Exhibit J is admitted.

4     Q.   Next moving on to Caldwell Exhibit K, found at

5  docket number 291-11.

6     A.   I have it.

7     Q.   What is this?

8     A.   It's another invoice for $50,000 from

9  Mr. Daneshmandi for another property.

10    Q.   Okay.  And was this amount paid by you?

11    A.   It was, yes.

12    Q.   Are -- okay.  Are you sure about that?

13    A.   I'm not.  I'd have to look at my dates on it.

14    Q.   Okay.

15    A.   It doesn't look like it was.  It was -- no.

16    Q.   Okay.  Okay.  And, again, was there any backup

17  submitted for this amount?

18    A.   That is the total itemization of what the request

19  was for.

20    Q.   And was this maintained by you in the normal course

21  of business?

22    A.   Yes.

23         MR. NICOUD:  Move for admission of Caldwell

24  Exhibit K, like Karen, found at docket number 291-11.

25              THE COURT:  Any objection?

1              MR. MITCHELL:  None.

2              THE COURT:  Exhibit K is admitted.

3       Q.   Next to Exhibit L, found at docket number 291-12.

4        What is this?

5       A.   It's an email exchange between me and

6  Mr. Daneshmandi and my paralegal regarding payments.

7       Q.   Okay.  Maintained by you in the normal course of

8  business?

9       A.   Yes.

10             MR. NICOUD:  Move for admission of Caldwell

11 Exhibit L.

12             THE COURT:  Any objection?

13             MR. MITCHELL:  No.

14             THE COURT:  All right.  Exhibit L is admitted.

15      Q.   Next to Caldwell Exhibit M, found at docket number

16 291-13.

17      A.   I have it.

18      Q.   What is this?

19      A.   Another email exchange.  But this is between --

20 starts out on the top between you and me and then the other

21 email exchange is between me and my paralegal about payments

22 to Mr. Daneshmandi.

23      Q.   Okay.  Can we scroll down?  So the email exchange,

24 when does it start with between you and your paralegal?

25      A.   We started emailing each other, it looks like

1   September of 2020.

2       Q.   Okay.  All right.  And was this the original email

3   from Mr. Daneshmandi on September 28th, 2020, was this

4   document maintained by you in the normal course of business?

5       A.   Yes, it was.

6       Q.   Okay.  Do you know if all of the amounts were paid?

7       A.   Well, there's a check attached to it.  One of the

8   checks was voided, I know that.  I'd have to go back and

9   verify.  But most likely.  Most likely.

10      Q.   Okay.  This is maintained by you in the normal

11  course of business?

12      A.   Yes.

13           MR. NICOUD:  Okay.  Move for admission of

14  Caldwell Exhibit M, like Michael.

15           THE COURT:  Any objection?

16           MR. MITCHELL:  No objection.

17           THE COURT:  Exhibit M is admitted.

18      Q.   Moving on to Caldwell Exhibit N, like Nancy, found

19  at docket number 291-14.

20      A.   I see it.

21      Q.   What is that?

22      A.   It's an invoice from Mr. Daneshmandi for work at

23  a -- at Shady Lane.

24      Q.   Okay.  Maintained by you in the normal course of

25  business?

1     A.   Yes.

2               MR. NICOUD:  Move for admission of Caldwell

3     Exhibit N found at docket number 291-14.

4               THE COURT:  Any objection?

5               MR. MITCHELL:  No objection.

6               THE COURT:  Exhibit N is admitted.

7     Q.   And moving to Caldwell Exhibit O, found at docket

8     number 291-15.

9     A.   That's another invoice from Mr. Daneshmandi for

10    Lakeview.

11    Q.   Okay.  And maintained by you in the normal course

12    of business?

13    A.   Yes.

14              MR. NICOUD:  Move for admission of Caldwell

15    Exhibit O.  This is found at docket number 291-15.

16              COURTROOM DEPUTY:  Stop talking at this time,

17    please.  Our judge just got disconnected.  She'll be back on.

18    Thank you.

19              THE COURT:  All right.  I'm sorry, folks.

20    Apparently I got disconnected somehow.  And so I'm back on

21    now.

22         I think I got disconnected right after the Exhibit N

23    was to be admitted; is that right?

24              MR. NICOUD:  I had moved for Exhibit N.  I had

25    moved on to Exhibit O.  But if it wasn't on the record, I

1  move for the admission of Exhibit N found at docket number

2  291-14.

3              THE COURT:  Okay.  I think Exhibit N has been

4  admitted.  And that's where we -- right after that is when I

5  got disconnected.

6              MR. NICOUD:  All right.

7      Q.   Turning to Caldwell Exhibit O, found at docket

8  number 291-15.

9       Mr. Moser, what is that?

10     A.   It's an invoice from Mr. Daneshmandi for the

11  Lakeview project for $25,000.

12     Q.   Okay.  Maintained by you in the normal course of

13  business?

14     A.   Yes.

15             MR. NICOUD:  Move for admission of Caldwell

16  Exhibit O.

17             THE COURT:  Any objections?

18             MR. MITCHELL:  No objection.

19             THE COURT:  All right.  Exhibit O is admitted.

20     Q.   Mr. Moser, have you become aware that the debtor is

21  pursuing several state court lawsuits?

22     A.   That's correct.  There's two of them for specific

23  performance where the debtor wants the contract, wants to

24  perform under the contract and purchase two houses.

25     Q.   And have you received any -- when were you informed

1    of those, that those had been filed?

2        A.   I've kind of known about them for a while.  About

3    the time they were filed, I'd talked to Mr. Daneshmandi quite

4    often.  So I'm sure we've talked about it.  But I wasn't

5    involved in the loop as far as whether to file them.

6        Q.   Okay.  And have you been getting any progress

7    reports on them?

8        A.   Just recently.  Yesterday I got some reports.

9        Q.   Okay.

10                  MR. NICOUD:  I'll pass the witness.

11                  THE COURT:  Does anyone else wish to examine

12   this witness?

13                  MR. MITCHELL:  Your Honor, I would like to

14   recross, based on some of the questions that Mr. Nicoud had

15   asked.

16                  THE COURT:  You may proceed.

17                  MR. MITCHELL:  Thank you.

18                  <u>RECROSS-EXAMINATION</u>

19   BY MR. MITCHELL:

20       Q.   Mr. Moser, I'm going to start back at the

21   beginning.  I'll jump around a little bit.

22       Did -- first of all, regarding the motion that's before

23   the Court today, did you receive the debtor's request to make

24   the distribution that's now the subject of the motion?  Did

25   you receive that within the 14 days from the Court's order?

1      A.   Yes.  It was a cooperative effort.  We worked

2   together for it.  But I did receive it, yes.

3      Q.   Okay.  And do you have the debtor's exhibits in

4   front of you?

5      A.   Yes.

6           MR. MITCHELL:  And I will reference for the

7   Court that the debtor's exhibits, our witness and exhibit

8   list is at docket number 294.

9      Q.   And so the Debtor's Exhibit 1?

10     A.   Yeah.  That's a letter that I received from

11  Mr. Cavari regarding the interim distribution.

12     Q.   Okay.  And that was within 14 days of the Court's

13  order; is that your testimony?

14     A.   That is correct.

15     Q.   Okay.

16          MR. MITCHELL:  Your Honor, I would ask that

17  the Court admit Debtor's Exhibit Number 1 into evidence.

18          THE COURT:  Any objection?

19          MR. NICOUD:  No objection.  This is Robert

20  Nicoud.

21          THE COURT:  All right.  Exhibit 1 which was

22  filed as an attachment to the exhibit and witness list, which

23  has been docketed as docket number 294 is admitted.

24          MR. MITCHELL:  Thank you, Your Honor.

25     Q.   Mr. Moser, as part of the expenses that were paid

1  out, did they include, for example, payments to secured

2  creditors that had liens on the property?

3       A.   Yes, they did.

4       Q.   Okay.  And did those payments include property

5  taxes on the properties of the debtor?

6       A.   Yes.  I believe.  There were a couple of

7  properties.  Yes, they did.  But there were also some claims

8  that they had in the bankruptcy case that got paid.  So I'm

9  not -- I don't know the answer to that for certain.  I'd have

10 to look.

11      Q.   Okay.  That's fine.

12      And the payments you made also included some attorney's

13 fees, as well?

14      A.   Definitely included attorney's fees, yes.

15      Q.   Okay.  I want to refer back to Mr. Caldwell's

16 Exhibit H.  Let me get to it.

17      And this was an Construction Consultant invoice that

18 you testified about earlier.  And I believe you said that

19 this amount was paid; is that right?

20      A.   Parts of it were paid.  I believe 100 was paid and

21 50 wasn't, is my recollection.

22      Q.   Okay.  I'm going to refer back to Mr. Caldwell's

23 Exhibit A -- excuse me -- yeah, that's right, Exhibit A,

24 which is your report, the Plan Agent report.

25      And if you look down at the bottom of page 4 leading to

1    the top of page 5 --

2        A.    Right.

3        Q.    -- do you see there there are four, I guess,

4    negative disbursements, if you will, of $25,000 each?

5        A.    Yes.

6        Q.    Does that help refresh your recollection as to what

7    amounts were put back from that amount that was paid in

8    Exhibit A?

9        A.    Yes.  I had it backwards.  50 was paid.  100 I

10   stopped payments on.

11       Q.    Okay.  So 100 out of the 150 as part of Exhibit A

12   ended up back in the Plan Agent account?

13       A.    Yes.

14       Q.    Okay.  Turning back to Mr. Caldwell's Exhibit I.

15       A.    Okay.

16       Q.    This is a communication between you and

17   Mr. Daneshmandi.  It looks like you requested that some

18   support be provided before you make a payment?

19       A.    Correct.

20       Q.    First a general question.  Was that -- was that a

21   common procedure?  I mean, you didn't just make payments just

22   because you received an invoice, right?  I mean, you would

23   verify that a requested payment was appropriate, at least at

24   some level?

25       A.    That's correct.  There was always some -- more than

1    discussion.  There was either an email or something in

2    writing.

3        Q.   Okay.  And pursuant to this Exhibit I, you

4    requested information.  Do you recall if you subsequently

5    received the support in order to make those payments?

6        A.   I'm sure I did, or I wouldn't make the payments.  I

7    have a paralegal who's very strict on that.

8        Q.   Understood.

9        All right.  Give me a second.

10            MR. MITCHELL:  So, Your Honor, I don't recall

11   if it was admitted, but I just want to make sure that it is

12   admitted.  If Mr. Caldwell did not request that his Exhibit A

13   be admitted, we want to ask that Mr. Caldwell's Exhibit A be

14   admitted into evidence.

15            MR. NICOUD:  Caldwell has no objection.

16            THE COURT:  All right.  Exhibit A is admitted.

17            MR. MITCHELL:  Okay.  Thank you.

18       Q.   Mr. Moser, I'll ask a question that I asked earlier

19   and I think I recall the answer.  But just to clarify, all of

20   the payments that you made that were requested by

21   Mr. Daneshmandi, you only paid them if you believed they were

22   either approved by the Court or consistent with the confirmed

23   plan; is that right?

24       A.   That's correct.

25       Q.   Would you even on occasion visit some of these

CINDY SUMNER, CSR (214) 802-7196

1  properties to verify that, you know, activity was going on,

2  that things you were paying for were being done?

3      A.   Yes, I did, with Mr. Daneshmandi.

4      Q.   Okay.  Did you -- did you have any opinion about

5  the conditions of the property when you went to see them?

6  Again, based on -- just given your level of expertise and

7  understanding, did it look like the properties were making

8  progress, were proceeding as you might expect?

9      A.   Yeah.  They were all construction sites at various

10  stages.  But I will say the finished products, the ones I saw

11  were pretty impressive.

12      Q.   Okay.

13          MR. MITCHELL:  I will pass the witness.

14          THE COURT:  Okay.  Any other questions for

15  this witness?

16          MR. NICOUD:  This is Robert Nicoud.

17                  RECROSS-EXAMINATION

18  BY MR. NICOUD:

19      Q.   Let's turn to Caldwell Exhibit J.

20      A.   All right.  Okay.

21      Q.   Now, with regard to the description of the items to

22  be paid, did you independently verify that each of those

23  things had been done?

24      A.   I did not.  But I will say Shady Lane is one of the

25  properties I went to and that was being done.  But I did not

1   independently verify the other ones.

2       Q.   Okay.  And when you did visit properties, were you

3   taking along the payment requests and checking off items to

4   see if they'd been done, or were you just verifying that they

5   were -- that work was being done?

6       A.   The bigger picture.  Just verifying work was being

7   done, who was working there, what was left to be done, how

8   close we are to selling it.

9       Q.   Okay.

10              MR. NICOUD:  Pass the witness.

11              THE COURT:  All right.  Mr. Moser, did you

12  wish to testify any further, in light of all of the

13  examination?

14              MR. MOSER:  No, ma'am, I rest.

15              THE COURT:  Thank you.  All right.  I'll

16  excuse you as a witness.

17      Is there any other evidence you wish to submit,

18  Mr. Moser?

19              MR. MOSER:  No, ma'am.

20              THE COURT:  Thank you.

21      All right.  Any other evidence any other party wishes

22  to submit?

23              MR. MITCHELL:  Your Honor, this is Greg

24  Mitchell.

25      I think both I and Mr. Caldwell probably have some

1  evidence.  We can go in any order you like.

2              THE COURT:  All right.  Well, since you're

3  speaking, let's hear from the debtor first and then senior

4  creditors.

5              MR. MITCHELL:  Okay.  I would like to call

6  Mr. Daneshmandi.

7              THE COURT:  All right.  Mr. Daneshmandi, are

8  you present?

9              MR. DANESHMANDI:  Yes, I am.

10             THE COURT:  All right.  Let's swear you in.

11             (The witness was sworn by the courtroom deputy.)

12                    <u>KAZEM DANESHMANDI</u>

13   The witness, having been duly sworn to tell the truth,

14  testified on his oath as follows:

15                    <u>DIRECT EXAMINATION</u>

16  BY MR. MITCHELL:

17     Q.   Mr. Daneshmandi, can you state your name for the

18  record, please.

19     A.   Kazem Daneshmandi.

20     Q.   I'll jump right in and I'll start with kind of

21  picking up with some of the questions that I asked Mr. Moser.

22  Were you -- were you in regular communication with Mr. Moser

23  regarding the houses, the properties of the debtor?

24     A.   Yes.

25     Q.   And did you provide information regarding the

1   requests that you were making for disbursements for the

2   property?

3       A.   Yes.

4       Q.   And kind of like Mr. Moser said in response to my

5   question, you apparently provided him enough information

6   to -- that he paid those requests, correct?

7       A.   Yes.  I provided the information and he also met me

8   at numerous properties.

9       Q.   Okay.  Let's talk in general about the expenses

10  that were incurred.

11      Let's talk generally first.  There were -- there were

12  large payments made to secured creditors of the properties;

13  is that true?

14      A.   That's correct.

15      Q.   And was there a general strategy going into the

16  confirmed plan as far as, you know, secured creditors and

17  then potentially eliminating the secured creditors as you go?

18      A.   Yeah.  But the plan was to work on the houses.  To

19  get the ones that were as close to finished finished,

20  especially if they had secured creditors, since my plan was

21  that secured creditors get paid off first.  So I would go

22  into -- the plan got confirmed October 31st of 2019.  So

23  that's -- that was about a year and a half ago.  And when it

24  was confirmed, the game plan when me and Joyce Lindauer, who

25  drew up the plan and Chris and Kim, his assistant, sat down

1   was to go ahead and -- I believe there was $77,000 left in my

2   debtor-in-possession account.  To take that money.  Make the

3   payments as Chris saw fit for lawyers, taxes, mortgage

4   payments, insurance, things like that.  And then to use money

5   to finish the next property to get sold and that was closest

6   to being ready, which would have been 2046 Greenstone in

7   Carrollton, which the secured creditor was Wells Fargo.  So

8   we went ahead and did -- did that.  Got it all fixed, fixed

9   up.  And sold it.

10       At that point, money would come back into the account.

11  And Chris, myself, Joyce would come up with the plan, like

12  the plan of attacked based on the plan that was drawn up.

13  And they would, again, distribute money to the ad valorem

14  taxes, which I think are like -- I don't have it on me, the

15  exhibit.  I think it was like almost 67,000.  The lawyers

16  that were dealing with the cases that were accrued by the

17  plan.  And then the money that was left over, which at that

18  point only came down to -- I'll have to look at the Plan

19  Agent report.  But I believe that it came down to, I want to

20  say maybe $2,000.  And that money was then supposed to go

21  towards fixing up that property, the next property that was

22  getting ready to be sold, which was 2029 Chatsworth in

23  Carrollton.  And at that point --

24       Q.   Let me jump in and try and steer a couple of

25  questions.  And I'm not trying to cut you off.  But I think

1   what it sounds like and what I think you're trying to get at

2   is, is it fair to say that the strategy that you took as far

3   as fixing up property, selling property, fixing up property,

4   selling property, did you believe that was consistent with

5   the plan that was confirmed, as far as the expenses that were

6   incurred and the timing of expenses, and that sort of thing?

7   Did you believe, as you were going, that everything was

8   consistent with the plan that was in place, that was

9   confirmed?

10      A.   Yes, 100 percent.  I -- I believed it was

11   consistent.  So did Joyce.  So did Chris.  So did Rod.  So

12   did Robert Nicoud.  Everyone was thinking it was consistent.

13   Even based on the email communications, everybody was on the

14   same plan.  Get the money.  Fix up the houses.  Pay off

15   secured creditors.  Pay off all these bills.  Onto the next

16   one.  Until finally -- like right now, we're down to the last

17   secured creditor house.  As soon as that one's done, then

18   from there on out, it was just all cash to be able to pay

19   everybody.  That was the plan that was drawn up from the get

20   go.  And that's the plan we went with.  If it was

21   inconsistent at any means, then we wouldn't even be able to

22   finish the first property, because there was no money from

23   the money that was transferred to even finish it.  So it

24   wouldn't make sense just to -- I guess, before the plan even

25   got confirmed, for it not to get confirmed or to go to

1   Chapter 7 at that point.  Because the plan was to fix up the

2   houses.  Sell them.  Pay off secured creditors, taxes,

3   lawyers, again, et cetera, et cetera, salaries, wages.  And

4   continue that train, keep going forward so that train keeps

5   moving.

6        Q.   Right.  And even -- and even though this was

7   contemplated to be a liquidating plan, you believed that

8   this, this process, this train you're talking  about, was

9   consistent with that, even though it was --

10            MR. NICOUD:  Objection, Your Honor, leading.

11   This is Robert Nicoud.

12            MR. MITCHELL:  I can rephrase the question,

13   Your Honor.

14            THE COURT:  The objection is sustained.  You

15   can rephrase the question.  Thank you.

16            MR. MITCHELL:  I apologize.

17        Q.   Mr. Daneshmandi, did you believe that the -- that

18   the efforts that you were making was the -- the best way to

19   implement the plan and maximize the estate assets?

20        A.   Yes.  Yes, per my plan.  It said to maximize the

21   profits of each house, which means to maximize would have

22   been to fix up the houses and keep going into it.  Fix up the

23   houses and sell them.  I completely thought it was

24   consistent.  Chris completely thought it was consistent.

25   Joyce -- everyone thought it was consistent to continue

1   having this train run.  So, yes, I do believe we were

2   operating under the plan correctly.  Otherwise -- I mean, I'm

3   sure Chris would have notified me or told me from the get go,

4   hey, he said no -- he said no to payment plenty of times to

5   me.  From the get go he would have said, no.  Just me

6   reviewing email things, I can see it in the language.  Chris

7   was completely thinking the same thing that I was thinking,

8   thinking exactly what the plan was thinking.  Fix the

9   properties up.  Pay the secured creditors.

10       Go ahead.

11       Q.   Sir, no.  If you hadn't incurred the expenses that

12   you incurred and engaged in the -- in the actions that you

13   engaged in, do you believe --

14           MR. NICOUD:  Objection; leading, Your Honor.

15           THE COURT:  Objection sustained.

16       Q.   Would we be sitting here today, Mr. Daneshmandi,

17   with $360,000 in the Plan Agent's bank account had it not

18   been for your efforts?

19       A.   No.  100 percent no.  We would be sitting here

20   right now -- we actually wouldn't be sitting here.  The plan

21   would have got -- not got confirmed.  And we would have gone

22   into Chapter 7 a year and a half ago on October 31st.  No one

23   has ever objected to the consistency of the plan.  Not even

24   Mr. Nicoud and Mr. Caldwell objected to the consistency of

25   the plan, because everybody was on board that the plan was

1   operating correctly, especially with the people that were

2   running the plan which at that time would be me with the

3   guidance of Chris.  If Chris thought it wasn't supposed to be

4   correct, he would have told me.  He wouldn't have paid me.

5   Nothing would have happened.  We'd be having this

6   discussion -- to answer your question, we would not be here

7   with any money.  That's the truth.

8      Q.   So real quick, just to kind of summarize the

9   numbers.  You prepared a demonstrative exhibit.  Do you

10  recall that?

11     A.   Yes.

12     Q.   And you provided that to me.

13          MR. MITCHELL:  Your Honor, I filed that as

14  a -- this morning.  I've labeled it, I think, on the exhibit

15  and witness list.  But it's the only document that's attached

16  to docket number 298.  And I also sent a copy to Mr. Nicoud

17  and Mr. Moser.  If you want to pull that up.  I was just

18  going to -- if there's no objection to the use of the

19  demonstrative, I was going to ask Mr. Daneshmandi to kind of

20  summarize the numbers that we believe reflect the money that

21  exists and the money that's been paid out.

22          And before I proceed, Your Honor, I just want to make

23  sure that you got there.

24          THE COURT:  I'm pulling it up right now.  It

25  will just take a minute.

1          MR. MITCHELL:  Okay.  That's fine.  I just

2    didn't want to start, if you weren't --

3          THE COURT:  Okay.  I've pulled it up.  It's

4    docket 298 you said, right?

5          MR. MITCHELL:  Yes.

6          THE COURT:  All right.  You may proceed.

7          MR. MITCHELL:  Okay.  Thank you.

8      Q.   Mr. Daneshmandi, you have this in front of you.

9    Can you kind of walk us through, again, kind of the summary

10   of what you believe to be the numbers as we sit here today as

11   far as what we have left, what number -- what amounts were

12   spent, and what they were spent on?

13     A.   Sure.  So my lawyer bills that were confirmed with

14   the plan and/or Judge Rhoades, her individual orders to get

15   them approved total $141,472.45.  And that included Trustee

16   fees, the Plan Agent, all of the lawyers involved.  The Plan

17   Agent hired a consultant and used an independent bank to do

18   the reports.  So that also includes, you know, the $300

19   charge here and there they would get for that.  So the lawyer

20   bills were authorized.

21     Q.   Okay.  And just so we're on the same page, what

22   other -- what other lawyers were paid as part of this?

23     A.   That was Joyce Lindauer, who first drew the plan

24   up.  That includes Rod Cavari.  It includes Chad Rubeck for

25   the appeal on the claim which is still on appeal right now.

 1  Caldwell's claim is still on appeal.  It includes you, Greg

 2  Mitchell.  It includes Ryan Luce, who is dealing with the

 3  Caldwell actions, as well as Rod Cavari.  That includes

 4  (indecipherable few words) who is dealing with one of the

 5  properties that's owned by GRC, a third interest,

 6  (indecipherable two words) bankruptcy.  He's dealing with

 7  that.  I believe that's all the lawyers.  Lawyers, Trustees,

 8  Plan Agent, Chris Moser, obviously.  That's where the

 9  141,472.45 came from.  All confirmed and approved by either

10  the plan or separate orders that Judge Rhoades had signed.

11       Q.   Okay.  Then we have the mortgage payments.  I'm

12  assuming that's self-explanatory.  These were -- were those

13  mortgage payments on properties that are part of the

14  bankruptcy estate?

15       A.   Correct.  There was two secured creditors when the

16  plan got confirmed; Wells Fargo, which became the first

17  property paid off.  So there were some mortgage payments to

18  them.  And then Statebridge, which had, I think at that time,

19  two -- I think they had two -- I think they had two loans at

20  that time.  They might have had three.  I don't necessarily

21  off the top of my head recall.  I know 1005 Shady Lane,

22  Keller was a loan with them.  I know that 6012 Mays was a

23  loan to them.  I believe that's it.  So the mortgage payments

24  per the Plan Agent's report, that was an exhibit, those were

25  authorized mortgage payments from the plan that were paid,

1   32,166.33.

2       Q.   Okay.  Tell me about the wages and salaries number.

3       A.   The wages and salaries, I was getting paid $7,500 a

4   month to run this estate.  That was up until December of

5   2020.  So the total of the wages, including having an

6   assistant for three months, three months maybe four, to help

7   me try to get everything on track totaled 107,500, which were

8   all also approved in my plan.  But then I was -- Mr. Caldwell

9   got three writ of garnishments, so they stopped paying me.

10  The last payment, I think, was December 2020.  He did three

11  separate writ of garnishments and he would just dismiss them

12  the day of the hearing.  And Chris would email me

13  (indecipherable word), dismissed the writ of garnishment.  So

14  I haven't been paid since, since January.  December was my

15  last payment since January.  Nothing this year.  So that's

16  all the wages in the confirmed plan, which was October 31st,

17  2019, a year and a half ago to now.  That was --

18      Q.   Okay.  So just to be clear, was your efforts in

19  working on behalf of the debtor, was that your only job?

20      A.   Yes.

21      Q.   And you spent all of your productive time trying to

22  re-commence the confirmed plan?

23      A.   All plus some.  Time and a half, double time.  I

24  spent all of my time trying to get everything worked out with

25  this company.

1        Q.    Okay.  Tell me about the taxes number.  Are those

2   property taxes related to the property?

3        A.    Correct.  So those were all of the taxes that had

4   been paid over the year and a half, which included ad valorem

5   taxes, the County taxes, Tarrant County, things like that.

6   So when I tallied all of those up, based on the Plan Agent's

7   report, I came to $62,320.36.  And those were all authorized

8   by the plan.

9        Q.    Okay.  Tell me where the -- moving to the net

10  generated from sales.  Where does that number come from?

11       A.    The net generated from sales, per my plan, all

12  sales proceeds were to be deposited with Mr. Moser.  So the

13  net generated from sales for every -- effectively every wire

14  that came through from the title companies, the total paid to

15  secured creditors, the closing costs, things like that, the

16  number came to 812,000 -- I'm sorry, $802,912.  And then of

17  that, Chris is holding right now $360,000.  So with all of

18  the approved expenses from lawyer bills, mortgages, wages,

19  taxes minus the 802,912, minus the 360, will leave $442,912

20  which was supposed to be for construction expenses.  And per

21  my disclosure statement, I estimated I was going to spend

22  $430,000.  And this is obviously before COVID-19 hit and all

23  of the prices have 10 times grown in (indecipherable word),

24  and lumber, and all of that kind of stuff.  So now I'm only

25  $12,000 under my complete budget.  And I only have --

1      Q.   Okay.   Okay.   And your last comment kind of

2   transitioned to the next couple of questions I was going to

3   ask.

4         One of the complaints from Mr. Caldwell has been the

5   timing that there were, you know, estimates earlier on that

6   were believed to -- that we would be a lot further along than

7   we are.   Tell me about that and tell me the affect that COVID

8   had on your business and the building -- working on the

9   properties.

10      A.   I mean, COVID-19 effectively started end of

11   February and really hit, I think it was March when they

12   started doing the stay-at-home and dealing with that.   So --

13   and it definitely hindered not only me being on the

14   properties actually doing physical labor, doing things like

15   that.   But the people working on the properties, the labor

16   force kind of disappeared.   Cost of labor skyrocketed.   Cost

17   of materials skyrocketed.   Home Depot wasn't open.   And when

18   it did become open, it was only open from like 9 to 4.

19   Things like that.   It just became a -- COVID-19 -- and I did

20   get COVID two times -- was just crazy.   So it effectively

21   slowed everything down big time.   Like I saw in, you know,

22   some of the exhibits that I communicated to Joyce in February

23   that some of these properties were going to get done in a

24   month, or two months, or six weeks, and obviously with

25   COVID-19, that was just impossible to do.   No one could work.

1   The costs were going up.  It was just impossible to complete

2   those.  And that's why it took a little longer to complete

3   those.

4        So I've been in my confirmed plan right now for a year

5   and a half.  I know Mr. Moser said it's been two years.  It

6   hasn't been two years.  It's been a year and a half that I've

7   been in my confirmed plan.  In that year and a half, almost a

8   year and two months of it have been COVID.  And the last six

9   months of it, Robert Nicoud and John Caldwell have stopped

10  any payments to be made to anybody.  So it's just been

11  sitting and looking (inaudible word), even though I'm still

12  working and (indecipherable two words), it's just -- it's not

13  feasible.  So out of a year and a half, a year was COVID and

14  a half a year was me, you know, the way I like to put it,

15  being stonewalled.  And at this point I still have sold five

16  of the ten properties, I think -- I think it was ten

17  properties total -- five of the ten properties.  And out of

18  those remaining five, one of the properties has been for sale

19  since confirmation, almost a year and a half now, or longer.

20  It was even when I declared bankruptcy back in May.  So

21  there's only four properties at that point that are left.

22  And two are, you know, partially completed.  And then one is,

23  the mobile home has -- the other one is a mobile home that's

24  in dilapidated condition and one is a rehab.  So I've been

25  doing my best to run the company and with COVID, lack of

1  employees -- they're not even employees, they're

2  subcontractors.  Lack of subcontractors, lack of money from

3  the Plan Agent.  And also, just to point out, if you look at

4  the Plan Agent report list, there are times like 2029

5  Chatsworth -- is there any way -- can you pull up the Plan

6  Agent report listed in the exhibits so I can see it?

7      Q.   Let me -- I don't -- let me ask some specific

8  questions.  That kind of got off track a little bit.

9      A.   All right.

10     Q.   No, you're fine.  We'll come back to some questions

11 that hopefully will touch on that.

12      Let's look at some specific exhibits that we have.

13          MR. MITCHELL:  Again, Your Honor, I'm

14 referring to exhibits attached to our witness and exhibit

15 list that appears at docket number 294.  And now I'm turning

16 to Exhibit Number 2.

17     Q.   Mr. Daneshmandi, Exhibit Number 2 is a number of

18 pictures that were taken, or that you took showing some of

19 the properties.  And if you would, tell us what we're seeing

20 here and how that affects why we're here today.

21     A.   Give me a second.  I'm trying to --

22     Q.   No problem.

23     A.   Okay.  So the pictures that you're seeing -- I

24 can't see -- I can't see your screen.  So I don't know what

25 you're sharing.  I only know what I provided.  I don't know

1   if you can email me the exhibit, then I can see it.  I can't

2   see the screen.  So I can take a picture, but I don't want to

3   start talking about a picture when you guys are looking at

4   something else.

5        Q.   Okay.  So, I guess, tell me in general, while I'm

6   trying to do that, tell me in general, the pictures that you

7   provided, they were pictures of the properties.  Were they

8   designed to be a before and after?  Were they designed to

9   kind of show us what the state of the property?  What was the

10  point of the pictures?  And then hopefully I can get you to

11  the pictures here.

12       A.   Sure.  If you look at the pictures, there's one

13  picture that says Google on it.  And it's going to have the

14  address 6012 Mays Place.  And that's going to be the before

15  picture.  It's going to have --

16            MR. NICOUD:  Your Honor, I'm going to object

17  about talking about the pictures.  We don't have it before

18  the Court.

19            THE COURT:  Well, I thought he was talking

20  about Exhibit 2?  Is he not talking about Exhibit 2?

21            MR. NICOUD:  Well, we don't know -- he -- the

22  witness has said he doesn't have it in front of him.  So I'm

23  not sure which picture we're talking about.

24            THE COURT:  Mr. Mitchell?

25            MR. MITCHELL:  Your Honor, I'm trying to

1  direct Mr. Daneshmandi.  I've sent over the pictures.  We're

2  not in the same place, so I apologize.  We're trying to

3  coordinate this as best we can.

4          THE COURT:  Why don't we take a 10 minute

5  recess right now so you can get off-line and coordinate and

6  make sure that he has a copy of the full set of the exhibits.

7          MR. MITCHELL:  That's fine.

8     Your Honor, before we take a break, can we address the

9  timing issue?  This was requested to be a two hour setting.

10  And so I didn't try to make accommodations when I got a

11  hearing set on me for 1:30 this afternoon in the District

12  Court in the Eastern District of Texas.  I have a hearing at

13  1:30.  If we're going to go that long, or even close to that

14  long, can we at least address that?  Because I actually have

15  to go there.  It's an in-person hearing.  And I was only

16  anticipating a two hour hearing, because that's what I

17  thought we got, as far as the setting.

18          THE COURT:  Well, who set this hearing?

19          MR. MITCHELL:  Well, I think we had initially

20  set at a particular day and Mr. Nicoud said that he thought

21  it was going to take a couple of hours and so he --

22          THE COURT:  My question is where in the

23  hearing in the Eastern District of Texas that you just

24  mentioned?

25          MR. MITCHELL:  It's actually at the Plano

1    District Court.

2              THE COURT:  Okay.  So you're going to be in

3    Plano?

4              MR. MITCHELL:  Correct.

5              THE COURT:  All right.  And that's fairly

6    close to your office, right?  How long do you expect that

7    hearing to last?

8              MR. MITCHELL:  I don't think it will take more

9    than 30 minutes.

10             THE COURT:  All right.  We'll recess -- we'll

11   recess then to give you time to go handle that matter.  Or

12   we'll just see where we are when it's time to recess for a

13   lunch break.  Okay?

14             MR. MITCHELL:  Okay.  Fair enough.  Thank you,

15   Your Honor.

16             THE COURT:  We're going to take a 10 minute

17   recess right now.  Why don't you all organize that in terms

18   of discussing off-line what remains, what evidence remains,

19   how long it's going to take, et cetera.  And, also, if anyone

20   wishes to examine any witness about an exhibit, you all need

21   to make sure the witness has a copy of the exhibits in front

22   of them when you start.  So you all do what you need to do to

23   make sure that happens.  Okay?  So we'll take a 10 minute

24   recess to give you all time to get organized.

25         We stand in recess.

1                    (Brief recess ensued.)

2                    COURTROOM DEPUTY:  GRCDallasHomes, LLC.  Case

3    number 19-41186.  Plan Agent motion for authority to make

4    certain payments, motion for sanction, and motion to compel

5    debtor and creditor.

6                    THE COURT:  All right.  When we -- when we

7    recessed, we recessed so that the parties can make sure all

8    of the witnesses have a copy of the exhibits in front of them

9    and to make arrangements about scheduling issues related to

10   scheduling conflicts for this afternoon.

11        So where are we now?

12                   MR. MITCHELL:  Your Honor, I think we're

13   prepared to proceed.  I think Mr. Daneshmandi has the

14   exhibits in front of him.  As far as timing, as I mentioned,

15   my -- the hearing is at 1:00 -- is at 1:30.  I just Google

16   mapped it.  I'm exactly 30 minutes away.  So any cushion

17   would be appreciated.  But that's where I'm at.

18                   THE COURT:  Okay.  Let's see if we can finish

19   with this witness first.  And maybe that might be where we

20   need to recess for the morning, any way.

21        So you may proceed.

22                   MR. MITCHELL:  Thank you, Your Honor.

23        Q.   Mr. Daneshmandi, when we left off, we were starting

24   to look at exhibits.  Do you have those exhibits in front of

25   you now?

1      A.   Yes.

2      Q.   Okay.  So starting with Exhibit 2.  Exhibit 2 is a

3   lot of pictures.  Tell us what we're seeing in these pictures

4   as it relates to what's before the Court.

5      A.   Correct.  Exhibit 2 is just a bunch of trash and

6   stuff that's been taken out of the property and bundled up.

7   The trash container has all of the trash in it, as well.  If

8   you go down to the following picture with the trees that are

9   growing into the electrical meter.  It just shows that the

10  electricity for that house needs to get done.  That's a fire

11  hazard.

12              MR. NICOUD:  Excuse me, Your Honor, Robert

13  Nicoud.  Can we find out what property we're talking about

14  and when the photo was taken?

15              THE COURT:  All right.  Let's be a little more

16  specific in your questioning so that we can get the

17  information.  And then further information ou guys can get

18  on -- in terms of by cross-examination.

19      Q.   Okay.  I guess, Mr. Daneshmandi, tell me, I guess,

20  were these pictures all taken at the same time?  Were they

21  taken at various times?

22      A.   The pictures were taken at various times.  I don't

23  recall the exact date that the pictures were taken, but I can

24  tell you which property the pictures are from.

25          The first picture with the trash outside --

1       Q.    Okay.

2       A.    -- is 2029 Chatsworth in Carrollton.  And the next

3   picture is the trash container that was -- that's either at

4   the property of 2029 Chatsworth or 6012 Mays.  The next

5   photo, which is the electrical meter with the trees growing

6   in, that is 6012 Mays.  It shows that it needed electricity.

7   The next picture you see is a finished out version of 6012

8   Mays with (indecipherable two words), the baseboard, the

9   stone, floors, the texture tape bed, electrical, faucets,

10  things like that.  The next picture you're seeing like a

11  custom gate that I've done, the landscaping, the paint, the

12  roof, deck work.  That's at 6012 Mays, as well.  The next

13  picture is going to be 6012 Mays that shows, again, the new

14  windows, the new door, painting, brick work, the landscaping,

15  the gate, next to a security system (inaudible word).  The

16  next picture is an internal picture -- interior picture,

17  excuse me, of 6012 Mays, again, which is the finish out

18  flooring, tape and bed, texture, followed by the next

19  picture, again, custom doors, custom windows, custom

20  cabinets, back splash, fans, lights.  You name it, it's in

21  the property.  All of these photos are 6012 Mays.

22       The next one is the new appliances, refrigerator,

23  double oven, the vent-a-hood, the dishwasher, the faucets,

24  double faucets, LED lights, the chandelier, the mirror,

25  doors, the handles on the doors, on the kitchen doors.  The

1  next one is a custom fireplace with stone inserts, security

2  system, inlays on top of the fireplace, the 6 inch baseboard,

3  the floors, the windows, the fans.  The next one is a close

4  up of the back splash, again, the cabinet, the glass inserts

5  into the custom cabinets, the appliances, the handles.  Then

6  you're going to go into the next picture, which would be the

7  bedroom which you'll see the two (indecipherable word) on the

8  doors, electrical, the baseboards, the new mirrors, LED

9  lights, HVC, which is air-conditioning ventilation, fire

10 alarm, things like that.  Next one you're going to see a

11 custom bathroom, custom glasswork, custom door, custom full

12 tile through the whole bathroom, including a custom floor

13 shower pan, tile, new toilet, new fixtures, new lights.

14 There's an LED speaker on top cuing up the light.

15      The next one you're going to look at the guest bathroom

16 new bathtub, new tile, new faucets, new cabinets with

17 handles, granite, toilet.  Next one you see a custom closet,

18 which is glass insert, custom cabinet work, handles,

19 flooring, trim work.  Next one is, again, another photo of

20 the bathroom that shows the glasswork that was done, the

21 flooring, the custom (inaudible word).  The next one you'll

22 see an outside photo which shows all of the stamped color

23 concrete that was done to the house.  I believe we had almost

24 three truckloads of concrete, the custom cedar pergola, the

25 fan, the lights, the brickwork, the doors, the landscaping.

1    Your next one is going to have a new garage door, the 8X8

2    cedar fence with top cap and rails at the top pieces,

3    stained.  You've got the stained concrete in multi -- three

4    different colors.  You've got new windows, new doors, new

5    trims.

6         You see the new 15 year roof on there with a bridge

7    (indecipherable word).  That's a little fence on top of the

8    roof.  The landscaping.  And then you're going to go to the

9    next picture which has Google on it.  That's the before

10   picture of that exact same house.  You can tell the

11   landscaping is not done.  The concrete is not done.  The

12   brick's not done.  The painting is not done.  The roof's not

13   done.  The trees aren't cut.  No new windows.  Anything like

14   that on it.  The final foundation has been done, obviously.

15   If you look at the next picture it says Google from the back.

16   It shows there's no foundation done, because those big cracks

17   in the driveway.  There's cracks in the driveway.  There's

18   cracks in the house, multiple cracks, which are also leaked

19   plumbing repairs.  (Indecipherable word) pipes, things like

20   that.  And that's just the -- that's the before picture of

21   the lot.  No fence.  No new grass.  No roof.  No bricks.  No

22   stamped concrete.  None of that stuff in there.  So that's

23   that exhibit.

24        Q.   Okay.  So did you take all of these pictures and

25   you're familiar with all of the contents in them?

1     A.   Yes.  The last photo, the Google ones, that's done

2   by the Google car that takes pictures.  I'm not sure.

3     Q.   Okay.  But you're familiar with the contents and

4   everything that we see here that's represented is true and

5   correct, to the best of your knowledge?

6     A.   Yes.

7     Q.   And -- so basically is this -- does this represent

8   kind of the quality of work that's being done to the

9   properties owned by the debtor?

10    A.   Correct.  It represents pretty much the before

11  pictures of how all the properties were.  If you would have

12  asked Chris what he thought of the properties he saw, they

13  were dilapidated conditions, not habitable, just messed up

14  and junk, with all due respect.  And then after I get done

15  finishing them, they're, you know, top of the tier.  Best of

16  the best.  That's why they sell so quick.  That's why they

17  get over my disclosure amounts.  I'm getting more for them,

18  because I put in all of that work and repair and money.

19    Q.   Okay.

20         MR. MITCHELL:  Your Honor, I'd ask that

21  Exhibit 2 be admitted into evidence.

22         MR. NICOUD:  Objection; relevance.

23         THE COURT:  Objection is overruled.  Exhibit 2

24  will be admitted.  You can connect as to relevance at

25  closing.

1          MR. NICOUD:  Okay.

2          MR. MITCHELL:  Thank you, Your Honor.

3     Q.   Mr. Daneshmandi, let's just go through them in

4  sequence.  Exhibit Number 3 is a State Court motion to

5  dismiss without prejudice in a -- in case number 20-10384 in

6  the 462nd District of Denton County.

7      What does this relate to and how is it relevant to

8  what's before the Court today?

9     A.   That's pretty much John Caldwell just stonewalling

10 GRC and wanting it to burn.  That's one of three writ of

11 garnishments they did.  And they would just dismiss them on

12 the day of the hearing just so that Chris wouldn't pay me and

13 the process wouldn't keep going.  And I tried my best to keep

14 the process going, but it's hard when you can't have access

15 to funds.  So the way that I would refer to it in my mind,

16 and I would tell my lawyers I was like, hey, COVID-19 hit and

17 Caldwell-19 hit.  Either one is going to make me not be able

18 to finish what I have to do per the plan.

19    Q.   And while we're at that, along the same lines,

20 looking at Exhibit 4.  Exhibit 4 is styled a notice of

21 non-suit in a different case filed by John Caldwell, cause

22 number 21-3543-431 in the 431st District of Denton County.

23 Is this a different case that shows us more of the same?

24    A.   Yes.  Filed for writ of garnishment and then

25 non-suited the day before the hearing.

1      Q.    Okay.

2            MR. MITCHELL:  Your Honor, I would ask that

3   Exhibits 3 and 4 be admitted.

4            MR. NICOUD:  No objection.

5            THE COURT:  Exhibits 3 and 4 will be admitted.

6            MR. MITCHELL:  Thank you.

7      Q.    Mr. Daneshmandi, turn to Exhibit 5.  Tell me what

8   we're looking at and how it relates to what's before the

9   Court today.

10     A.    Exhibit Number 5 was 2029 Chatsworth Drive in

11  Carrollton.  I believe it was the second property that I

12  sold.  So after I fixed up the property, obviously you get it

13  approved by the City per the permits, things like that, as

14  well as the people that are buying it get a residential

15  inspector to come out and inspect everything.  At the time

16  that they got the inspection, the Plan Agent only had maybe 2

17  to $5,000 in his account maximum.  In this addendum, this is

18  what the buyer was asking for.  They're asking for all this

19  stuff to get fixed.  So then I just cross it off and say,

20  fine, I'll give you a new roof.  You go to the next page,

21  mechanical exhaust vent.  Everything that I say yes and

22  there's a CG, that's their signature, is me going these are

23  all -- me agreeing that these are all of the issues with the

24  house that they want to address so that it would sell and

25  bring money into the plan for Chris.  So each one, yes, yes,

1  yes.  So if you go down I'm doing grating and drain through

2  all the supply system.  The water -- (indecipherable word)

3  one is not necessary, but everything else.  All of the water

4  supply lines in the attic should be fixed.  Grating and

5  drainage, roof, mechanical exhaust vents.

6       We'll go to the next page now.  The faucets appear

7  sub-below water pressure.  I go fix all new pipes and

8  faucets.  Next, the (indecipherable two words) is not

9  functioning.  It's probably from the (indecipherable word).

10  Fix or replace faucet.  Then it goes (indecipherable word),

11  which are electrical things you plug into the electricity.  I

12  go, yes, I'll switch them to make it Code compliant.

13  (Indecipherable few words) outlets work.  Fine, I'll switch

14  them and make them Code compliant.  Next page, same thing.

15  All of the electrical stuff that needs to be done, I'm

16  saying, yes, yes, yes, yes, I'll do it all.  That's all

17  electrical stuff.

18       If you go down to electrical system.  The condition

19  should be further investigated and corrected.  Next, fix --

20  locate (indecipherable word).  I go, yes, install

21  (indecipherable word).  Fashion details.  There's no

22  (indecipherable word) on there, yes, yes.  So you see me

23  agree to everything -- this is agreeing to everything,

24  essentially, that they want so that I could get the house

25  sold for maximum value per my plan.  And I'm going ahead and

1   agreeing to fix all of these things on it.  We both signed

2   it.  But at that time, Chris didn't have money in the

3   account.  So I emailed him and I said, hey, we don't have any

4   money.  I'm going to use some of my cash that I've been using

5   from getting from my wages and salary to go ahead and pay

6   out-of-pocket to get all of this stuff done.  To put a whole

7   new roof on a house, 30 squares, and all of this concrete

8   work, and exhaust, and electrical.  All of this kind of

9   stuff.  I'm going to go ahead and pay for it out-of-pocket

10  because if I don't, this house is not going to sell.  We're

11  not going to have any money in the account.  I'll pay for it

12  out-of-pocket.  I'm going to bill you later.  He agreed to

13  it.  What I submitted was the email communication where I'm

14  telling Chris that and he's responding back to me and we

15  continue to do that.  And I'm asking for that money back.

16  Chris asked me, can I have support?  Like he'd ask for all of

17  the repairs, to have support for this repair.  I sent him

18  saying, yes.  I've done all this, as a contractor would.  I

19  want to get paid for it.  And I'm using my own money to fund

20  the job, because there's no money left because he had paid

21  all of the taxes and the lawyers.  You see, I think, $142,000

22  to lawyers.  The majority -- a lot of these are because they

23  just keep stonewalling motion, motion, objection, objection.

24  They just won't let me (indecipherable word).  It's like

25  getting a divorce.  It's crazy.

1    Q.   Okay.  So --

2              MR. MITCHELL:  Yeah, that's all of the

3    questions I have for Exhibit 5, Your Honor.  I would ask that

4    Exhibit 5 be admitted into evidence.

5              THE COURT:  Any objection?

6              MR. NICOUD:  Voir dire, Your Honor.

7              THE COURT:  You may.

8              MR. NICOUD:  I just want to --

9                    VOIR DIRE EXAMINATION

10   BY MR. NICOUD:

11   Q.   What is the date of this document?

12   A.   I believe there's dates in the -- it looks like

13   there are signatures from -- like automated signatures.

14             MR. MITCHELL:  Yeah.  There's a DocuSign date

15   right next to the signatures that says 4/24 -- 4/25.

16   A.   Yeah.

17             MR. MITCHELL:  April 25th of 2020.

18   A.   First page of the exhibit.

19   Q.   So 4/25/2020?

20   A.   Actually, it's on multiple pages of the exhibit,

21   but, yes, 4/25/2020.

22             MR. NICOUD:  With that, no objection.

23             THE COURT:  All right.  Exhibit's admitted.

24             MR. MITCHELL:  Thank you, Your Honor.

25                  (no omission)

1                <u>DIRECT EXAMINATION CONTINUED</u>

2   BY MR. MITCHELL:

3       Q.   Mr. Daneshmandi, turn to Exhibit 6.  Exhibit 6 is

4   an email from your former counsel regarding -- this is back

5   in March of 2020.  What is the reason for including this

6   exhibit and what does this tell us, as it relates to what's

7   before the Court?

8        Mr. Daneshmandi, are you there?  Can you hear me?

9       A.   I can now.

10      Q.   Okay.

11      A.   I can now.

12      Q.   Okay.

13      A.   It's an email from Joyce to Mr. Robert Nicoud dated

14  March 5th, which potentially was the peak of COVID-19.  So

15  Mr. Nicoud had emailed Joyce and put her on notice saying

16  that the properties weren't finished as per -- as he wanted.

17  And we were in default.  Ms. Lindauer, however, responded

18  back, we're not in default.  The houses are getting done.

19  It's a process.  As we know with construction, it usually

20  takes longer than necessary.  She pointed that stuff out to

21  him.  So the email just goes, Greenstone he said was one of

22  the houses that weren't done and not sold.  And that's one of

23  the houses -- hey, that house was closed.  Next was

24  Chatsworth at that time.  And I was saying, hey, I'm going to

25  get it finished because of permit inspections like Jewel and

1  Harlington.  It's due for -- and these are all, you know,
2  like rough times.  That's the whole point that I was trying
3  to say with this was, these are all rough times.  This was
4  like when Corona hit.  So all of these things -- like the
5  houses will get put for sale way later.  I will finish them
6  way later.  There's -- I couldn't be bound by this, because
7  this was right at the beginning of the start of Corona and
8  everything in my life completely changed.  So that was the
9  whole point of -- you know.

10     Q.  So does this email kind of show that despite some
11  of the delays, there was regular communication between your
12  counsel and Mr. Caldwell's counsel regarding status?

13     A.  Yes.  And if Mr. Nicoud thought we were in
14  violation or inconsistent or anything like that, he
15  definitely would have notified my lawyer, as he did on this
16  occasion, as proof.  If he thought there was something wrong,
17  he would have notified her.  If Chris thought there was
18  something wrong, they would have notified her.  No one ever
19  thought anything was wrong.  We were following through with
20  what we were supposed to do.

21     Q.  Okay.

22         MR. MITCHELL:  And for the record, Your Honor,
23  this is also Caldwell -- Mr. Caldwell's Exhibit G.  I don't
24  recall if that was admitted.  But we would ask that it be
25  admitted as our Exhibit Number 7.  No, Number 6, I'm sorry,

1   our Exhibit --

2                    THE COURT:  All right.  Any objection?

3                    MR. NICOUD:  No objection.

4                    THE COURT:  All right.  Exhibit 6 is admitted.

5        Q.   Mr. Daneshmandi, I want to turn to Exhibit Number

6   8.  Exhibit Number 8 is a text message string between you and

7   Mr. Caldwell.  Tell me what's going on here and when this

8   happened and why it happened.

9        A.   Okay.  So the basis of the lawsuit that's now in

10  the appeal process of Mr. Caldwell's, finally thought we had

11  a contract between us to -- he invested money into a

12  particular property.  I signed the promissory notes, which is

13  the basis of the appeal that's going that says, hey, if

14  anything goes in default, I will give you --

15                   MR. NICOUD:  Your Honor, this is Robert

16  Nicoud.  The witness has testified it pertains to a state

17  court matter that's on appeal.  It's not relevant to this

18  proceeding.

19                   MR. MITCHELL:  Your Honor, we would submit

20  that this -- that this exhibit is relevant to show the kind

21  of mentality of the objecting creditor.  That, you know, as

22  we've tried to argue all along, Chapter 7 is not in the best

23  interest of anyone.  And we believe that Mr. Caldwell's

24  recommendations to the Court, decisions, are made based on

25  emotion.  That he sincerely does not like Mr. Daneshmandi,

1   which is certainly his right.  But we believe that it's

2   clouding his views.  And we believe that this text message

3   kind of demonstrates that clouding of kind of clear thinking.

4           THE COURT:  All right.  I don't think

5   Mr. Caldwell's thinking is at issue.  Objection is sustained.

6           MR. MITCHELL:  Okay.  Thank you, Your Honor.

7      Q.   Mr. Daneshmandi, if you would turn to Exhibit 9.

8   And I would point out that Exhibit 9 is also Mr. Caldwell's

9   Exhibit H.  I think Mr. Moser addressed this in some

10  follow-up questioning.  But I just wanted to go ahead and ask

11  you, there's void written by several entries.  Does the void

12  reflect the numbers that were backed out that we looked at in

13  Exhibit A when I was questioning Mr. Moser?

14     A.   Correct.  They were voided checks.  So out of those

15  six checks, four of them were voided.

16     Q.   Got it.  So out of $150,000 that was initially

17  paid, $100,000 was eventually put back?

18     A.   Correct.

19     Q.   Okay.

20          MR. MITCHELL:  And I guess even though I

21  believe Exhibit H was admitted, we would ask that our Exhibit

22  9 be admitted, to the extent that it reflects the

23  (indecipherable word) of the particular transactions.

24          THE COURT:  Any objection?

25          MR. NICOUD:  No objection.

1          THE COURT:  Exhibit 9 is admitted.

2     Q.    Okay.  Mr. Daneshmandi, we're almost there.  Look

3  at Exhibit 10.  Exhibit 10 is an email from Mr. Moser to your

4  counsel, Mr. Cavari, and you were included.  Tell me what we

5  see here and how this is relevant to what's before the Court.

6     A.    What you're seeing is an email from Chris back to

7  Rod.  And it was -- when the Court found us in default we

8  contacted Joyce and I said, Joyce, can you re-do the plan?

9  She said, no.  At that point, me and Rod called up Chris and

10  said, hey, we want you to distribute all of the money, except

11  for the 50, 60 grand that's for lawyers, for the allowed

12  administrative expenses to all of the creditors.  And then --

13  so we initiated that discussion with Chris saying, hey, we

14  want to do this.  Chris came back and said that -- exactly

15  what it says in the email.  Nicoud won't let it -- Nicoud

16  would be amenable to keeping the case in Chapter 11 and

17  making a proposed distribution, if we can all reach an

18  agreement on selling the remaining houses.  From that brought

19  Rod had replied back to him saying the Court's order did not

20  ask for us to come into an agreement with Mr. Nicoud.  It

21  just asked us to come into compliance.  And by coming into

22  compliance, the 300 -- over 300,000 we have distributed to

23  all of the creditors.  That's what we want to do.  And that's

24  Chris' response back saying, good.  I think it's a step in

25  the right direction to make a large distribution, which is

1   all of the money in their estate to the people.  And when I

2   went back and went through the accounting of the Plan Agent's

3   report, I only spent 156,000 on construction of other

4   properties that haven't been sold as of right now, but are in

5   the process getting work.  So 156,000 was to remain

6   non-compliant.  Us putting double that, 300,000 to pay

7   everybody, should put us back into compliance.  And out of

8   good faith, we're trying, A, (indecipherable word) the plan;

9   B, just give all of the money back to the people and come

10  into compliance like the Court had asked.

11      Q.   Okay.

12           MR. MITCHELL:  Based on that, I would ask that

13  Exhibit 10 be admitted into evidence.

14           MR. NICOUD:  No objection.

15           THE COURT:  Exhibit 10 is admitted.

16      Q.   Mr. Daneshmandi, I just have one other -- well,

17  probably just one question, but one line of questioning, if I

18  have a follow-up.

19       Have you made a side-by-side comparison of the results

20  if this case were to be converted to Chapter 7 versus other

21  options?  And, if so, what did you conclude?

22      A.   Yes, I did.  So if they were to convert this to

23  Chapter 7, the first thing would be the secured creditor

24  Statebridge would take back 1005 Shady Lane.  Then there's

25  only remaining four properties.  The four properties, as I've

1   mentioned, one has been for sale for, you know, 6, 700 days,

2   a long time.  It's a mobile home, unhabitable.  Another is a

3   mobile home, unhabitable.  So both of those, per my

4   disclosure statement and per the Cad results are both

5   $25,000.  So I've submitted both of those at 25.  The house

6   on Keller, like I said, would go back to the creditor.  Then

7   there's only two properties house.  There's a house on

8   Lakeview that on my disclosure I put at 90.  Cad is 120, but

9   the house is still down to the studs on the inside.  The

10  inside needs to be finished.  And then the other house, which

11  is 4430 Chapman, that house still needs -- it's on my

12  disclosure for 130.  The Cad value is 130.  That house would

13  end up selling for that.  Or if it went to Chapter 7, it

14  would both just go away.

15       So if you just look at the numbers, $130,000 for

16  Chapman plus the two mobile homes at $25,000 a piece would be

17  50,000, that would be 180 plus Lakeview, which would end up

18  getting 90,000, so 180 would make 270,000.  And Chris is

19  holding $300,000 right now.  So that would be $500,070.  If

20  this went to Chapter 7 after all of the fees and the -- and,

21  you know, the lawyers putting in the notice to get fee

22  agreements and stuff like that, after it was all done, and

23  salary fee agreements, all that, it might net the creditors

24  25 cents on the dollar.  If we continue with the plan as

25  confirmed, as we've been doing for the last year and a half,

1   I'm still projected to pay people 45 cents to 50 cents on the

2   dollar completely.  So I'm still on track to do exactly that.

3   Even if I was -- let's say even right now if I was to take

4   1005 Shady Lane and say, hey, let me go ahead and finish this

5   property, that property alone would then generate over

6   100,000 plus thousand dollars into the estate.  And then I

7   could fire sale the other properties without excess fees and

8   stuff like that.  And at that point, it would still net the

9   creditors probably around 40 to 45 cents right there.  If we

10  continue, it's exactly what the plan was drawn up and meant

11  to be, to pay people a maximum of 50 cents on the dollar of

12  their allowed claims.

13      Q.   Fair enough.  I think you answered any follow-up

14  that I would have.

15                 MR. MITCHELL:  I'll pass the witness.

16                 THE COURT:  All right.  Does anyone wish to

17  examine this witness?

18                 MR. NICOUD:  This is Robert Nicoud.

19                 THE COURT:  Okay.  You may proceed.

20                 CROSS-EXAMINATION

21  BY MR. NICOUD:

22      Q.   Turn, please, to Debtor's Exhibit Number 5.

23       Tell me when you're ready.

24      A.   I see it.

25      Q.   Okay.  And I want to understand, these are all

1    issues that were raised by the purchasers, proposed

2    purchasers after the house was complete and offered for sale?

3         A.   Correct.

4         Q.   Now I don't see that -- there were no issues with

5    the air-conditioning unit; am I correct?

6         A.   Correct.

7         Q.   Okay.  It had a brand new air-conditioning unit in

8    it, didn't it?

9         A.   Correct.

10        Q.   And do you know when that was installed?

11        A.   I don't recall.

12        Q.   Okay.  Was it installed after October 18th of 2019?

13        A.   After -- when?  October?

14        Q.   October 18th, 2019.

15        A.   Honestly, I don't recall.  I've been working on

16   that house for years.

17        Q.   Okay.  Do you recall that it needed a new

18   air-conditioning unit in October of 2019?

19        A.   I don't recall the month that it needed a new

20   air-conditioner unit.  But I do remember it needing a new

21   air-conditioner unit.

22        Q.   Okay.  Did you, on behalf of GRC, ever reach an

23   agreement with John Caldwell regarding the amounts of funds

24   to be spent for a new air-conditioning until on the

25   Chatsworth property?

1     A.   I don't -- I don't really recall, but, perhaps.

2     Q.   Okay.  Are you familiar with the pending lawsuits

3  in state court that GRC is pursuing?

4     A.   Yes.

5     Q.   Okay.  There's a suit against Julie Turner.  What

6  was that -- what is that one about?

7     A.   This suit against Julie Turner, I believe it's a

8  breach of contract suit (indecipherable word) from other

9  causes of action.  But I have -- I had the house under

10  contract.  The people didn't perform and didn't want to sell

11  it for the price after it went under contract.  So we're

12  suing for specific performance.

13     Q.   Okay.  So it's to compel her to sell the property

14  to GRC?

15     A.   Correct.

16     Q.   And how much would GRC have to pay, if it won the

17  lawsuit?

18     A.   That's a number that's undetermined.  I don't know

19  what the Court would make us pay.  Would it make us pay the

20  purchase price less the attorney's fees?  Would it make us

21  pay the purchase price less damages and attorney's fees?

22  Would it make us pay over the purchase price?  I'm not sure.

23     Q.   Okay.  Next item.  There's a lawsuit pending

24  against Pamela Freeman.  What's that one about?

25     A.   Exact same reason.  House was under contract.

1   People decided they didn't want to sell it.  Breach of

2   contract, amongst other things.

3        Q.   Did you consult with Mr. Moser before these

4   lawsuits were filed?

5        A.   Yes.  Chris knew about the lawsuits from -- to be

6   honest with you, you actually brought up the lawsuits during

7   pre-confirmation.  Joyce had not included the causes of

8   action.  And then you made a big deal about it so Joyce was

9   like, okay, we'll include the causes of action.  And she went

10  through and listed the causes of action for you.

11       Q.   You don't even know when these lawsuits were filed.

12       A.   I don't have the dates in front of them.  But

13  they've been filed.  I've consulted with Joyce.  I've

14  consulted with Chris on them.  Chris has consulted with the

15  attorneys on them.  So it's been in the process.

16       Q.   Do you recall GRC entering into a lease for the

17  property on Mays?

18       A.   Yes.

19       Q.   And that lease was entered into after the plan was

20  confirmed, correct?

21       A.   Yes.

22       Q.   And payments were $2,500 a month?

23       A.   Correct.

24       Q.   And were those monies turned over to Mr. Moser?

25       A.   No.  They weren't supposed to be.  Per my plan,

1    sales proceeds were supposed to be turned over to Chris

2    Moser.

3         Q.   Okay.  Does GRC have any other income, other than

4    from sales proceeds, since the confirmation of this plan?

5         A.   No.

6         Q.   Okay.  No other leases?

7         A.   No.

8         Q.   Does GRC keep records of the payments that it makes

9    to its subcontractors?

10        A.   It depends on the subcontractors and the work being

11   done.  So not always.

12        Q.  So some yes, some no?

13        A.   If it calls for it then, yes.  If it doesn't call

14   for it, there's no need.

15        Q.   So it depends on whether it's called for or not?

16        A.   Let's just say I go pick up four subs at $250 a day

17   and say, hey, do they know how to do roofing?  Yes.  Okay.

18   Come on out, let's knock out this roofing.  I work.  I could

19   pay them in cash and there's no receipts or records.

20        Q.   Your mother has a real estate company similar to

21   GRC; is that correct?

22        A.   I wouldn't say similar to GRC.  I would just say

23   she has a real estate company.

24        Q.   Okay.  Generally, what kind of business does it do?

25        A.   Real estate.

1            MR. MITCHELL:  Your Honor, I'm going to object

2  generally to the relevance of this line of questioning as to

3  what it has to do with what's before the Court today.

4            THE COURT:  All right.  What's it's relevance?

5            MR. NICOUD:  I want to -- the testimony given

6  was that he does 110 percent of his effort toward GRC.  And I

7  want to find out, does he do any work for his mother's

8  company.

9            THE COURT:  All right.  You may proceed on

10  that question.

11      Q.   Do you do any work for your mother's company?

12      A.   I help my mom out.

13      Q.   Okay.  How many properties does it own?

14      A.   I don't know.

15      Q.   More than ten?

16      A.   No.

17      Q.   Okay.  Does she have any other employees or

18  helpers?

19      A.   Yes.  I wouldn't say employees.  She has

20  subcontractors, as well.

21      Q.   Okay.  Do you help her coordinate with the subs and

22  so forth?

23      A.   I help my mom out whenever she needs anything in

24  life.

25      Q.   Okay.  Do you charge her anything for that?

1      A.    I don't charge her anything to do it.

2      Q.    Okay.

3      A.    I don't get paid.  I've never gotten paid.

4      Q.    Okay.

5      A.    I'm just being a son.

6      Q.    Okay.  Now, what is the current status of the

7   property at 1005 Shady Lane?

8      A.    The current status is the foundation was fixed.

9   The roof has been done.  The concrete holes have been filled

10  in.  I haven't been there really recent.  Coming up I have to

11  do the concrete work.  I have to put the rebar in.

12  Effectively right now, the problem is you guys have stopped

13  me from working on the house.  But my goal was after the roof

14  was to go on --

15     Q.    I just want to know what the status of it is.

16     A.    Okay.  The status is in construction.

17     Q.    Okay.  If you'll look at GRC Exhibit 9.

18     A.    I see it.

19     Q.    And the -- there's an entry for Shady Lane.  And

20  that $25,000 was actually paid to Construction Consultants?

21     A.    There's -- yeah, $50,000 got billed.

22     Q.    But only 25 is allocated to Shady Lane; is that

23  correct?

24     A.    That's what it appears.  But, again --

25     Q.    Do you know that to be a fact?

CINDY SUMNER, CSR (214) 802-7196

1      A.   Well, there's a lot of properties on there.   And

2   there was agreed upon work to be done.   Checks got cancelled.

3   You guys had objected to them getting paid and the amounts.

4   So it was a cluster situation of all of these houses and

5   checks getting cancelled.   What work's getting done here.

6   What work's been finished.   Who's been paid.   There's no

7   money in the account.   Paying cash.   All of this kind of

8   stuff is going on at this time.   So I can't honestly sit here

9   and look at this bill and take it piece by piece.

10      Q.   Okay.   So when it says $25,000 per task here,

11   that's not necessarily, if I'm understanding it correct, a

12   correct allocation?   Some are different, some are in

13   progress?

14      A.   I don't know, because I didn't prepare that.

15      Q.   Well, did you request that it be paid?

16      A.   Yes, I did.   I requested through the Plan Agent to

17   get paid.   And Chris -- Chris actually came to those

18   properties.   Chris --

19      Q.   Did you -- did you make sure that the work was

20   done?

21      A.   Yes, for the work completed.   Sure.

22      Q.   Okay.   Can you turn to Caldwell Exhibit J?

23      A.   Yes, I see it.

24      Q.   Okay.   And that includes some work done on Shady

25   Lane, correct?

1       A.   Correct.

2       Q.   And do you know how much of that $24,000 is

3  allocated to Shady Lane?

4       A.   Of that 24,000, I mean, I would have to break them

5  up per property.  But it looks like if I -- we listed 25

6  piers installed, the bulk of it is going to be towards Shady

7  Lane because that's heavy work.  Re-lifting the whole house,

8  25 piers installed, which mean jackhammer, 30 feet of under

9  concrete -- yeah, this is actually when Chris came to the

10 property and he reviewed it.  He saw that there were workers

11 there.  That there was dirt all in the house.  And that we

12 were actively working on it.

13      He first went to --

14      Q.   Was this work that was done in excess of what was

15 the $25,000 allocated to Construction Consultants in the

16 prior exhibit?

17      A.   I don't know how to -- I don't know to say yes or

18 no, because I'm not sure exactly what was allocated from

19 each.  And I noted five properties right there.  So I'd have

20 to literally see the property and go through it to know what

21 I allocated for each property.

22      Q.   Okay.  Now, for a period of time you had an

23 assistant and requested payment for her, correct?

24      A.   Correct.

25      Q.   And what was your assistant's name?

1        A.    Christina Akerman.

2        Q.    Okay.  Did you also have a personal relationship

3   with her?

4        A.    No.

5        Q.    None at all?

6        A.    No.

7        Q.    Okay.

8               MR. NICOUD:  I'll pass the witness.

9               THE COURT:  All right.  Does anyone else wish

10   to examine this witness?

11       Any redirect?

12               MR. MITCHELL:  No, Your Honor.

13               THE COURT:  Thank you.

14       The witness is excused.

15       Any other evidence you wish to present?

16               MR. MITCHELL:  No, Your Honor.

17               THE COURT:  Any other evidence any other party

18   wishes to present?

19               MR. NICOUD: Yes, Your Honor.  This is John

20   Caldwell.

21               THE COURT:  Don't you have your own lawyer?

22               MR. NICOUD:  No.  This is Robert Nicoud

23   speaking on behalf of John Caldwell.  Sorry.

24               THE COURT:  I was a little confused.  But,

25   okay.  Yes, Mr. Nicoud.

1              MR. NICOUD:  Yes.  We have evidence that we

2    wish to present.  Myself as a witness and Mr. Caldwell.

3              THE COURT:  All right.  You may proceed.

4         Who are you going to call first?

5              MR. NICOUD:  First I'm going to call myself.

6              THE COURT:  Okay.  Let's swear the witness in.

7              (The witness was sworn by the courtroom deputy.)

8              THE COURT:  You may proceed.

9                   ROBERT NICOUD

10     The witness, having been duly sworn to tell the truth,

11   testified on his oath as follows:

12                   DIRECT EXAMINATION

13   BY MR. NICOUD (in narrative)

14              THE WITNESS:  My first testimony relates to

15   Exhibits A, D -- Caldwell Exhibits A, D, and C.

16         Exhibit A was prepared by me and it is a spreadsheet

17   that is derived from Plan Agent Exhibit 4.  The Plan Agent's

18   ledger.  The figures are all the same as what is in the

19   original report, except for the following.  I have added a

20   column called category where you can see I've put in an

21   allocation of how that particular transaction would be

22   applied.  I removed the running balance column.  And on a few

23   instances, for example, on August 4 of 2020, we've gone over

24   this in some prior exhibits, we had a single check that was

25   allocated to four or five properties.  And in that instance,

1  what I did is just allocated that payment equally to each of

2  the properties, since there was no other breakdown.

3       And the Court can see on page 9 of 9 the deposit and

4  disbursement columns both reconcile to the Trustee's original

5  report.  And so I would ask that Exhibit A be admitted.

6                 THE COURT:  Any objection?

7                 MR. MITCHELL:  No objection.  I think it

8  already was admitted.  But no objection.

9                 MR. NICOUD:  I think you're correct, it was.

10                THE COURT:  Okay.  All right.  Hold on.  Let's

11 do this.  You all are taking up a lot more time than you

12 originally said you were going to and I have counsel on the

13 phone in a hearing who needs to go to another hearing.  So

14 I'm concerned about that.

15      But which exhibits does any -- that has not yet been

16 admitted does anyone wish to offer?

17                MR. NICOUD:  I wish to offer, then, Exhibits

18 D, B -- Caldwell Exhibits B, C, D, E, F, and G.

19                THE COURT:  Okay.  And for the record, that is

20 filed as docket number what?

21                MR. NICOUD:  That is docket number 291-1 --

22                THE COURT:  That's fine.  I've got it.  Okay.

23 These are documents attached to the witness and exhibit list

24 that's been filed as docket number 291.

25      Does anybody object to any of those exhibits?

CINDY SUMNER, CSR (214) 802-7196

1          MR. MITCHELL:  No objection.

2          THE COURT:  All right.  So Exhibits B, C, D,

3  E, F, and G filed as attachments to docket number 291 will be

4  admitted.

5      Is there any other evidence any other party wishes to

6  offer that had not already been admitted?

7          MR. MITCHELL:  Your Honor, the debtor would

8  like to admit -- we didn't file until today, admittedly, but

9  it's -- it's other versions of the Plan Agent's report.  We

10 filed it as an additional witness and exhibit list that's

11 found at docket number 299.  And we included Exhibits 12 and

12 13.  Those are versions of the Plan Agent report.  Mr. Nicoud

13 alluded to the fact that he removed the column and re-ordered

14 them.  To the extent that it mattered, we just wanted to have

15 in the record a full Plan Agent report.  Exhibit 12 is as of

16 May the 2nd, I believe, beginning of May.  And Exhibit 13 is

17 the same report as of, I believe it was yesterday.  So we

18 would ask that Exhibits 12 and 13 be admitted.

19         THE COURT:  Any objection?

20         MR. NICOUD:  No objection.

21         THE COURT:  All right.  So Exhibits 12 an 13

22 attached as exhibits to docket number 299 are admitted.

23     Okay.

24         MR. MITCHELL:  And that's all I have, Your

25 Honor.

1                    THE COURT:  Thank you.

2          Mr. Nicoud, you may continue with your testimony.

3                    THE WITNESS:  In particular, on Exhibit B --

4                    THE COURT:  B like boy, Mr. Nicoud?

5                    THE WITNESS:  B like boy.  B like boy.

6                    THE COURT:  Okay.

7                    THE WITNESS:  On the last page, page 8 of 8,

8    you can see there is a summary that I have prepared that

9    totals out the various categories that I had put in the Plan

10   Agent's report.  And, again, the total reconciles back to the

11   disbursements.  So from this, you can see how I have

12   allocated payments toward particular properties or if they

13   weren't for particular properties, toward the general areas.

14   And that is derived from the spreadsheet.

15         And for Exhibits D, E, F, and G, those communications

16   accurately represent the communications that I had with

17   Ms. Lindauer.  And that would conclude my testimony.

18                    THE COURT:  All right.  Does anyone wish to

19   cross?

20                    MR. MITCHELL:  I do not, Your Honor.

21                    THE COURT:  All right.  Mr. Nicoud, then, you

22   are excused as a witness.

23         Now, did you wish to call any other witnesses,

24   Mr. Nicoud?

25                    MR. NICOUD:  Yes.  We'd call John Caldwell.

1          THE COURT:  Mr. Caldwell --

2          MR. CALDWELL:  I'm here.

3          THE COURT:  Thank you.  Let's swear you in.

4          (The witness was sworn by the courtroom deputy.)

5                    JOHN CALDWELL

6    The witness, having been duly sworn to tell the truth,

7    testified on his oath as follows:

8                    DIRECT EXAMINATION

9    BY MR. NICOUD:

10     Q.   Mr. Caldwell, have you ever met Christine Ackerman?

11     A.   I cannot recall if I've ever met her.

12     Q.   Okay.  Have -- has Mr. Daneshmandi ever told you

13   anything about her?

14     A.   It was his girlfriend at the time.

15          MR. MITCHELL:  Objection, Your Honor.

16   Objection, Your Honor.  That calls for hearsay testimony.

17          THE COURT:  Objection's overruled.

18     Q.   Next, did you ever reach an agreement with

19   Mr. Daneshmandi regarding any expenses to be incurred in

20   installing a new air-conditioning unit on the Chatsworth

21   property?

22     A.   There was never an agreement.  Never even a chance

23   to make an agreement.  I went and looked at it twice.  And

24   once there was the older version and when I went back there

25   was a new version.  And that's all I could tell you.

1       Q.   Okay.  Was the -- when you say, new version, what

2  does that mean?

3       A.   A new outside unit that I could see.

4       Q.   Okay.  Was that new unit installed after October of

5  2019?

6       A.   Yes.

7       Q.   Okay.

8            MR. NICOUD:  I'll pass the witness.

9            THE COURT:  Okay.  Any cross of this witness?

10           MR. MITCHELL:  Just briefly, if I could, Your

11  Honor.

12           THE COURT:  You may.

13                CROSS-EXAMINATION

14  BY MR. MITCHELL:

15      Q.   Mr. Caldwell, what is your -- what is your position

16  regarding what is in the best interest of the debtor and all

17  of the creditors in this case?

18      A.   What is my position?  Let me think about that.

19      Q.   Let me be more specific.  Let me be more specific.

20       Is it your position that conversion of this case to

21  Chapter 7 is in the best interest of all the creditors and

22  the debtor?

23      A.   I feel with how the money was spent before, that

24  how it is now (indecipherable word) involved, at least with

25  no oversight, is in now way in the best interest of the

CINDY SUMNER, CSR (214) 802-7196

1  creditors.

2              MR. MITCHELL:  Objection; non-responsive.

3              THE COURT:  Objection sustained.

4        You need to answer the question posed.

5        A.    Can you repeat the question for me, please?

6        Q.    Do you -- sure.  Do you believe that Chapter 7 is

7  in the best interest of the creditors and the debtor in this

8  case?

9        A.    Yes.  I believe that is the best solution.

10       Q.    Have you reviewed other options?

11       A.    As in -- be more specific, please.

12       Q.    As in anything other than Chapter 7.

13       A.    I'd have to say not really reviewed.  I have

14  nothing to go on to review.

15       Q.    Do you recall -- without getting into specific

16  settlement discussions, do you recall receiving proposals

17  from the debtor that were alternatives to Chapter 7?

18       A.    Yes.

19              MR. MITCHELL:  I have no further questions.

20              THE COURT:  All right.  Thank you.

21        No further questions for this witness.  Does anyone

22  else have any further questions?

23              MR. NICOUD:  Nothing further from

24  Mr. Caldwell.

25              THE COURT:  Thank you.  The witness is

1  excused.

2       Does anybody have any further arguments -- I mean any

3  further evidence they wish to present?

4       I'll take that as a no.

5       Are you all going to be able to wrap up your final

6  closing arguments by 1:00?

7            MR. MITCHELL:  Your Honor, this is Greg

8  Mitchell.

9       To the extent that it makes a difference, at the risk

10 of violating the Court's (inaudible word due to audio cutting

11 out), I am almost to my destination.

12           THE COURT:  Oh, I can tell.

13           MR. MITCHELL:  If you will give me -- I

14 believe if you will give me 5 minutes, I'll actually be at my

15 destination.  If you will let somebody else go first, I'm

16 prepared to make closing arguments so that we can get this

17 wrapped up.  And I think I can do it before 1.  And since I

18 will be at my destination, I think we've got until maybe

19 1:15.

20           THE COURT:  Okay.  All right.  It's

21  Mr. Moser's motion, so I'm going to let him go first.

22           MR. MOSER:  Yes, Your Honor.

23       Very briefly.  Just to summarize everything.  I have

24 $357,000 in the account.  And depending on what this Court

25 wants to do, it seems to me to make a distribution, a

1  sizeable distribution to unsecured creditors who have been
2  waiting quite a while is in the best interest of the estate.
3  Having said that, if the thought is that there's going to be
4  further construction, remodeling, et cetera, how much of a
5  distribution we can make is going to be the question.  The
6  proposal I have right now basically would have left me with
7  about 20 grand in the bank, which isn't a whole lot to do
8  further rehab, et cetera.  Which would mean that we'd
9  basically have to sell the houses as-is would be the thought.
10      If everybody were on page -- on the same page to do
11  that, I'd propose to basically distribute, you know,
12  everything except for 25, 20, $25,000 right now.  In addition
13  to unsecured creditors, there are attorneys who I have been
14  authorized to pay.  And they are for the services that you've
15  heard about about the specific performance case, et cetera,
16  Mr. Mitchell, Plan Agent fees, et cetera.  Those probably
17  come to roughly 40 grand.  I'd have to get the exact number.
18  But I'd like to pay those also.
19      My request also requested to pay Mr. Daneshmandi three
20  months of $7,500, which is January, February, and March.  I'd
21  need to verify that he's done some work in those months,
22  which I believe he has.  But my request would also include
23  paying him.
24      So long story short, if we're going to just liquidate
25  the houses without fixing them up, I'd say let's pay as much

1  money out as possible right now as an interim distribution.

2  And then if the monies come in just distribute on a

3  going-forward basis.  The only monies I really need is

4  Statebridge has a mortgage payment that I need to pay and

5  insurance on that.  So it's not -- the carry costs aren't

6  going to be that expensive, if we're not remodeling the

7  houses.  But if we're remodeling the houses, I'm going to

8  need some input from people who know a lot more than me about

9  what the projected costs of construction are going to be.

10     With that, I conclude.

11          THE COURT:  Thank you.

12     All right.  Does anyone else wish to be heard in

13  closing?

14          MR. NICOUD:  This is Robert Nicoud.

15     Your Honor, we're on a somewhat unusual procedural

16  path.  We came before the Court back in March on Caldwell's

17  motion to modify the plan to deal with what had previously

18  been an undisclosed lease of property income to the estate

19  that was not explicitly dealt with in the plan because,

20  frankly, nobody envisioned it.  The Court didn't rule

21  specifically on that.  But the Court did enter an order that

22  found that the debtor was in default under the plan and gave

23  the debtor 14 days to either file to modify the plan or to

24  come into compliance with the plan.

25     They clearly did not file anything.  And so their

1    effort was to propose to the Plan Agent to make this interim

2    distribution.  And that would then bring them into

3    compliance.  And if they failed on either of those tasks,

4    then the order provides that the case would be converted to

5    Chapter 7.  So the Trustee submitted his motion for interim

6    distribution and, therefore, carries with it the issue of did

7    the debtor meet its obligations under this Court's order of

8    March 12, 2021.

9        We contend that the debtor has not cured its default.

10   That making an interim distribution doesn't cure it in this

11   amount.  And based on the testimony, or lack thereof from

12   Mr. Daneshmandi, I don't know how we can ever really

13   determine what would be necessary to bring the debtor into

14   compliance since his testimony was, he doesn't keep records.

15   So we don't know what has really been spent on these

16   properties.  All we know is that there's been a lot of money

17   requested and paid by the Plan Agent.

18       I think there's ample evidence that this case should be

19   converted to Chapter 7.  We have a history of non-compliance,

20   that being payment requests on barely enough information.  As

21   I'll get into later, there's been active misrepresentation

22   concerning the status of properties and their conditions.

23   The debtor entered into an undisclosed lease of property,

24   which from Mr. Daneshmandi's own testimony, well, since it's

25   not part of the plan, we don't have to report about it.  They

1   have -- the debtor has pursued lawsuits without adequate

2   consultation with the Plan Agent as required by Section

3   4.04.4 of the plan.  And the debtor has increased his salary

4   from $4,000, which is what it was during the case per Court

5   order to $7,500.  And has employed his girlfriend.  So we've

6   had thousands of dollars spent with no distribution to

7   unsecured creditors.

8        Now, I want to run down one particular property.  That

9   being the property on Mays to just show how the size of the

10  problem we got here.  If the Court looks at Caldwell's

11  Exhibit E, that being a letter from Joyce Lindauer in

12  response to a letter from me.  And she's representing that

13  several properties are going to be sold.  That -- in

14  paragraph 4 on page 2, 6012 Mays, the debtor has about a week

15  left on this property, one week, seven days.  This is in

16  February of 2020.  Next go to Caldwell Exhibit G.  Again, a

17  message from Ms. Lindauer also addressing Mays.  And in March

18  of 2020, Mays just needs a custom window and minor touch-up

19  and it's ready to go.  Next go to Exhibit H.  We have an

20  invoice submitted by Mr. Daneshmandi which says that I want

21  $50,000 more in June of 2020 to work on Mays, which in March

22  of 2020 was one week away from being ready for sale.

23       Now, fortunately, that money was not paid out.  Then we

24  move to Exhibit J, an invoice from Mr. Daneshmandi for

25  $24,000 which, again, includes substantial work on the Mays

1  property.  Then Exhibit K.  Mr. Daneshmandi wants another

2  $50,000 for work on the Mays' property, when it had been

3  represented in February of 2020 that it is one week away from

4  sale.  We, of course, have absolutely no backup for any of

5  the amounts that were actually spent by GRC on these

6  properties, because he doesn't keep records.  But you can see

7  from Exhibit B that we spent -- and I'll say, we.  Creditors

8  spent on the Mays' property $114,750 after it was represented

9  it was one week away from selling.  That's who we're dealing

10  with.

11       We have got unaccounted for thousands of dollars.  And,

12  frankly, unknown how we're ever going to account for it.  The

13  proposal to simply say, okay, yeah, you got us, here's a few

14  hundred thousand dollars, that doesn't fix the problem.  It's

15  certainly not a plan modification.  And it doesn't bring this

16  debtor into compliance with what the Court determined the

17  debtor was supposed to be doing.  But it improperly spent

18  money from the unsecured creditors' pool.  There's been no

19  distributions.  Given the evidence that's before the Court

20  today, we think the only solution is the appointment of a

21  Trustee or conversion to Chapter 7.

22       That concludes my argument.

23            THE COURT:  Okay.  Are you suggesting that

24  Mr. Moser paid -- that were improper, or made distributions

25  that were somehow improper, Mr. Nicoud?

1          MR. NICOUD:  Well, that it was certainly

2  requested of him.  Not in compliance with the -- with

3  insufficient justification.  Just to say, oh, I want $50,000

4  for this general work on Mays.

5          THE COURT:  Okay.  But, again, I'm not

6  understanding your argument.

7      Are you suggesting that Mr. Moser somehow made

8  distributions under the plan that were improper?  Or are you

9  simply saying some of the requests that the debtor made, or

10  the debtor's principal made were somehow improper?  But I

11  don't see where Mr. Moser actually paid out on these that was

12  improper.  That's what I'm trying to understand.

13          MR. NICOUD:  It was improper for

14  Mr. Daneshmandi to make requests and get paid on the invoices

15  that were not in compliance with the plan.  So that is the

16  improper act.  Further is improper for him to,

17   Mr. Daneshmandi, not to maintain records of what the debtor

18  then spends on its subcontractors and what other expenses it

19  may have.

20          THE COURT:  Okay.  But, again, I'm still not

21  understanding.  Explain this to me.  Okay?

22      You're asking for a Trustee to be appointed, or the

23  case to be converted.  I understand that that's what you're

24  asking for.  But we already have a Plan Trustee who makes

25  determinations about what gets paid and what doesn't get

 1  paid.  So unless he's doing something wrong, I don't really

 2  understand what the purpose would be of appointing a Chapter

 3  11 Trustee, or converting the case, at this juncture.  So can

 4  you explain that to me?

 5              MR. NICOUD:  Okay.  The Plan Agent's role was

 6  defined by the plan, which is to take the money in and pay

 7  the money out.  The Plan Agent was not responsible for

 8  getting -- for working with subcontractors.  Not responsible

 9  for supervising the work being done.  His role is limited.  A

10  Trustee would take complete control of everything from

11  beginning to end.

12              THE COURT:  Again, here's my question, though.

13  The Plan Trustee was put in place to make plan distributions

14  and make payments on any invoices and make plan

15  distributions.  Is that not correct?

16              MR. NICOUD:  Yes, that's correct.

17              THE COURT:  Okay.  So the thing that you're

18  complaining about is that there were somehow distributions

19  made, payments made to the debtor's principal that were

20  somehow improper, right?  But that also goes to -- so what

21  you're saying is, in effect, that Mr. Moser made plan

22  distributions that were improper and so now we need a full-on

23  Trustee.  I guess what I'm trying to understand, again,

24  Mr. Nicoud, is the issue that you're complaining about has to

25  do with, you know, the disbursements.  That funds were paid

1   out that should have been paid out to unsecured creditors

2   rather than to the various contractors and/or the debtor's

3   principal, and they should not have been paid out.  So you

4   are, in fact, saying that Mr. Moser did something improper

5   and we need a different Trustee who has more -- broader

6   rights.  Except the issue still relates to the disbursements,

7   which he does have a role in.

8              MR. NICOUD:  Well, what you said is correct.

9   The Court previously found that the debtor was in default

10  under the plan.  How that default came about would be a

11  combination.  It's improper request/improper payment.  And

12  that the only way around that I see -- and I think the flaw

13  is that the Plan Agent is not a Trustee.  And that we need a

14  Trustee, someone in here who can control this from beginning

15  to end.  Because we're going to end up somewhere down the

16  line where all of these assets are sold and we've got a

17  couple of thousand dollars in the account and that's it.

18             THE COURT:  And somehow having a Chapter 11

19  Trustee in place is going to change that?

20             MR. NICOUD:  Yes.

21             THE COURT:  Okay.  Explain that to me.  I'm

22  trying to understand exactly what we're talking about, what

23  you are talking about.

24             MR. NICOUD:  The Chapter 11 Trustee will have

25  the power to say, we're not doing any more work on this

1   house, or that house.  I'm listing it for sale.  Here's the

2   price we're going to list it at.  Or, the Chapter 11 Trustee

3   can say, okay.  I've looked at this.  Here's what I think we

4   should spend.  You file a proper motion with the Court.

5   Whatever procedure has to be in place so we know down to the

6   penny where the money is going, what it's supposed to be for.

7   And if creditors disagree with how it's being spent, the

8   Court can resolve that issue.

9          THE COURT:  Okay.  All right.

10       Let me hear from the other parties.

11         MR. MITCHELL:  Your Honor, this is Greg

12  Mitchell for the debtor.

13       We obviously would request that the Court grant the

14  Plan Agent's motion.  Allow the distributions to be made.

15  Allow the debtor to continue to maximize the value of the

16  estate by repairing and remodeling the remaining properties

17  prior to their sale.

18       Mr. Caldwell has put on evidence here today that we

19  believe simply focuses on the existence of a default.  And to

20  some extent out of fear that the Court might focus on that

21  evidence, we've spent much of our time responding to that

22  evidence.  But we would submit that most of that evidence is

23  irrelevant to the issues before the Court today, which we

24  believe to be fairly narrow, including, number one, the

25  actions proposed in the Plan Agent's motion bring the debtor

1    into compliance with the plan as confirmed.  And, number two,

2    if not, what result makes sense in terms of the best interest

3    of all parties.  Does it make sense to push the parties

4    either to continue as they're doing now to try to maximize,

5    maybe mediate the issues, the differences in an attempt to

6    maximize, or simply converting to Chapter 7?

7         Mr. Nicoud has thrown around numbers that without any

8    context don't really mean anything.  There was an $800,000

9    number that was thrown out without really considering the

10   authorized expenses that GRC incurred every month; mortgage

11   payments, ad valorem taxes, attorney's fees, Trustee fees,

12   Plan Agent fees, administrative costs, payments to pay

13   utilities for each of the properties.  It's not as if the

14   debtor has been running around, you know, gambling with the

15   money.  The money was spent on expenses that needed to be

16   paid, which is entirely consistent with the confirmed plan.

17   I think the lack of context substantially decreases the

18   credibility of the complaint.

19        As to the first issue, as far as coming into

20   compliance.  Once again, we believe it does.  We believe that

21   the focus of the Court's finding regarding breach was the

22   failure  to provide distributions.  We do not believe that

23   the Court found nor do we believe that the confirmed plan

24   prohibits the debtor spending funds to maximize the value of

25   the properties, or the making of payments to the debtor's

1  principal.  We believe that the plan contemplates the type of

2  conduct that the debtor engaged in in order to maximize the

3  value of the property.  The notion of value maximization by

4  development is not exactly a novel concept.  I mean, the

5  whole reason that developers develop properties is their

6  belief that by doing so, they will realize a greater return

7  than they would by simply selling the property as is.

8       I would also point out that the notion of developing

9  the properties to maximize value is not inconsistent with a

10  liquidating plan.  Because, again, we believe that the plan

11  fully contemplated a liquidation plan that maximizes value by

12  fixing up the properties prior to sale.  And that that effort

13  would necessarily involve expenses.  And I think you don't

14  have to look any further than the budget that was attached to

15  the disclosure statement that was filed two years ago to see

16  that there was several hundred thousand dollars contemplated

17  as expenses that would need to be incurred, in order to bring

18  the properties up to sale and maximize the value to the

19  estate.

20       Mr. Caldwell argues that the efforts took longer than

21  expected.  And to that point, we do not disagree.  At the

22  risk of stating the obvious, we're just now starting to

23  emerge from the year long pandemic that did not by any means

24  spare the real estate industry.  Labor shortages existed,

25  supply chains were disrupted, and, you know, costs

1   mushroomed.  And despite all of the challenges, this debtor

2   managed to fix up and sell some of its property.  Yes, it

3   took a little longer than expected.  But we submit the result

4   is consistent with the results contemplated by the plan.

5   Much of that success we would submit comes as a result of the

6   efforts of the debtor's principal, who did much of the work

7   himself.  That effort led to a couple of the facts being

8   argued here today.  Both that the effort took a little longer

9   and that the debtor's principal was paid for his efforts.  We

10  don't think that was inappropriate at all.  But it's not

11  necessary for the Court to make a determination as to the

12  efforts of the debtor's principal today.  It's only necessary

13  for the Court to determine that the proposed actions of the

14  Plan Agent bring the debtor into compliance with its

15  confirmed plan.  And we believe it does.

16       As a last point in the first issue, we would point out

17  that the Court's ruling in which it found a brief, which we

18  attached as Exhibit 7 to our witness and exhibit list,

19  contemplated an either or scenario.  Either come into

20  compliance what the plan confirmed, or that the debtor

21  properly modify the plan.  We believe that the Court's ruling

22  implies that coming into compliance is an option.  And we

23  believe that the Plan Agent's motion does just that.

24       Turning to the second issue.  If and only if the Court

25  were to find for some reason that the Plan Agent's motion

1   does not bring the debtor into compliance, what is in the

2   best interest of the creditors and the estate?  As a

3   technical matter, I'm not sure this issue is before the

4   Court.  But if the Court goes this direction, we would

5   certainly want the opportunity to weigh in.  And I don't want

6   to ignore it, in case the Court is prepared to go that

7   direction today.

8        Mr. Caldwell argues that Chapter 7 is in the best

9   interest.  We believe we have shown today that Mr. Caldwell's

10  position is driven by more emotional consideration based on

11  his clear lack of trust of the debtor's principal.  Whether

12  or not that lack of trust is justified or not is not really

13  relevant.  He admitted that he didn't even consider other

14  alternatives to Chapter 7.  He admits that he received some

15  proposals, but he never read them.  We believe Mr. Caldwell's

16  position doesn't take into account the consideration of

17  anyone but Mr. Caldwell.  And, ultimately, we don't really

18  believe that Chapter 7 is even in Mr. Caldwell's best

19  interest.  We believe he probably realizes this.  It's just

20  that his mis-trust of the debtor's principal overrides any

21  attempt at a rational analysis.

22       As we noted in our reply to Mr. Caldwell's objection,

23  and I believe Mr. Daneshmandi referenced in his comments

24  today, the debtor has made a proposal that it believes will

25  return somewhere between 45 and 50 percent to Mr. Caldwell,

 1  whereas we believe that a Chapter 7 would lead to somewhere

 2  closer to a 25 to 30 percent return.  That at least warrants

 3  further consideration, which we don't believe Mr. Caldwell

 4  has done.  And that is why we propose as an alternative to

 5  approving the Plan Agent's motion, to the extent the Court is

 6  not going to grant that, then he returns to mediation, prior

 7  to giving up on it and throwing in the towel.  The hope would

 8  be that a mediator could bring the parties together in a way

 9  that would allow for the maximization of value to occur in a

10  way that addresses both parties' concerns and which has

11  really just been the debtor's goal all along.

12      Finally, I would just kind of echo some of the comments

13  that the Court made by way of its questions to Mr. Nicoud.

14  And that is, despite whatever concern there was about

15  payments that were made to Mr. Daneshmandi or made on behalf

16  of the debtor, there was regular communication with

17  Mr. Moser.  And Mr. Moser, you know, testified today that he

18  didn't simply pay an invoice simply because it was presented

19  to him.  He would ask questions.  And we saw evidence today

20  that -- where he did ask questions.  And we saw where the

21  supporting documentation was provided.  And we saw -- we

22  heard Mr. Moser tell us that he actually went out to visit

23  some of the properties to make sure that the work that he was

24  paying for was being done.

25      We believe, you know, if you're going to listen to

1   anybody in terms of credibility, you know, you've got two

2   parties here today that are clearly invested, Mr. Caldwell

3   and Mr. Daneshmandi.  If you're having trouble weighing

4   those, consider Mr. Moser's testimony.  Because he's a

5   disinterested third party.  I don't think he cares one way or

6   the other whether one party wins.  He testified credibly that

7   he verified payments.  He made payments where he thought it

8   was appropriate.  And we believe that's where we are.  And we

9   believe that his motion does what the Court directed and it

10  brings into compliance the debtor.  And we would ask the

11  Court to approve the motion.

12            THE COURT:  Thank you.

13       All right.  Having considered the evidence, having

14  heard arguments of counsel, and reviewed the pleadings filed

15  in this case, the Court finds that the motion to make a

16  distribution should be granted.

17       Mr. Moser, it's your motion, so I'm going to ask that

18  you submit an order consistent with the Court's ruling.

19            MR. MOSER:  Yes, ma'am.

20            THE COURT:  Thank you.  All right.  Parties

21  are excused and we're adjourned.

22            (End of Proceedings.)

23

24

25            C E R T I F I C A T E

1          I, CINDY SUMNER, do hereby certify that the

2    foregoing constitutes a full, true, and complete

3    transcription of the proceedings as heretofore set forth in

4    the above-captioned and numbered cause in typewriting before

5    me.

6

7

8

9

10

11

12

13                                   /s/Cindy Sumner

14                          _____

15                          CINDY SUMNER, CSR #5832
                            Expires 10-31-2022
16                          Cindy Sumner, CSR
                            5001 Vineyard Lane
17                          McKinney, Texas 75070
                            214 802-7196
18

19

20

21

22

23

24

25